1

**NEXUS BANKRUPTCY**
BENJAMIN HESTON (297798)
100 Bayview Circle #100
Newport Beach, CA 92660
Tel: (949) 312-1377
Fax: (949) 288-2054
*ben@nexusbk.com*

2

3

4

5

**LAW OFFICES OF RICHARD A. LUCAL**
RICHARD A. LUCAL (143372)
333 S. Juniper Street, #100
Escondido, CA 92025
Tel: (760) 741-8141
Fax:  (760) 741-8145
*ral@looral.com*

6

7

8

9

Attorneys for Plaintiff

10

**UNITED STATES BANKRUPTCY COURT**

11

**CENTRAL DISTRICT OF CALIFORNIA**

12

**RIVERSIDE DIVISION**

13

14

15

16

17

18

19

20

21

22

23

| | |
|---|---|
| In re:<br><br>MICHAEL PAUL NEWMAN,<br><br>           Debtor. | Case No.: 6:21-bk-11329-SC<br><br>Chapter 7<br><br>Adv. No.: 6:21-ap-01071-SC |
| SANG HOON LEE,<br><br>           Plaintiff,<br><br>v.<br><br>MICHAEL PAUL NEWMAN,<br><br>           Defendant | **PLAINTIFF'S TRIAL BRIEF**<br><br><u>Trial</u><br>Date:          October 30, 2023<br>Time:          9:30 a.m.<br>Courtroom:  5C<br>Location:    411 W. Fourth Street<br>                   Santa Ana, 92701 |

24

25

26

27

28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 7

   A.  Factual Background ................................................................................ 7

   B.  State Bar Court Decision ...................................................................... 14

II.     LAW AND ARGUMENT ............................................................................ 21

   A.  The Doctrine of Collateral Estoppel Applies to Both the State Court Judgment and

       The State Bar Court Decision and Precludes Relitigation of Issues ...................... 21

   B.  Defendant Committed Defalcation While Acting In A Fiduciary Capacity ........... 23

   C.  Defendant Committed Embezzlement ................................................. 25

   D.  Defendant Committed Willful And Malicious Injury To Plaintiff's Property ....... 26

III     CONCLUSION ............................................................................................ 28

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Banks v. Gill Distrib. Ctrs., Inc.*, 263 F.3d 862 (9th Cir. 2001)……………………..…………24

*Brosterhaus v. State Bar* (1995) 12 Cal.4[th] 315……………………………………………...22

*Bullock v. BankChampaign, N.A.*, 569 U.S. 267………………………………………….…24

*Burdette v. Carrier Corp.*, 158 Cal.App.4th 1668, 1689, 71 Cal.Rptr.3d 185, 201 (2008)......... 22

*Carillo v. Su (In re Su)*, 290 F.3d 1140 (9th Cir. 2002)…………………………………….…26

*Comcast of L.A., Inc. v. Sandoval (In re: Sandoval)*, 341 B.R. 282 (Bankr, C.D. 2006)……….26

*Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 153-54 (1934)............................... 26

*Gayden v. Nourbakhsh* (*In re Nourbakhsh*), 67 F.3d 798, 800 (9th Cir. 1995)........................... 26

*Grogan v. Garner*, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)................ 21

*In re Harmon*, 250 F.3d 1240, 1245 (9th Cir. 2001) ...................................................... 21

*In re Littlejon*, 942 F.2d 551 (9th Cir. 1991)………………………………………….…25,26

*In re Peklar*, 260 F.3d 1035 (9th Cir. 2001) ...................................................... 26

*Kawaauhau v. Geiger, 523* U.S. 57 (1998)........................................................... 26

*Larsen v. Beekmann*, 276 Cal.App.2d 185, 189, 80 Cal. Rptr. 654 (1969) ................................. 26

*Lucido v. Superior Court (People)*, 51 Cal.3d 335 (Cal. 1990)...................................................... 21

*Maltaman v. State Bar* (1987) 43 Cal.3d 924, 947……………………………………………22

*Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373 (1985)........................................ 21

*Murphy v. Murphy*, 164 Cal. App. 4th 376, 78 Cal. Rptr. 3d 784 (2008)............................... 21,22

*Oney v. Weinberg (In re Weinberg)* 410 B.R. 19……………………...…………………………22

*Otto v. Niles (In re Niles)*, 106 F.3d 1456 (9th Cir. 1997)………………………….....23,24

*Ormsby v. First Am. Title Co. of Nev.*, 591 F.3d 1199………………………………………….26

*People v. Taylor*, 12 Cal.3d 686, 695 (Cal. 1974) ...................................................... 22

*Phillips v. Estate of Arnold* (*In re Phillips*), BAP No. WW-15-1178-TaKuJu (B.A.P. 9th Cir.

   Dec. 16, 2016)……………………………………………………………………...25

*Stephens v. Bigelow (In re Bigelow)*, 271 B.R. 178……………………………………...24

*Transamerica Commercial Fin. Corp. v. Littleton* (*In re Littleton*), 942 F.2d 551

(9th Cir. 1991)...................................................................................................................... 25

*Warner Construction Corp. v. L.A.,* 2 Cal.3d 285 (1970)………………….………………….26


**Statutes**

11 U.S.C. §523(a)(4)..................................................................................... passim

11 U.S.C. §523(a)(6)..................................................................................... passim

28 U.S.C. §1738 ................................................................................................... 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Chloe Taekyeong Lee ("Plaintiff"), Trustee of the Sang Hoon Lee Living Trust, respectfully submits this trial brief.  Plaintiff is the successor to decedent Sang Hoon Lee ("Lee").  Defendant Michael Newman ("Defendant") represented Lee with regard to a personal injury claim, and, as two court's have found, misappropriated $130,000 of Sang Hoon Lee's money from Defendant's attorney-client trust account.  This trial represents Defendant's third bite at the apple on all of the key factual issues to be tried in this matter.  First, Defendant lost a five-day bench trial in 2019 in a civil action filed by Lee in August of 2017 and was found liable for conversion in the amount of $130,000.  (Ex. 67)   The judgment was affirmed after Defendant's appeal. (Ex. 68)

Second, Newman was charged with five counts of professional misconduct by the California State Bar in connection with Newman's representation of two clients, Arms Trans Inc. ("ARMS") and Lee in the same matter.   The State Bar Court found Newman culpable on all five counts including two violations of rules governing conflicts of interest ("failures to properly disclose a relationship with an interested party and to obtain informed written consent to a representation involving potential conflicts of interest") and "three violations of trust accounting duties (failures to maintain client funds in trust, to restore disputed client funds to a trust account, and to promptly pay client funds on request)."  (Ex. 79, p. 1)   As the State Bar Court found: "This misconduct involved a troubling disregard for the duties [Newman] owed his clients over an extended course of dealing.   [Newman] engaged in a problematically conflicted representation, during which he unilaterally withdrew $130,000 more in legal fees from a vulnerable client's settlement funds than the client had agreed to pay." (Ex. 79, pp. 1 and 2) "Due to the serious nature of his misconduct, the substantial aggravating factors – including, most notably, [Newman's] profound lack of insight into the wrongfulness of his acts – and the

limited mitigation, the court recommends that [Newman] be suspended from the practice of law for two years, with execution stayed, and that he be placed on probation for two years with conditions including a six-month actual suspension." (Ex. 79, pp. 1 and 2)    The State Bar Court decision was implemented by the California Supreme Court in April of 2023.  (Ex. 70)

Apparently, with this third bite of the apple, Defendant intends to contradict his sworn testimony in the two prior proceedings and/or to dispute facts necessarily found in the two prior proceedings in order to obtain discharge of both the State Court judgment and the State Bar restitution order.  For instance, Defendant testified in the State Court and State Bar Court that he had Lee sign a blank contingent fee retainer agreement, that, post-signature by Lee, Defendant inserted the contingent fee percentages of 5% (pre-trial) and 10% (trial and post-trial) and that he sent the retainer to the opposing party's insurance carrier.  (See, e.g., ex. 79, p. 9).   Despite this conclusive testimony with requisite findings made by two courts, Defendant has identified issues for trial relating to the terms of the initial retainer and whether Defendant altered it after it was signed by Lee.  (Jt. Pretrial Statement, Litigated Facts 8 and 9).

The exhibits submitted to this Court (including 8 days of trial testimony[1] in two courts and the resulting judgement/decisions made), and the testimony and evidence to be adduced at trial overwhelmingly demonstrate that Defendant committed acts of defalcation [Bankruptcy Code §523(a)(4)], embezzlement [Bankruptcy Code §523(a)(4)] and willful and malicious injury [Bankruptcy Code §523(a)(6)] exempting from discharge both the State Court judgment and the State Bar restitution order.

---

[1]    As to citations to trial testimony, the specific page numbers will be preceded by an "N" for Defendant Newman's testimony, an "L" for Sang Hoon Lee's testimony, an "LP" for Lindy Park's testimony and a "DH" for Dave Hudrlik's testimony.    Park and Hudrlik were and are the owners and managers of ARMS.

# I.

## INTRODUCTION

### A.  Factual Background.

The following factual background is a blend of stipulated facts ("Stip.Facts"), findings of the State Court in support of its conversion judgment, proceedings before the State Bar Court (plus findings), and evidence before this Court (including documentary evidence, 6 volumes of trial testimony from the State Court and State Bar Court), and evidence to be introduced at trial.

Lee was formerly a contractor with Arms Logistics, Inc. ("ARMS"), a local trucking and transport company.  Defendant was in-house counsel for ARMS and held himself out as general counsel to third parties. (Stip.Fact 2; Exs. 2, 5, 24 and 26).    In 2015, Lee was severely injured in a work-related accident involving a driver from Belena Transportation ("Belena"), and both the police report and Belena's insurance carrier identified the Belena driver as being at fault. (Stip. Fact 1 and 2)    At the time of the accident, there were issues with regard to Lee's classification as an independent contractor, and Defendant advised ARMS that he believed Lee was misclassified. (Stip.Fact. 3; Ex. 64).  Prior to Lee's accident, Newman had advised ARMS on classification of drivers and had drafted an independent contractor agreement used by the Company.  (Ex. 64, p. N82:1-26; State Bar Court Decision, ex. 79, p. 7)

In early 2015, ARMS, through one of its owners Lindy Park, agreed to pay Lee a weekly salary, to provide transportation and Korean/English translation services. (Stip.Fact 4)    ARMS also agreed to have Defendant, as its in-house counsel, assist Lee with processing his insurance claim.  (State Bar Court Decision, Ex. 79, pp. 7-8; Ex. 64, pp. LP 194:23-198:22; Ex. 65, pp. L341:4-342:19, 408:22-27, DH308:23-309:24)    As Park discussed with Lee and explained to Defendant, if Lee consulted an attorney other than Defendant, it was unlikely that ARMS would be able to pay Lee and provide the benefits under this agreement.  (Ex. 64, pp. LP194:23-198:12, 202:22-204:25)    Having Defendant represent Lee on his claim protected ARMS from potential litigation with Lee.

As part of his job as in-house counsel for ARMS, Defendant would regularly represent the owners, employees and contractors of ARMS, at the direction of the owners of ARMS, David Hudrlik ("Hudrlik") and Lindy Park ("Park").    When representing these individuals, it would fall under his ARMS/Caravan salary, and Defendant did not collect fees from the owners, employees and contractors separately from his ARMS salary. (Ex. 26)  When dealing with third parties, Defendant would not always identify his affiliation with ARMS but would sometimes use the designation:  "Law Offices of Michael P. Newman."  (State Bar Court decision, Ex. 79, p. 6; Exs. 2, 3, 4, 5, 24, 26, 64 [pp. N20:21-21:3, 21:28-22:17, 23:8-18, 42:10-25, LP193:9-194:1, 200:22-201:11 and 65 [pp. DH303:24-304:2] and Ex. 66 [N509:25-510:9, N560:26-562:5])    With regard to his representation of owners, employees or contractors of ARMS, Newman was always paid directly by ARMS and, in fact, Lee is the only one from whom Defendant sought compensation.  (Ex. 64, pp. 23:8-18, LP193:25-194:1)

In 2015, Defendant took on Lee's representation with regard to his claim against Belena Transportation, which resulted in the creation of a fiduciary attorney-client relationship. (Stip. Fact 5)    As the State Bar Court found, Defendant was jointly representing ARMS and Lee with regard to Lee's personal injury claim, the representation was done without any disclosures of potential conflicts and without the parties giving knowing waivers of any conflicts.  (Exs. 2, 5, 11 and 12; Ex. 79, p. 8)   At the time, Defendant had been an attorney for approximately one year, had no litigation experience and had never handled a personal injury claim.  (Stip. Fact 6)  Lee's native language was Korean and he spoke very little English.   Translation services were provided by Korean-speaking employees of ARMS.  (Stip. Fact 7).   Any information about the litigation provided to Lee was given by Defendant to ARMS and passed on – with Defendant expecting that his statements to ARMS would get to Lee. (Ex. 64, pp. N34:5-18, 35:25-36:3, 41:22-27, 124:24-125:14)   During 2015, Defendant was representing Lee as part of his duties as in-house counsel for ARMS and while being paid a salary at ARMS.  (Ex. 79, p. 8)   Lee and ARMS always understood and believed that Defendant was representing Lee only in Defendant's capacity as the attorney for ARMS, and Lee had no ability to control or direct Defendant.  (Ex.

64, pp. LP198:20-22, and ex. 65, pp. DH306:9-12, 308:23-28, L349:10-19, 357:4-13, 386:1-387:7, 392:16-393:16, 425:8-15)

Defendant was initially unsuccessful trying to negotiate a settlement with Belena's carrier in 2015.  (Stip.Fact 8)    Defendant had, however, sent a demand for about $2.5 million in damages in June of 2015, and, while Belena's carrier did try to attribute 50% fault to Lee, it did not contest the amount of the demand. (Ex. 2, 3, 4, 24 and 64 [pp. N25:28-26:14, 43:7-44:3]) As such and knowing that the Belena policy limit was $1 million, Defendant knew in 2015 that a policy limit offer was likely. (Id.)    Although Defendant was aware of this at the time, it was never disclosed to either ARMS or Lee prior to Defendant demanding the Lee sign a contingency agreement.  (Ex. 64, pp. N44:10-21, 57:11-24, LP205:27-206:22, 209:10-23 and ex. 65, pp. DH308:6-22, L343:14-344:10)

On January 20, 2016, Defendant sent an email to the owners of ARMS, Park and Hudrlik, stating that the Belena carrier required Lee to sign a contingency fee agreement in order for Defendant to talk to him about the claim.  (Stip. Fact 9 and Exs. 5 and 7)    The adjustor did not require a contingency fee agreement but only a representation letter.  (Ex. 24)    The retainer agreement provided by Defendant to ARMS did not include contingency percentages, and Defendant requested that ARMS decided the percentages.  (Ex. 5)    On January 20 or 21, 2016, Lee signed a retainer agreement that Defendant had previously provided to ARMS ("First Retainer Agreement").  (Stip.Fact 10 and exs. 5, 7 and 11; Ex. 64, N52:2-54:6, 58:22-59:24)    At the time that Lee signed the agreement, it included no contingency percentages.   After Lee signed, and without his knowledge, Defendant inserted percentages of 5% if resolved before trial and 10% for trial and post-trial and sent the retainer to the Belena carrier.  (Id.; Exs. 5, 7 and 11) The retainer agreement further provided that Defendant would get nothing if terminated prior to a settlement.  (Exs. 11 and 64, pp. N78:20-79:1)    The First Retainer Agreement: 1) was not dated; 2) did not specify the contingency fee; 3) did not contain disclosures regarding the joint representation of ARMS; 4) falsely stated that Defendant did not represent any other party in connection with the claim; and 5) was written in English. (Ex. 11)    Shortly after the First

Retainer Agreement was signed and submitted by Defendant to the Belena carrier, ARMS

inserted 15% into another copy of the retainer agreement ("Second Retainer Agreement"), and

Lee signed the agreement. (Stip. Fact 11 and exs. 6 and 12; Ex. 65: pp. DH304:26-307:17,

L390:7-18, 410:25-412:3, 412:10-413:25)   Defendant never discussed the terms of either

retainer agreement with Lee, and all of his fee discussions were with the owners of ARMS. (Ex.

64, pp. N35:6-21, 35:25-36:7, 85:16-87:3,  and Ex. 65, L391:27-392:10, 414:4-8, 419:5-

23, DH304:26-306:12)   Defendant, without disclosing that he had already sent the First

Retainer Agreement to the Belena carrier and begun a dialog, explained to ARMS that 15% was

required for the Belena carrier to take him seriously. (Ex. 65, pp. DH304:26-307:17)

With both the First Retainer Agreement and the Second Retainer Agreement and based

on oral and written statements by Defendant (Ex. 5), both ARMS and Lee believed that

Defendant was continuing to represent Lee as ARMS in-house counsel and under his ARMS

salary, and that the retainers did not change the nature of the representation. (Ex. 64, pp.

LP198:20-22,  and ex. 65, pp. DH304:26-305:12, 306:9-12, 308:23-28, L349:10-19, 386:1-

387:7, 392:16-393:16, 425:8-15)   Defendant never explained to Lee or ARMS that he expected

to be paid under the retainer agreement, and never discussed the retainer directly with Lee at any

time. (Ex. 65, pp. N (depo) 431:10-432:26)   Defendant never explained to ARMS or Lee that

the representation could be conducted either hourly, on a contingency, or any other basis. (Ex.

65, pp. DH307:18-25 and LP209:15-17, L413:6-10)

As Newman expected and after Lee signed a contingency fee retainer, it took only a few

phone calls to the Belena carrier to get a policy limits offer of $1 million.  (Ex. 7, 9, 10, 24 and

ex. 64, pp. pp. N43:7-44:3)   At the same time that Defendant was representing Lee with regard

to his dispute with Belena, he was actively representing ARMS with regard to this same dispute

as well as any potential claims that Lee might have against ARMS. (Ex. 69, pp. 22-25, and ex.

65, pp. DH309:10-24 and ex. 66, N (depo) pp. 560:26-564:16)   Defendant drafted various

versions of agreements between Lee and ARMS which identified Lee as an independent

contractor, agreed to have Lee repay ARMS, and agreed to have Lee waive any potential claims

against ARMS. (Exs. 10, 13, 14 and 16;  Ex. 64, pp. N76:27-78:5, 79:23-80:23; Ex. 65, pp. DH311:18-313:10)   The State Bar Court found this to be a troubling conflict of interest which precluded Defendant from providing Lee with competent advice about his claims.

As found in the State Court judgment (with findings) and the State Bar Court decision, Defendant, after the anticipated $1 million offer from Belena's carrier was received, responded to a question from Lindy Park as to whether the Second Retainer Agreement should be modified. (Ex. 10)   Defendant said: "I wouldn't have taken the 15% anyways, better to leave to show discount." (Ex. 10)   At the time that Defendant sent this email, he knew that the Second Retainer Agreement could be terminated by Lee with him getting no fee.  (Ex. 12; Ex. 64, pp. N78:20-79:1)

Between this February 26, 2016 email exchange between Defendant and Park and Lee's execution of documents on March 16, 2016, ARMS entered into an agreement with Lee that 15% of the settlement proceeds would be used to reimburse ARMS, and ARMS would pay Defendant from those proceeds. (L347:3-26, 349:10-19, 414:4-415:1, 425:25-426:6, LP283:11-287:22, 300:23-301:7, DH308:23-28)   Defendant met with Hudrlik and agreed that he would get a flat fee of $20,000 from the settlement (with the remaining $130,000 going to ARMS). (Ex. 64, pp. LP213:21-26, 223:22-224:1, and Ex. 65, pp. DH311:10-17, 313:4-10)  This was confirmed as a necessary finding of fact in both the State Court judgment and the State Bar Court decision.   Defendant then amended the agreement between Lee and ARMS to have Lee repay ARMS $130,000. (Ex. 16; Exs. 64, pp. 79:23-80:23 and ex. 65, pp. 311:18-313:10)   In this Defendant-drafted agreement, Lee waived any potential claims against ARMS, confirmed that he was an independent contractor, and agreed that ARMS would be reimbursed $130,000 from the settlement for compensation and services provided.

Both the amended Lee/ARMS agreement and the Belena settlement release were signed by Lee on March 16, 2016 with Defendant, an ARMS translator, Lee, and a notary present.   (Ex. 64, pp. N89:5-90:8)    During this meeting, Defendant, with a translator present, made no effort to discuss either agreement or any other issues with Lee. (Ex. 66, pp. N560:12-22, 563:4-564:16)    Neither prior to nor during the March 16, 2016 meeting, did Defendant disclose that he always intended to retain $150,000 from the settlement funds. (Ex. 64, pp. N57:15-17, 59:25-60:18, 84:10-22, 90:20-28, LP228:13-16, Ex. 65, pp. DH313:4-10, L348:17-24, 349:4-23, and Ex. 66, pp. N516:27-517:22, 542:1-24  N545:15-17)    If Lee had been made aware that Defendant would be retaining $150,000, he would not have entered into this agreement which provided for an additional payment of $130,000 to ARMS.    As both the State Court and State Bar Court found, Lee had agreed with ARMS to allow ARMS to keep 15% of the settlement, and ARMS would compensate Defendant from this amount.  (Ex. 65, pp. L349:10-23).

In late March of 2016, Defendant received the settlement funds, and, on March 28, 2016, sent a letter to LEE which stated that 15% of the settlement would be paid to Defendant and $130,000 to ARMS.  (Stip. Fact 13)    While Defendant knew that Lee required a translator to obtain information about his claim, Defendant sent the letter in English and did not provide a copy to his other client, ARMS, who would have also handled the translation. (Ex. 17;  Ex. 64, pp. N93:28-95:9, LP229:3-14; Ex. 65, pp. L357:27-358:13)    With his understanding that $150,000 from the settlement funds was to pay both any obligation to ARMS and Defendant, Lee objected to Defendant's letter providing for $280,000 to be paid. (Ex. 65, pp. L351:4-352:6, 386:1-19)    He then talked with Lindy Park who confirmed that Defendant was to only receive $20,000 with ARMS receiving $130,000 and the total ARMS/Newman payment to be $150,000 from the settlement.  (Ex. 64, pp. LP229:3-230:26, 297:17-22)

On or about April 8, 2016, a little over a week after the settlement funds cleared his account, Defendant paid himself $150,000 which was deposited in his general business account.

(Stip.Fact 14)   In July, 2016, Hudrlik sent Defendant an email to discuss the fee issue and get

Defendant involved in a meeting with Lee, with Park available to translate and with Hudrlik

present. (Ex. 18)   Defendant refused and immediately resigned. (Ex. 64, pp. N157:4-6, 102:22-

104:4, and ex. 65, pp. DH317:18-318:9)   For the first time, Defendant claimed that his accepting

$20,000 and ARMS getting $130,000 from the settlement would be unethical fee-splitting and

that he intended to keep the full $150,000 – despite his earlier agreement. (Ex. 64, pp. N140:1-9,

177:26-178:16, LP 212:10-213:20, 228:17-19 and Ex. 65, pp. DH313:11-314:20-23, 314:27-

315:19, L349:20-23)   During the State Court trial, Defendant admitted that he could always

discount his fees to $20,000 and Lee could agree to pay $130,000 to ARMS without implicating

any fee-splitting issues.  (Ex. 66, pp. N571:22-572:3)

On August 2, 2016, Defendant personally delivered a letter to Lee, in English, with a

summary of the allocations of the settlement proceeds and which showed $150,000 paid to

Defendant – with nothing to ARMS. (Ex. 20)   For the first time, Defendant gave Lee a business

card indicating that he was not working for ARMS. (Ex. 65, pp. L354:8-19)  When Lee found

out that Defendant had not paid ARMS from the $150,000, he paid $130,000 to ARMS.  (Ex. 20;

Ex. 64, pp. LP234:15-235:5, and Ex. 65, pp. L355:22-356:14)     In an August 2016 email, Lee

demanded that Defendant reimburse the $130,000 to Lee.  (Ex. 19)   Defendant refused and told

Lee that he could initiate a fee arbitration.

On August 28, 2017, Lee sued Defendant in Riverside Superior Court for conversion,

malpractice, and fraud.   After a 5-day bench trial in March and April of 2019, the Court entered

judgment on the conversion claim for $130,000 plus interest from April 8, 2016.  The Court

dismissed the malpractice claim as untimely and found that Lee had not met his evidentiary

burden on the fraud claim.   In July of 2019, the Court entered a statement of decision.

(Stip.Facts, 15-20).   As to the conversion claim, the Court found that Defendant had agreed to

accept $20,000 from the settlement funds for representing Lee, and, by taking $150,000, had

converted $130,000. (Stip.Fact 19)  After the parties appealed, the Court of Appeals affirmed the

judgment. (Stip.Fact 23)  Defendant thereafter sought to discharge the judgment through a

Chapter 7 bankruptcy.  Plaintiff then timely filed the instant adversary proceeding.


### B.  <u>State Bar Court Decision</u>.

In October, 2021, the State Bar initiated disciplinary proceedings against Defendant, and

a three-day trial was held in April of 2022.   In its Decision, the Court stated, ex. 79, pp. 4-5, "In

this discipline case, the court has applied the clear and convincing evidence standard of proof to

independently assess the records admitted from the relevant civil proceedings, resolving all

reasonable doubts in [Newman's] favor."   "In addition, [Newman] was given fair opportunity to

present evidence to contradict, temper, or explain all admitted civil records."   After three days of

live testimony, the State Bar Court found Newman culpable on all five counts including two

violations of rules governing conflicts of interest ("failures to properly disclose a relationship

with an interested party and to obtain informed written consent to a representation involving

potential conflicts of interest") and "three violations of trust accounting duties (failures to

maintain client funds in trust, to restore disputed client funds to a trust account, and to promptly

pay client funds on request."   (Ex. 79, p. 1)

The Court found that all of the culpability witnesses were highly credible (Lindy Park,

David Hudrlik, Rajendra Karki, and Richard Lucal) – with the notable exception of Defendant.

(Ex. 79, p. 5)   The judge found Defendant's factual accounts unreasonable and contrary to the

overwhelming weight of the evidence (including documents and credible witness testimony).

Defendant was evasive. (Ex. 79, p. 6)

The State Bar Court confirmed the factual analysis above as to Defendant's work for ARMS and on behalf of its owners, employees, contractors for a set salary, that Defendant advised ARMS on classification of truck drivers and drafted an independent contractor agreement that applied to Lee, that Defendant informed ARMS that he believed Lee was misclassified at the time of the accident, that ARMS entered into an agreement with Lee to provide weekly compensation, translation and transportation services and Defendant's legal assistance with the Belena insurance claim, that Defendant, at ARMS' request, began assisting Lee in January, 2015, that Defendant had minimal contact with Lee throughout the representation, and that Defendant was representing Lee under his regular ARMS salary.  (Ex. 79, p. 6-9)    The Court specifically confirmed the above analysis as to issues regarding the First Retainer Agreement, the lack of any informed waiver of conflicts, the false statement that Defendant only represented Lee in the dispute and that Defendant never discussed conflicts of interest with Lee.  (Ex. 79, pp. 8-10)    Park, Hudrlik and Lee all understood that both the First and Second Retainer Agreements were sent for the purpose of allowing Defendant to negotiate with Belena's adjustor and not to change the fact that his work for Lee was being done under his ARMS salary. (Ex. 79, p. 10-11)    The Court further did confirm that Defendant had directed Lee to initially sign a retainer without percentages, had later inserted the percentages of 5% and 10% and had sent the retainer to the Belena insurance adjuster. (Ex. 79, p. 11)    Defendant never discussed either retainer with Lee.   Lee and ARMS agreed that ARMS would get 15% from any settlement and would compensate Defendant from that amount – with the agreement that $130,000 would go to ARMS (as reimbursement for salary and other benefits provided) and $20,000 to Defendant. (Ex. 79, p. 12)    The Court discusses, at length, the February 26, 2016 email exchange between Defendant and Park in which Defendant stated:  "I wouldn't have taken

the 15% anyways, better to leave to show discount" and which attached a draft agreement

between ARMS and Lee which was prepared by Defendant (as well as prior drafts).  (Ex. 79, pp.

12-14 and ex. 10, 13, 14, 16)    The Court found this statement to be consistent with the

testimony that the Second Retainer Agreement was not agreed to by Lee, was believed by Lee to

be required only to have Defendant negotiate with the Belena carrier, and did not represent an

agreement by Lee to pay Defendant 15% of the settlement.

As to Defendant's March 28, 2016 summary of expense sent to Lee (after Defendant had

received the $1 million settlement), the Court found that Lee had objected to paying $150,000 to

Defendant and $130,000 to ARMS – as he had only agreed to a total of $150,000 to cover both.

This was confirmed by ARMS. (Ex. 79, p. 15)   As to the work performed by Defendant after the

retainer was signed, it included minimal contact with the Belena carrier to get the $1 million

settlement and little effort to negotiate discounts in Lee's medical bills.  (Ex. 79, p. 17)

The Court noted that Defendant for the first time raised a claim that paying $130,000 to

ARMS would be illegal fee splitting at a July 12, 2016 meeting.   (Ex. 79, p. 16)   The Court

discussed Defendant's final settlement accounting, Lee's payment of $130,000 to ARMS in

August, 2016 and Lee's August 23, 2016 demand that Defendant reimburse the $130,000 – as

well as Defendant's response. (Ex. 79, p. 17-18)    All of the State Bar Court's findings are

consistent with and corroborate the factual discussion above.

After making factual findings applying the clear and convincing standard, the Court

found that Defendant violated California Rule of Professional Conduct 3.310(B)(3) by failing to

disclose to Lee his relationship with ARMS, that Defendant knew that ARMS had a substantial

interest in the outcome of Lee's case, that a settlement with Belena would reduce the likelihood

of a claim against ARMS by Lee, and that a settlement would end ARMS' requirement to make

payments and provide other services to Lee.  "Arms' interests were a motivating factor in its

request that [Defendant] work on Lee's claim to begin with, infecting the representation with

conflicts from the outset." (Ex. 79, p. 21)   The conflicts lasted throughout the attorney-client

relationship between Lee and Defendant – from January, 2015 through August, 2016.  Defendant

never provided Lee with written disclosures or obtained an informed waiver of conflicts.  The

Lee/ARMS agreements drafted by Defendant clearly demonstrate the nature of the conflicts as

they had Lee admitting to being an independent contractor, waiving his rights against ARMS and

agreeing to pay substantial money to ARMS. (Ex. 79, pp. 21-22)

      Defendant was also found culpable of violating California Rule of Professional Conduct

3-310(C)(1) by representing two clients in the same matter when the interests of the two clients

potentially conflict without obtaining the informed consent of each.  (Ex. 79, pp. 22-23)

"Nevertheless, [Defendant's] conduct and communications leave no doubt that he was acting as

Arms' counsel, as well as Lee's, with regard to overlapping issues."  (Ex. 79, p. 23)  The Court

gave a detailed description of the numerous potential conflicts raised by Defendant's joint

representation of ARMS and Lee with regard to Lee's claim against Belena and noted that the

conflicts were clear from the outset of Defendant's representation of Lee. (Ex. 79, p. 24)

Defendant failed to "notify each client of the relevant circumstances and the actual and

reasonably foreseeable adverse consequences that the joint nature of the representation would

have on his abilities to represent each." (Ex. 79, p. 24)   While having a duty to Lee to maximize

his recovery, Defendant had a duty to ARMS to protect it from liability to Lee.   Defendant's

"duty of loyalty to Lee *should* have prevented [Defendant] from advising Arms about legal

exposure to, and avoidance of, Lee's potential claims."  (Ex. 79, p. 25)

The Court found Defendant culpable for violating California Rule of Professional Conduct 4-100(A) by failing to maintain clients in a client trust account when the attorney's fee is disputed by the client. (Ex. 79, p. 26)    Defendant was found culpable for depositing the $150,000 in his firm's general account when he knew there was a fee dispute and failing to return $130,000 to the account once Lee further informed Defendant of the dispute in August of 2016. (Ex. 79, pp. 26-28)    The Court found that Lee did not agree to pay a 15% contingency fee to Defendant.    Lee agreed to pay $150,000 in total to ARMS and Defendant, and the agreement was that Defendant would get $20,000 and ARMS $130,000. (Ex. 79, p. 27)    The Court found Defendant culpable for violating California Rule of Professional Conduct 4-100(B)(4) by failing to pay Lee $130,000 on demand. (Ex. 79, p. 28)

The Court was required to evaluate issues of aggravation and mitigation.    As to aggravating circumstances, the Court found that Defendant committed "five distinct ethical violations…" (Ex. 79, p. 29)    This warranted moderate aggravation under applicable rules.    A critical finding with regard to the issues pending in this bankruptcy proceeding, the Court found that Defendant "caused significant harm" to Lee. (Ex. 79, p. 31)    "By engaging in a hopelessly conflicted dual representation, without proper disclosures of the circumstances, [Defendant] deprived Lee of the opportunity to make an informed decision about whether to seek independent, unconflicted counsel to fully advise him on the scope of his potential claims – including those against Arms.    [Defendant] then conducted the representation at Arms' direction, relegating Lee's interests to the backseat, seemingly unaware of his concurrent duties as Lee's fiduciary." (Ex. 79, p. 31)    Defendant, by wrongfully taking $130,000 and refusing to promptly return it at Lee's request, deprived Lee of substantial funds when he was "particularly vulnerable, due to his injuries, related expenses, and inability to work." (Ex. 79, p. 31)    This

significant harm to the client was a basis for substantial aggravation under applicable standards. (Id.)

The Court further found that Defendant's "misconduct also is substantially aggravated by his utter failure to accept responsibility for his actions." (Ex. 79, p. 32)   "Rather than accepting responsibility, [Defendant] has attempted to shift the blame to others, including the principals of Arms."   Defendant displayed a defiant attitude toward the civil judgment.   Defendant "insists that he will never return Lee's money – money he only received because of his position of trust as Lee's fiduciary." (Ex. 79, p. 32)   Defendant's "unwillingness to consider the impropriety of his actions goes 'beyond tenacity to truculence' and poses a risk of further professional misconduct. (Ex. 79, p. 32 [citation omitted])   The Court further found additional aggravation because of Defendant's continuing failure to make restitution and the high level of victim vulnerability.   (Ex. 79, p. 33)

Based on its analysis of the factual and legal issues and aggravating factors (with mitigation considered), the Court imposed six months of actual suspension and an additional 18 months of probation.   The Court ordered that Defendant make restitution of $130,000 plus interest from April 8, 2016 (at 10%), and required the restitution to be made 30 days prior to the end of the probation period. (Ex. 79, p. 41)   The Court awarded sanctions against Defendant.  In April of 2023, the California Supreme Court confirmed the discipline and entered a final order. (Ex. 70).

Each of the factual issues decided by the State Bar Court, by a clear and convincing evidence standard, were essential to its determination of Defendant's culpability for "willfully" violating five rules of professional conduct involving conflicts of interest and client funds and serious aggravating factors.  **In making those specific findings of fact, the State Bar Court**

**rejected as incredible and unbelievable certain testimony from Defendant on the following issues that Defendant is expected to repeat at trial (to contest facts already decided against him)**:  Defendant's claims that: (1) he did not represent Lee until June, 2015 and that there was no conflict because ARMS had orally agreed to pay Lee weekly and to provide services (p. 8, fn 2 and p. 21); (2) Defendant had an oral 15% contingency agreement with ARMS in 2015 (p. 9, fn 3); (3) Defendant did not talk with Hudrlik about changing the fee from the 5% in the First Retainer Agreement to 15% in the Second Retainer Agreement (p. 11, fn. 4); (4) the Second Retainer Agreement was not for the purposes of his talking with Belena's carrier but was to memorialize a prior oral fee agreement (p. 12, fn. 5); (5) he never entered into an agreement with ARMS for $20,000 paid from the settlement for representing Lee (p. 12, fn. 6); (6) the February 26, 2016 email from Defendant to Park was not intended to state that Defendant would take no fee from the Second Retainer Agreement but that he would not take the full 15% unless he negotiated Lee's medical bills to less than $500,000 (p. 13, fn. 7); (7) While Defendant admits to having drafted the first two versions of the ARMS/Lee agreements, he claimed that he did not draft the final agreement in which Lee agreed to pay ARMS $130,000 in reimbursement (p. 14, fn. 8; exs. 8, 13, 14, 16); (8) Lee, after receiving Defendant's March 28, 2016 letter regarding distribution of settlement proceeds, only disputed the payment of $130,000 to ARMS (p. 15, fn. 11); (9) the generic waiver paragraph in his Second Retainer Agreement validly obtained informed consent from Lee (p. 21-24); (10) he did not represent both Lee and ARMS with respect to Lee's accident and injuries (p. 23); and (11) To avoid any responsibility for his action, others were to blame (p. 31).   There can be no doubt that Defendant will give the same testimony in this proceeding and try to contradict the necessary factual findings of the State Bar Court proceedings – leading to two conflicting judicial results.

## II

## LAW AND ARGUMENT

**A.  The Doctrine of Collateral Estoppel Applies to Both the State Court Judgment and the State Bar Court Decision and Precludes Relitigation of Issues.**

Both the State Court judgment and State Bar Court decision (implemented by California Supreme Court order) represent final rulings and the doctrine of collateral estoppel applies to the necessary factual findings made by the respective Courts.

The Ninth Circuit has held:

> Principles of collateral estoppel can be used in the context of bankruptcy adversary proceedings. *Grogan v. Garner*, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Under the Full Faith and Credit Act, 28 U.S.C. § 1738, the preclusive effect of a state court judgment in a subsequent bankruptcy proceeding is determined by the preclusion law of the state in which the judgment was issued. *Gayden v. Nourbakhsh* (*In re Nourbakhsh*), 67 F.3d 798, 800 (9th Cir. 1995) (citing *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985)).

*In re Harmon*, 250 F.3d 1240, 1245 (9th Cir. 2001).

In California, whether collateral estoppel will prevent a party from litigating a fact or issue requires five threshold requirements be met:

> **First**, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. **Second**, this issue must have been actually litigated in the former proceeding. **Third**, it must have been necessarily decided in the former proceeding. **Fourth**, the decision in the former proceeding must be final and on the merits. **Finally**, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Lucido v. Superior Court (People)*, 51 Cal.3d 335, 341 (Cal. 1990); See also *In re Harmon* at 1245; *Murphy v. Murphy*, 164 Cal. App. 4th 376, 78 Cal. Rptr. 3d 784 (2008).

The scope of issues and facts that a party can be collaterally estopped from relitigating require that the court weigh the equities in applying the doctrine:

> Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings?

1  *Burdette v. Carrier Corp.*, 158 Cal.App.4th 1668, 1689, 71 Cal.Rptr.3d 185, 201 (2008).

2  　　　If these requirements are met, the court must then consider whether application of

3  collateral estoppel will further the public policies underlying the doctrine: "(1) to promote

4  judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments

5  which undermine the integrity of the judicial system; and (3) to provide repose by preventing a

6  person from being harassed by vexatious litigation." *People v. Taylor*, 12 Cal.3d 686, 695 (Cal.

7  1974); *Lucido* at 343.  While the State Court proceeding did not involve the narrow issue of

8  dischargeability,

> [t]he fact that different forms of relief are sought in the two lawsuits is irrelevant,
> for if the rule were otherwise, litigation finally would end only when a party ran
> out of counsel whose knowledge and imagination could conceive of different
> theories of relief based upon the same factual background.

*Murphy v. Murphy* at 400-01 (2008); see also *Lucido* at 342 ("the identical issue requirement

addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether

the ultimate issues or dispositions are the same").

　　　With regard to the State Bar Court decision, incorporated by California Supreme Court

Order (Exs. 69 and 79), California law does allow claims preclusion for State Bar Court

decisions because the Court was acting in a judicial capacity and resolved disputed issues of fact

which the parties had adequate opportunity to litigate.  *Maltaman v. State Bar* (1987) 43 Cal.3d

924, 947; *Brosterhaus v. State Bar* (1995) 12 Cal.4th 315, 324.   Further, the findings of the

California State Bar Court are made on the higher evidentiary standard of clear and convincing

evidence. *Oney v. Weinbert (In re Weinberg) 410 B.R. 19, 35.*  Collateral estoppel only applies if

the present issue is identical to an issue decided in a prior proceeding, but this requires only that

"identical factual issues" are at stake in two proceedings – not whether the ultimate issues or

disposition are the same.  *Brosterhaus v. State* Bar (1995) 12 Cal.4th 315, 324; *Lucido v. Superior*

Court (1990) 51 Cal.3d 335, 341-2.

　　　Here, the factual basis for the State Court's determinations of conversion involves

determination of certain necessary issues which are identical to those presented in this adversary

1   proceeding.   This included Defendant's agreement to accept a flat fee of $20,000 for his

2   representation of Lee, his collection of $150,000, and his refusal to return $130,000 at Lee's

3   demand.  As discussed above, the State Bar Court findings, on a clear and convincing standard,

4   are more extensive on issues identical to that presented in this case including:  (1) that Defendant

5   had potential conflicts arising from his joint representation of Lee and ARMS on the same

6   matter; (2) that Defendant failed to disclose these conflicts to Lee or to obtain his knowing

7   consent; (3) that the conflicts of interest prevented Defendant from properly representing Lee,

8   that Defendant promoted the interests of his other client ARMS over Lee, and when Lee was in a

9   highly vulnerable condition; (4) that Defendant operated with a complete disregard for the actual

10   and potential harm to Lee; and (5) that Defendant willfully violated three ethics provisions

11   regarding trust accounting by taking Lee's money and by failing to return it to trust despite a

12   client dispute.   All of these acts were done while Defendant was in a fiduciary position to Lee.

13        The State Court trial took five days and included a number of witnesses, including

14   Defendant.  The State Bar Court trial took three days, included the Court's access to transcripts

15   from the State Court proceeding and had testimony from over 10 witnesses, including Defendant.

16   Defendant was a party to both proceedings and represented by counsel.   The findings of the

17   State Court and State Bar Court effectively establish that Newman misappropriated $130,000

18   while acting in a fiduciary capacity, that the misappropriation was committed with indications of

19   fraud, that Newman displayed a reckless disregard for the potential damage to a very vulnerable

20   client, and that his actions were intentional and wrongful.   Given preclusive effect to those

21   findings, the Court must find defalcation, embezzlement and willful and malicious act –

22   precluding discharge.

23

24     B.  **Defendant Committed Defalcation While Acting in a Fiduciary Capacity.**

25        Section 523(a)(4) provides that debts that arise from a debtor's defalcation while acting

26   in a fiduciary capacity are not dischargeable. A debt is nondischargeable under § 523(a)(4)

27   defalcation, where "1) an express trust existed, 2) the debt was caused by fraud or defalcation,

28

and 3) the debtor acted as a fiduciary to the creditor at the time the debt was created." *Otto v.*

*Niles (In re Niles),* 106 F.3d 1456, 1459 (9th Cir. 1997).

In the Ninth Circuit, an attorney-client relationship may rise to the level of a fiduciary relationship for purposes of § 523(a)(4) if there are client trust funds  involved. *Stephens v. Bigelow* (*In re Bigelow*), 271 B.R. 178, 187 (B.A.P. 9th Cir. 2001).  Here, Defendant was Plaintiff's attorney, and therefore an attorney-client relationship existed.  The State Court found that Defendant converted Plaintiff's funds from a client trust account, and this court, in granting partial summary judgment, and the BAP, on appeal, confirmed that the first and third elements above are satisfied.  (citing to *Banks v. Gill Distrib. Ctrs, Inc.*, 263 F.3d 862 (9th Cir. 2001)

As to the second element above, for a debt to be caused by defalcation, the fiduciary must engage in: (1) bad faith, moral turpitude, or other immoral conduct, (2) ***intentional improper conduct*** or criminally reckless conduct, or (3) conduct in which he, although without actual knowledge of his wrongdoing, was ***willfully blind to or consciously disregarded a substantial and unjustifiable risk*** that a breach of his duties would result.  *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274, 133 S. Ct. 1754, 1760 (2013).

While the State Court judgment was found only to have been a strict liability conversion claim, the State Bar Court did include conclusive findings that Defendant acted in bad faith, moral turpitude or other immoral conduct (justifying the imposition of discipline with aggravating factors), intentional improper conduct, and conduct to which he was "willfully blind to or consciously disregarded a substantial and unjustifiable risk that a breach of his duties would result."  Essentially, the State Bar Court, applying a clear and convincing evidence standard, found every issue necessary for defalcation.   Each of those issues were necessarily decided both with regard to culpability and with regard to the determination of aggravation.

//

//

//

1

    C. **Defendant Committed Embezzlement.**

2

    The Ninth Circuit has held that embezzlement under §523(a)(4) requires three elements:

3 (1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the

4 property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud."

5 *Transamerica Commercial Fin. Corp. v. Littleton* (*In re Littleton*), 942 F.2d 551, 555 (9th Cir.

6 1991) (internal quotation marks and citation omitted); *Phillips v. Estate of Arnold* (*In re*

7 *Phillips*), BAP No. WW-15-1178-TaKuJu (B.A.P. 9th Cir. Dec. 16, 2016) (emphasis added). On

8 Lee's motion for partial summary judgment, this Court, affirmed by the BAP, held that the first

9 and second elements were proven in the State Court proceedings for the purposes of collateral

10 estoppel. The sole issue to be decided in further proceedings whether there were "circumstances

11 indicating fraud."

12

    While this definition requires that one show "circumstances indicating fraud", it is not

13 necessary that all of the elements of fraud be proven in order to prevail under this theory. Both

14 this Court, in its grant of partial summary judgment and the Bankruptcy Appellate Panel,

15 determined that the State Court's finding that Lee did not prove his fraud claim in not preclusive

16 as to the issue of "circumstances indicating fraud." As the Ninth Circuit Bankruptcy Appellate

17 Panel has held: 'the third element of §523(a)(4) embezzlement [fraudulent intent] 'required on

18 indicia of fraud as opposed to proof of all elements of fraud.'" *In re Phillips* at *7:

19

> The state court's findings and conclusions demonstrate[d] numerous indicators of

20     fraud including "intentional conversion of Banana's funds", self-dealing, the
> complete lack of disclosure to Arnold of the improper payments, the lack of a

21     business purpose for the improper payments, the lack of records and invoices, clear
> and convincing evidence of bad faith, and mislabeling the payment of a substantial

22     finder's fee in order to avoid disclosure to Arnold.

23     *In re Phillips*, at *7 (citing to the transcript of the state court proceeding).

24

    Here, the circumstances indicating fraud are substantial and numerous. First, Defendant,

25 as a fiduciary, committed constructive fraud by withholding material information about his

26 substantial conflicts of interest in jointly representing Lee and ARMS on the same matter, his

27 inability to properly assert Lee's claims and rights as a result of the conflict, the likelihood and

28

imminence of obtaining a $1 million settlement at the time that he demanded a contingency fee

retainer agreement, his intent to keep 15% from the settlement proceeds (while exposing Lee to a

$130,000 debt to ARMS), etc.  (*Warner Construction Corp. v. L.A.,* 2 Cal.3d 285, 294 (1970))

His active misrepresentations included stating that the purpose of the contingency fee agreement

was to allow him to talk with the Belena adjustor, and that he did not intend to take the 15%

contingency fee (at a time when he knew the contingency fee agreement could be cancelled with

Defendant receiving nothing).  Lee had no way of discovering the information withheld or the

active misrepresentations.   To the extent that Defendant made false statements to ARMS, he

knew the information would be relayed to and relied on by Lee.   Throughout these events,

Defendant engaged in fraudulent behavior to accomplish his ends of taking Lee's money. These

facts support a finding that the debt at issue is the result of Defendant's embezzlement.


### D. **Defendant Committed Willful and Malicious Injury to Plaintiff's Property.**

Bankruptcy Code section 523(a)(6) excepts from discharge "willful and malicious injury

by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6).   A

creditor must prove both willfulness and malice.  *Ormsby v. First Am. Title Co. of Nev.*, 591 F.3d

1199, 1206 (9th Cir. 2010).   The "willful injury requirement is met only when the debtor has a

subjective motive to inflict injury or when the debtors believes that injury is substantially certain

to result from his own conduct."  *Carillo v. Su (In re Su)* 290 F.3d 1140, 1142 (9th Cir. 2002)

To prevail on a Section 523(a)(6) claim arising from a California conversion judgment, a

creditor must "first establish that a conversion has occurred under California law, and second

that the conversion was willful and malicious."  *Comcast of L.A., Inc. v. Sandoval (In re:*

*Sandoval),* 341 B.R. 282, 295 (Bankr. C.D. 2006)

However, the Court held that this was no longer the law since the United States Supreme

Court in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998) clearly stated that "not every tort judgment

for conversion is exempt from discharge. Negligent or reckless acts... do not suffice to establish

that a resulting injury is 'willful and malicious'". *Kawaauhau* at 63-64 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934)).    This Court may determine that Defendant, who naturally had awareness of the economic value of the money he "intentionally" converted, carried a belief that injury was "substantially certain" to result from his conversion.

As to maliciousness, a plaintiff must show that a defendant committed (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. *Id*.    "When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure." *In re Littleton*, 942 F.2d 551, 554 (9th Cir. 1991).   Accordingly, the Court rejected that such a per se rule exists and held that "[a] judgment for conversion under California law therefore does not, without more, establish that a debt arising out of that judgment is non-dischargeable under § 523(a)(6)." *In re Peklar*, 260 F.3d 1035, 1039 (9th Cir. 2001); see also *Larsen v. Beekmann*, 276 Cal.App.2d 185, 189, 80 Cal. Rptr. 654 (1969) ("a conversion is not per se always a willful and malicious injury to the property of another.").

The "without more" that was missing from *Peklar* is present here.    In addition to the State Court judgment and its findings, the State Bar Court filled in the other requisite findings when it imposed discipline against Defendant for willful ethical violations with substantial aggravating factors and ordered restitution of $130,000 plus interest to Lee.    The evidence was overwhelming on the issue of conflicts of interest, the negative impact on Lee's rights, damage to Lee (a vulnerable client), Defendant's refusal to take responsibility and blatant disregard for his fiduciary responsibilities and duty of loyalty to Lee.   The State Bar Court further found all of the necessary elements to demonstrate that this conduct was intentional, and/or with reckless disregard to any potential damage to Lee.

### III

### CONCLUSION

Wherefore, for the reasons set forth above, and in the interests of justice, Plaintiff respectfully requests that this Court find, based on the legal principle of collateral estoppel applied to the State Court Judgment and State Bar Court decision, and the evidence submitted at trial that the State Court Judgment and State Bar restitution order are non-dischargeable pursuant to Bankruptcy Code sections 523(a)(4) and 523(a)(6).


NEXUS BANKRUPTCY

Date: October 16, 2023                    /s/Benjamin Heston
                                          Benjamin Heston,
                                          Attorney for Plaintiff



LAW OFFICES OF RICHARD A. LUCAL

Date:  October 16, 2023                   /s/Richard Lucal
                                          Richard A. Lucal
                                          Attorney for Plaintiff

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**100 Bayview Circle, Suite 100
Newport Beach, CA 92660**

A true and correct copy of the foregoing document entitled (*specify*): **PLAINTIFF'S TRIAL BRIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 10/16/2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Suzanne C Grandt    suzanne.grandt@calbar.ca.gov, joan.randolph@calbar.ca.gov
Howard B Grobstein (TR)    hbgtrustee@gtllp.com, C135@ecfcbis.com
Donald W Reid    don@donreidlaw.com, 5969661420@filings.docketbird.com
United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____    I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 10/16/2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed (state method for each person or entity served):

The Honorable Scott C. Clarkson
411 West Fourth Street
Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/16/2023 | Benjamin Heston | /s/Benjamin Heston |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**