1   Donald W. Reid – SBN 281743
    LAW OFFICE OF DONALD W. REID
2   PO Box 2227
    Fallbrook, CA 92088
3   (951) 777-2460
    don@donreidlaw.com
4

5   Counsel for Defendant

6
                    **UNITED STATES BANKRUPTCY COURT**
7
          **CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION**
8

9   In re                                   Case No. 6:21-bk-11329-SC

10  MICHAEL PAUL NEWMAN,                     Chapter 7

11
                    Debtor                   Adv. No. 6:21-ap-01071-SC
12
    ───────────────────────────             **DEFENDANT'S TRIAL BRIEF**
13  CHLOE LEE, Trustee of the Sang Hoon Lee
    Living Trust,
14                                           Trial:
                    Plaintiff,               Date:        October 30, 2023
15                                           Time:        9:30 a.m.
    v.                                       Courtroom:   5C
16
    MICHAEL PAUL NEWMAN,
17
                    Defendant.
18

19

20

21

22

23

24

25

26

27

28

                                      i

# TABLE OF CONTENTS

Page

I.    STATEMENT OF FACTS ..................................................................................1

    A.    Newman's Representation of Lee ................................................................1

    B.    The First and Second Retainer Agreements................................................7

    C.    Newman Negotiates $1,000,000 Settlement Offer from Belena
        Transport (Betula Release Agreement).....................................................10

    D.    Lee Separately Agrees to Pay ARMS $130,000 From Settlement
        Funds (ARMS Reimbursement Agreement)..............................................12

    E.    Newman Receives Settlement Funds and Delivers March 28, 2016 Letter
        to Lee Describing Proposed Distributions of Settlement Proceeds ..........14

    F.    Newman Makes Interim Distribution of $100,000 to Lee and Newman
        Pays Himself 15% Contingency Fee Pursuant to the Second Retainer
        Agreement..................................................................................................23

    G.    Newman Negotiates Discounted Payoffs with Medical Creditors ...........23

    H.    ARMS and Lee First Dispute Payment of $150,000 to Newman
        Three Months After the Transfer ..............................................................25

    I.    Lee Files Complaint with California State Bar..........................................27

    J.    Lee Files SC Action against Newman ......................................................28

    K.    Newman Files for Bankruptcy and Lee Files this Adversary
        Proceeding.................................................................................................29

II.    ADMISSIONS AND STIPULATIONS ........................................................29

III.    CLAIMS FOR RELIEF ................................................................................29

    A.    First Claim – Defalcation While Acting in Fiduciary Capacity
        [11 U.S.C. § 523(a)(4)].............................................................................30

    B.    Second and Third Claims – Embezzlement and Larceny
        [11 U.S.C. § 523(a)(4)].............................................................................33

    C.    Fourth Claim – Willful and Malicious Injury [11 U.S.C. § 523(a)(6)] .....34

IV.    CONCLUSION..............................................................................................35

**TO THE HONORABLE SCOTT CLARKSON, U.S. BANKRUPTCY JUDGE,**

**PLAINTIFF AND COUNSEL OF RECORD:**

Defendant Michael Paul Newman ("NEWMAN") submits this Trial Brief in the above-captioned related adversary proceedings in advance of Trial on October 30, 2023.

## I.      STATEMENT OF FACTS[1]

### A.      Newman's Representation of Lee

1.      Sang Hoon Lee ("LEE") formerly worked for Arms Logistics ("ARMS") as a truck driver. In December 2014, LEE was seriously injured in a work-related auto accident involving another transportation truck. The driver in the other truck was employed by Belena Transportation. The police report and Belena Transportation's insurance carrier both found that the Belena Transportation driver was at fault. JPTS ¶ 1; Ex. 1 (Accident Report) at 0001.[2]

2.      At the same time, Michael Paul Newman ("NEWMAN") worked for ARMS as their in-house counsel. NEWMAN was paid by Caravan Canopy, a company that was related to ARMS and was owned and operated by the same individuals, Lindy Park ("PARK") and David Hudrlik ("HUDRLIK"). JPTS ¶ 2.

3.      On January 6, 2015, PARK sent an email to NEWMAN regarding the accident and reads in relevant part:

> Newman, you know about the recent accident with one of our drivers, Sang Hoon Lee at the PORT where he was [caught] between his vehicle and another driver.
>
> Pam Coopersmith works for our insurance agent, Trevor Scott (RSI). She says below that the adjuster from the other party's insurance company will be contacting our driver.
>
> I instructed my driver to inform the adjuster he's not feeling well and can't speak English well so contact Lindy Park, safety officer.

---

[1] NEWMAN acknowledges the Court's request for a "concise" statement of facts. *See* Judge Clark's Regular Procedures for Trial and Evidentiary Hearings. The following Statement of Facts is intended to be concise but it appears lengthy due to the extensive quotations from the Joint Pre-Trial Stipulation [AP Doc. 78] ("JPTS"), as well as from prior court testimony of two important witnesses who are now unavailable for trial: Sang Hoon Lee ("LEE") who is deceased, and Steve Kim, ARMS's former Operations Manager, who NEWMAN has been unable to locate to compel his attendance at trial. The Statement of Facts quotes directly from the record for ease of reference.

[2] All citations are to the batestamp in the lower left and right corners of each trial exhibit.

The adjuster called him today and Sang Hoon Lee told him to contact someone in the office and that he'll get the person's phone number (then called me and asked if he could give out my cell, which is [sic] I ok'd). Sang couldn't get a [hold] of him again. I'm sure the adjuster will call him tomorrow.

I was thinking maybe it would just be better you called the adjuster on Thursday after I give you the details. Just [letting] you known.

I will call you in on Thursday as I will not be here tomorrow.


Thanks,

Lindy

Ex. 2 (Park Email) at 0017.

4.     After LEE was injured in the accident, there were questions raised as to whether LEE was properly classified as an independent contractor. NEWMAN advised ARMS that he believed LEE was misclassified and likely had a claim against ARMS for Labor Code violations. JPTS ¶ 3. During trial in the SC Action (defined below), LEE testified that he discussed his potential misclassification claims against ARMS with PARK after LEE was discharged from the hospital.

> Q.     Now, after the accident, did Mr. Lee ever form a belief that he might have a claim against Arms Trans?
>
> A.     While I [LEE] was in the hospital, that thought never popped up. But after discharge from the hospital, I met with Lindy Park, and she told me that I could possibly sue against the company, and then also I have a right to hire a lawyer. On the other hand, she could possibly help me with the legal aid from the company.
>
> Q.     Who did he understand would be paying for the legal aid?
>
> A.     The company.

Ex. 65 (SC Action Transcript, Vol. 2 of 3) at 0579:4-11 (Lee Testimony through an interpreter).

5.     In early 2015, shortly after LEE's accident, an agreement was reached between LEE and ARMS which provided that ARMS would pay LEE a weekly salary, provide him with Korean/English translation services and transportation services. JPTS ¶ 4. LEE testified this was an <u>oral</u> agreement between PARK (on behalf of ARMS) and himself.

> Q.     Now, did Mr. Lee ever enter an agreement with Lindy Park with regard to living expenses and other help he might receive?
>
> . . .

1    A.    No. I did not sign any written document. I had a good relationship with the company.

2    Q.    By MR. LUCAL: Okay. Did he have an oral agreement to have her help with his expenses and needs?

3

4    A.    Yes. Oral, yes.

    Q.    What was that agreement?

5    A.    Number one, if I hire a lawyer, then I could possibly sue the company for the damages. Number 2, if I don't hire, then the

6    company would help me with all the expenses and – plus $1,000 per

7    a week until I receive a settlement. And also, she promised me – provided me with all the conveniences I would need like

8    interpreting, transportation to and from the hospital.

9        And Lindy allowed me time to mull over his hard proposal. So it took me about a week, and then I came back and decided to

10   accept her offer. The second choice.

11   Q.    Now, was part of that offer that he had to use the company counsel with regard to any insurance claim?

12   . . .

13   THE WITNESS: Yes. That's part of it. Was all included. Because she said that she was going to help me with legal matters using the

14   company counsel.

15   Q.    BY MR. LUCAL: Now, during this time that he has having the company counsel work with him, did he understand that Lindy

16   Park was the one supervising the company counsel?

17   A.    Yes.

18   Q.    Was he relying on Lindy Park to provide him with information as to what Mr. Newman was doing on his case.

19   A.    Correct.

20   Q.    Was he relying on the accuracy of Lindy Park's information?

21   A.    Correct.

22   Q.    Did he have any reason -- based upon his relationship with Lindy Park, did he have any reason to doubt that she would tell him

23   the truth about what was going on?

24   A.    No. None at all.

25   Q.    Now, during the six months after the accident, can he describe for us what types of services Arms would provide for him

26   in order to help assist him with his needs?

27   A.    The company provided me with rides and interpreting services. And he took me to the letters [sic]. I received it from my

28   personal -- my insurance company. Sometimes the company helped

3

1    me with the doing the groceries because I was not able to use my
arm. So services and stuff like that.

2    Ex. 65 at 0579:25-0581:13 (Lee Testimony).

3        6.    NEWMAN was initially reluctant to represent LEE because (1) NEWMAN was

4    busy with other legal matters for ARMS, and (2) NEWMAN and PARK/HUDRLIK disputed the

5    appropriate fee to pay NEWMAN.

6        7.    Steve Kim, ARMS' Operations Manager, testified during the SC Action to

7    NEWMAN's initial reluctance to take on LEE's matter. He testified that he worked for

8    Caravan/ARMS as its Operations Manager from 2016 through early 2018. He further testified that

9    he knew NEWMAN for 15 years, previously at Kumho Tires and then at Caravan, and that he also

10   knew LEE as a driver for ARMS. Ex. 66 at 0716:6-28.

11       8.    Regarding LEE's retention of NEWMAN, Steve Kim testified that NEWMAN

12   informed him that he did not want to represent LEE because he was too busy with ARMS's other

13   legal matters and that there was an initial dispute between NEWMAN and ARMS, specifically

14   PARK and HUDRLIK, regarding the amount of NEWMAN's contingency fee. Steve Kim

15   testified that PARK and HUDRLIK balked at the customary 33 1/3 percent contingency fee, and

16   that they eventually agreed that NEWMAN should represent LEE at a 15% contingency fee:

17       Q.    Okay. Do you recall a time when Mike Newman had
represented Sang Hoon Lee in an injury case that Sang Hoon Lee
18       suffered –

19       A.    Yes.

20       Q.    When was that?

21       A.    I'm not clear on the date, but it should have been maybe
third quarter 2016-ish.

22       Q.    All right. How long – how long did Mike Newman represent
Sang Hoon Lee?
23
. . .
24
         A.    As far as I know, the entire length of his lawsuit. From
25       beginning to end.

26       THE COURT:        Do you have an idea of how many months
we're talking about?
27
         THE WITNESS:      Should have been approximately a year.
28       Maybe a couple months over.

4

Q.      BY MR. MASON: Okay. At the beginning of the representation, do you recall Mike Newman refusing to represent Sang Hoon Lee?

A.      Um, I know he didn't want to. I know he had spoken to me on multiple occasions that he did not want to represent Mr. Lee personally because he was mostly too busy working on Caravans's and Arms' suits, and he didn't want to represent Mr. Lee personally.

Q.      Why was it – was there any other reason that he didn't want?

A.      I also – I know they did have some disagreement between Lindy [Park] or Dave [Hudrlik] – I forget with who – but it was regarding, I guess, lawyer fees.

Q.      And was that dispute at the beginning of his representation?

A.      That was before he agreed to take the case on, so I want to say before, yeah.

Q.      Okay. Do you recall – did Mike later accept representing Sang Hoon Lee?

A.      Yes.

Q.      And do you know why he later accepted the representation?

A.      From what Mike had told me early on, it was – I guess they came to a negotiated – negotiation for Mr. Lee's fees – legal fees.

I know he had talked to me about person – I guess normal personal injury lawyers would make somewhere in the tune of 30-some percent. And I know Lindy and Dave were bulking [sic] at that figure. And Mike didn't want to have to charge that much. So as far as I know, they settled on half, which was about 15 or so.

Q.      And that was at the beginning, when Mike started –

A.      Yes.

Q.      When Mike initially started his representation?

A.      Yeah.

Ex. 66 at 0718:1-0719:28 (Steve Kim Testimony).

9.      When NEWMAN took on LEE's representation, a fiduciary attorney-client relationship was created. JPTS ¶ 5.

10.      At the time NEWMAN took on LEE's case, NEWMAN had been admitted to the State Bar for approximately one year, did not have any litigation experience, and had never handled a personal injury action. JPTS ¶ 6. LEE did not know this; LEE only knew that NEWMAN was general counsel for ARMS.

> Q.    Okay. Now, Mr. Lee, at the time that you started working –
> or having the company counsel work for you, did you have any
> understanding as to what his background? His legal experience and
> expertise?
>
> A.    Not at all. All I knew is he was a general counsel for the
> company.
>
> Q.    Did he ever learn that Mr. Newman had never worked on a
> personal injury case?
>
> A.    No. I never paid attention. I was just focusing on my work.

Ex. 65 at 0582:11-16 (Lee Testimony).

11.    LEE's native language was Korean and he spoke very little English. The translation services, when provided, were by other Korean employees at ARMS. JPTS ¶ 7. Specifically, LEE identified two ARMS employees provided him translation services: (1) Allen Kim, ARMS's Vice President, and (2) Steve Kim, ARMS's Operations Manager. *See* Ex. 65 at 0577:24-27 ("Q. BY MR. LUCAL: Who interpreted for him [LEE] when he had in-person meetings with Mr. Newman? A. At the time, vice president, the Allen Kim. And also Steve [Kim], but on speakerphone.").

12.    LEE did not have a meeting in which PARK and NEWMAN were both present. Ex. 65 at 0577:20-23 (LEE: "I spoke with a Lindy Park in person, but I don't recall an instance in which I had a meeting with Lindy Park and Mr. Newman."). LEE spoke to NEWMAN without a translator twice, but those meetings did not concern the terms of NEWMAN's retention or compensation. Ex. 65 at 0577:28-0578:6 (LEE: "I had a chance to speak with [NEWMAN without a translator] on the phone when I was bringing the medical bills. And on another occasion. And also I spoke with him in person when he was visiting me at my home with a settlement check.").

13.    LEE testified that PARK was his sole source of information about "everything regarding the case."

> Q.    Well, after the retainer agreement was signed by Mr. Lee,
> how many times did Mr. Newman give him the information about
> the case?
>
> A.    And I heard just about everything regarding this case through
> Lindy Park. I never heard anything directly from Newman.

Ex. 65 at 0584:8-13.

14.     Throughout 2015, NEWMAN was unsuccessful in trying to negotiate a settlement with Belena Transportation's insurance carrier. JPTS ¶ 8.

15.     On June 15, 2015, NEWMAN sent a demand letter to Midway Insurance Management International, Inc., which described LEE's extensive injuries and demanded $2,500,000 in compensation. Ex. 3 (Demand Letter) at 0021. NEWMAN contends that this is the time, June 2015, when he first started representing LEE.

16.     On or about September 15, 2015, NEWMAN drafted a Complaint for Personal Damages on behalf of LEE and against Belena Transportation and others. Ex. 4 (Draft Complaint).

**B.     The First and Second Retainer Agreements**

17.     On January 20, 2016, NEWMAN sent an email to HUDRLIK and PARK, the owners of ARMS, which stated that Belena Transportation's insurance carrier required that LEE sign a formal retention agreement in order to be able to talk with NEWMAN and to process the insurance claim. JPTS ¶ 9. Ex. 5 (Newman Email). The email stated in full as follows:

> Hi Lindy,
>
> I have heard from a new administrator from the insurance company. He was reaching out to all of clients that were dealing with the old administrator. I appears that they were not doing their job (explains why I could never get anywhere) and they fired them. This one has assured me that they will not be like the other one and we should get results. He has asked for all the bills (I am working on what I know) and the medical records. Attached is an engagement letter that needs to be signed by Sang if he wishes for me to represent him. It is a contingency based letter although I left blank but standard for personal injury cases. They will not talk to me unless I have this letter.
>
> Thanks,
>
> Michael P Newman
> General Counsel for
> Arms Logistics

Ex. 5 (Newman Email) at 0027.

18.     On January 21, 2016, PARK sent an email to NEWMAN, HUDRLIK, and others in response, instructing NEWMAN to insert a 15% contingency fee in the retainer agreement.

> This is what I want done:

1.  In Newman's contract, put 15%.... Newman keeps and between Arms and Caravan, they will decide how to credit this amount.

2.  Make a separate contract for Sang Hoon Lee and ARMS for the salary we've been giving to be paid back to ARMS by Sang from the winnings.

Allen, as I explained to you.... In case Newman doesn't understand, please explain to him.

Thanks.
Lindy

Ex. 6 (Park Email) at 0033.

19.     On January 20 or 21, 2016, LEE signed a retainer agreement that NEWMAN had previously sent to ARMS ("First Retainer Agreement"). JPTS ¶ 10. Ex. 11 (First Retainer Agreement). The First Retainer Agreement represents that NEWMAN would receive a 5% contingency fee on any settlement, and a 10% contingency fee after filing legal action. Ex. 11 (First Retainer Agreement) at 0049.

20.     Shortly after the First Retainer Agreement was executed, ARMS inserted a 15% fee into another copy of the retainer agreement ("Second Retainer Agreement"). LEE then signed the Second Retainer Agreement. JPTS ¶ 11. Ex. 12 (Second Retainer Agreement) at 0053.

21.     LEE believed that his signing the First and Second Retainer Agreements were necessary for NEWMAN to continue communications with Belena Transportation's insurance company and that it would not change anything in his relationship with NEWMAN or require him to pay NEWMAN's legal fees.

> Q.      Now, in January 2016, did he [LEE] find out that the insurance company was requiring that he sign a piece of paper in order for Mr. Newman to talk to them?
>
> A.      In January, yes, I heard about it, and I think I signed it.
>
> Q.      Did he sign it because he thought it was necessary for the discussions to continue?
>
> A.      Yes.
>
> Q.      Did he believe that by signing that retainer agreement, it changed anything in his relationship with company counsel?
>
> A.      No, not at all.
>
> Q.      After he signed that retainer agreement, did Mr. Newman treat him any differently as far as the legal relationship

8

1    A.    No, I don't think so.

2    Q.    Now, when – did he first sign the agreement without having
it read or explained to him?

3    A.    I don't recall if there was any interpreting service at the time,
but all I knew was I was told that such document need to be signed
4    to talk to the insurance company.

5    Q.    Now, at the time that he signed that document, did he have
any understanding that it had an obligation to pay any attorney's
6    fees under that agreement?

7    A.    No.

8    Ex. 65 at 0582:21-0583:17 (Lee Testimony).

9        22.    While LEE did not believe he had an obligation to pay legal fees under the Second

10   Retainer Agreement, he did believe that 15% of the recovery would be paid to ARMS, not

11   NEWMAN.

12   Q.    Now, after the settlement was reached, did Mr. Lee talk to
Lindy Park about what would happen with the settlement funds?

13   A.    So in my recollection, I think I had a conversation with her
regarding $1 million, and in which 15 percent out of the settlement
14   would go to the company. Hold on. Let me rephrase it. Okay. That
15   15 percent conversation occurred before the settlement was reached.

16       With regard to percentage, Lindy Park told me that it would
be good if settlement was over $1 million, but if the settlement is
17   less than $1 million, then the company would lose money.

18   Q.    Did she explain where the number of 15 percent came from?

19   A.    I don't recall where it came from, but I do remember Lindy
Park suggested just the 15 percent.

20   Q.    Was it his understanding that with regard to any money that
was going to be paid to Mr. Newman, that would be paid by the
21   company?

22   A.    Yes.

23   Ex. 65 at 0585:3-22 (Lee Testimony).

24       23.    LEE thought that NEWMAN would be compensated an unspecified amount from

25   the 15% fee that would be paid to ARMS.

26   Q.    Now with regard to that agreement that he signed in January
to – the retainer agreement to allow Mr. Newman to talk to the
27   insurance company, did he agree that by signing that agreement, it
would give Mr. Newman the right to 150,000?

28

> A.    No, not at all. I thought he would be compensated from the $150,000 that would go to the company.

Ex. 65 at 0587:24-0588:1 (Lee Testimony).

### C.    Newman Negotiates $1,000,000 Settlement Offer from Belena Transport (Betula Release Agreement)

24.    On January 21, 2016, NEWMAN sent a letter to Thomas Lyons an investigator with Koenig & Associates that included a copy of the First Retainer Agreement. Ex. 7 (Newman Letter to Lyons).

25.    On January 26, 2016, Mr. Lyons sent a letter to Belena Transport regarding NEWMAN's demand letter on behalf of LEE. Ex. 8 (Lyons Letter to Newman).

26.    On February 23, 2016, Mr. Lyons sent an email to NEWMAN informing him that Belena Transportation's insurance carrier agreed to settle the matter for the policy limit ($1,000,000.00). Ex. 9 (Lyons Email to Newman).

27.    On February 25, 2016, PARK sent an email to NEWMAN asking him five questions. On February 26, 2016, NEWMAN sent a reply email to PARK answering the questions in red. Ex. 10 (Park-Newman Emails).

> Newman,
>
> 1.    Can you please send me a copy of the agreement that Sang Lee originally refused to sign? I will need to change the amount, etc…. but I need the contract please.
>
> <span style="color:red">I gave a copy to Dave.</span>
>
> 2.    Sang Lee has decided to settle. He came to ARMS today and advised that he's willing to settle for the 1 million… so start talking to the other side and get the settlement agreement docs.
>
> <span style="color:red">I Have the doc's let me know when he can sign as needs to be notarized.</span>
>
> 3.    After I review the agreement between ARMS and SANG, I will ask you to add in there something that releases ARMS from being sued after this is all settled…can you add that then send me the document I asked for in #1?
>
> <span style="color:red">Attached with changes</span>
>
> 4.    Do we need to change the agreement between you and SANG as it currently says 15% on that agreement.

I wouldn't have taken the 15% anyways, better to leave to show discount.

5.  Sang wants to know when he can get his money…so my question to you is once the million comes into your escrow account, do you wait to disperse Sang's portion until your negotiations with the hospital bills are complete or can you disperse something to Sang before negotiations with the hospital are complete?

It will take about 30 days to get check. My bank will require couple of days to release funds I am guessing. I can release some of the money and they rest after all bills are paid.

The faster Sang gets his money, the less ARMS has to pay his "advances". Until he gets some of the money, I have to continue giving him his weekly advance….

Let me know.

Thanks.

Lindy Park
Caravan Global

Ex. 10 (Park-Newman Emails) at 0045. Attached to NEWMAN's response email was an early draft of a Payment Agreement Between Sang Hoon LEE and Arms Trans, Inc., which was later modified by ARMS to be the ARMS Reimbursement Agreement (defined below). *Id.* at 0047. NEWMAN prepared this early draft while serving as counsel to ARMS before NEWMAN agreed to represent LEE. Notably, this early draft did not refer to a specific dollar amount that LEE was obligated to pay ARMS. Per this email chain, NEWMAN added release language for benefit of ARMS. *Id.*

28.    NEWMAN will testify that when he wrote "I wouldn't have taken the 15% anyways, better to leave to show discount," he meant that he would not have taken the full 15% contingency fee without first negotiating the discount of Lee's substantial medical bills and liens (which then totaled about $500,000 and which NEWMAN was unsure could be reduced). This was a continuation of a recent verbal conversation between NEWMAN and PARK about reducing the medical bills. NEWMAN represented that he would not take a larger contingency fee than what LEE would receive after medical were paid. NEWMAN did not, by this email, agree to receive only $20,000 for his representation of LEE or share his legal fees with ARMS.

29.    In March 2016, Belena Transportation settled the claim for $1,000,000. JPTS ¶ 12.

11

30.     On March 16, 2016, LEE signed a Release of all Claims (the "Betula Release Agreement") wherein LEE released all claims against Belena Transportation, its principals, and insurers in exchange for payment of $1,000,000.00 ("Settlement Funds"). Ex. 15 (Betula Release Agreement) 0061-0062.

### D.     Lee Separately Agrees to Pay ARMS $130,000 From Settlement Funds (ARMS Reimbursement Agreement)

31.     That same day, on March 16, 2016, and unbeknownst to NEWMAN, LEE signed a Payment Agreement Between Sang Hoon and Arms Trans., Inc. (hereinafter, the "ARMS Reimbursement Agreement") wherein LEE promised to pay $130,000.00 to ARMS, and LEE released ARMS from all liabilities and claims (including the employee misclassification claims described above). Ex. 16 (ARMS Reimbursement Agreement) at 0063.

32.     LEE testified that he signed the ARMS Reimbursement Agreement during a meeting with Allen Kim[3], the Chief Financial Officer of ARMS.

Q.     Does he recall a meeting that took place at that time for the document [Betula Release Agreement, Exhibit 15] to be signed?

A.     In my recollection, yes. I met with Allen and Newman and Raj and me to sign this paper.

Q.     During that meeting, did Allen Kim agree [sic] to this release to him?

A.     He might have. Yes, explained it to me, but I don't really recall the detail of it.

Q.     Did Mr. Newman participate in that meeting and say anything.

A.     I don't recall.

Q.     Now, with regard to Exhibit 16 [ARMS Reimbursement Agreement]. If you would look at the next tab, did he – is that his signature at the bottom of the page?

A.     That's correct.

Q.     Is this the agreement that he entered into with Arms to reimburse them for his expenses?

A.     Correct.

---

[3] NEWMAN is informed and believes there is no familial relationship between Allen Kim (ARMS's Vice President) and Steve Kim (ARMS's Operations Manager).

Q.      He had talked to Lindy about this agreement before he signed it?

A.      I might have, but I don't really recall.

Q.      Did he talk to her about the idea of reimbursing Arms?

A.      Yes, I did talk about it prior to signing this document, and I was explained that I had to reimburse the company for the expenses once I received the settlement. And also, I was told the part of their money would go to Newman as well.

Q.      Now, at that meeting, did Mr. Newman say anything about the money he intended to take out of the settlement proceeds?

A.      No, he didn't.

Q.      If he [LEE] had known that Mr. Newman was going to take 150,000 out of the settlement proceeds, would he have signed this agreement to reimburse Arms?

A.      No, I would not have.

Ex. 65 at 0586:17-0587:23 (Lee Testimony).

Q. BY MR. MASON: Previously, Mike Newman testified on the stand that you questioned the $130,000 that was paid to Arms Trans because you really didn't know that you had signed the agreement on March 16th that said that you had to pay $130,000 [ARMS Reimbursement Agreement, Exhibit 16]?

A.      You mean I forgot I had to sign the agreement to pay $130,000?

Q.      Not forgot. You didn't understand the document because it was not explained to you before you signed it?

A.      Explain by who?

Q.      Allen Kim.

A.      In my recollection, Allen explained with regard to the $130,000, it would cover all the help I received from Arms Logistics. Although I had signed the agreement to pay $130,000, I never thought it would be an additional. I thought 15 percent would cover $130,000 as well. And I heard later from Lindy Park that our 15 percent – $ 130,000 repaid to the company, and the balance due, $20,000, would be paid to Newman as some kind of bonus.

Ex. 65 at 0624:1-19 (Lee Testimony).

33.      As described more fully below, LEE testified repeatedly during the SC Action that NEWMAN seemed unfamiliar with the ARMS Reimbursement Agreement and generally unaware that LEE agreed to pay $130,000 to ARMS.

13

Q.    Well, did you talk to Mr. Newman at any point about why there was a payment there fore Arms Trans and a payment to Mr. Newman?

A.    Yes. Actually, I asked Newman about it when I visited his company, his office with the medical bills I had received. At the time, Lindy Park was not in office; she was out of the country. So I confronted him with this amount. And then he called Steve Kim for interpreting and also told me that I understand 130,000 goes to company, but I don't know about 15 percent. But Michael Newman told me that I don't know about $130,000.

So I was upset little bit because my understanding was 15 percent included everything. And I told him, "Where does $130,000 come from?" And also I told Newman, "Hold $130,000 until Lindy Park comes back." And then I recall Michael Newman saying that at this point, it would not be released unless he approved it.

Q.    Mr. Lee, with regard to the 15 percent to Mr. Newman, do you understand Mr. Newman to still be the general counsel of Arms Trans?

A.    Yes.

Q.    What difference, if any, did you believe there was in a payment to Michael Newman versus a payment to Arms Trans?

A.    Again, I believe 15 percent included everything, so I thought $130,000 was additional amount, which I did not anticipate.

Q.    Now, with regard to the Exhibit 16 [ARMS Reimbursement Agreement], did Mr. Newman ever express any concerns to you about this particular agreement and whether it's enforceable or not?

. . .

A.    No. I never heard about it.

Ex. 65 at 0589:9-0590:15.

**E.    Newman Receives Settlement Funds and Delivers March 28, 2016 Letter to Lee Describing Proposed Distributions of Settlement Proceeds**

34.    In late March of 2016, NEWMAN received the $1,000,000 settlement check from Belena Transportation. On March 28, 2016, NEWMAN sent a letter to LEE which stated, among other things, that 15% of the settlement proceeds ($150,000) would be paid to the Law Office of Michael P. Newman and $130,000 would be paid to ARMS. JPTS ¶ 13.Ex. 17 (March 28, 2016 Letter) at 0065.

1    35.    Thereafter, a meeting occurred between NEWMAN and LEE, as interpreted by

2    Steve Kim (ARMS's Operations Manager)[4], wherein NEWMAN explained to LEE that (1)

3    NEWMAN had negotiated down LEE's substantial medical bills, and (2) NEWMAN would pay

4    himself the 15% contingency fee ($150,000). This meeting was separately testified to by Steve

5    Kim and LEE.

6    36.    LEE testified that this meeting lasted about five to ten minutes. Ex. 65 at 0590:16-

7    18 ("Q. How long did Mr. Lee talk with Mr. Newman and Steve Kim about that spreadsheet that's

8    Exhibit 17 [the March 28, 2016 Letter]? A. Maybe five minutes. Maybe ten.").

9    37.    Steve Kim testified that NEWMAN specifically discussed the amount of

10    NEWMAN's legal fees. LEE did not object to the amount of NEWMAN's legal fees but LEE did

11    object to paying an additional $130,000 to ARMS pursuant to the ARMS Reimbursement

12    Agreement.

13    Q.    And did you translate any communication between Mike
       Newman and Sang Hoon Lee?

14    A.    I believe once. That was at the very, very end, after the

15    lawsuit was settled and Mr. Lee had gotten, I guess, a payout.

16    Q.    Do you know how much that payout was?

17    A.    $1 million, which was the cap, from what Mike had told me.

18    Q.    Where did that – where did that – the time when you
       translated for Michael and Sang Hoon, where did that meeting take

19    place?

20    A.    In Caravan's office – in Mike's office next to the kitchen in
       Caravan.

21    Q.    Who was present there?

22    A.    Myself, Mike, and Mr. Lee.

      Q.    And at that meeting, what was discussed?

23    A.    Well, I guess I – I was brought on because – Allen [Kim]

24    had done most of the translating, and I guess he wasn't available that
       day. And that is the only reason why Mike had wanted me to come.

25
       But from my recollection, it was – Mike wanted to discuss
26    with Mr. Lee how this payout would be broken down into what –
       went into what fees, and so on and so on, and how much he would

27

28
—————————————————
[4] See Ex. 66 at 0716:24-28.

1  be – how much of the total of that $1 million that Mr. Lee would be
entitled to.

2  Q.    Do you recall Sang Hoon Lee ever referencing a letter he had
received, before that meeting, from Mike Newman?

3

4  A.    A letter?

Q.    Do you recall?

5  A.    At that meeting, no, I don't think I recall.

6  Q.    Okay. At that meeting – just to confirm, you said they would
discuss payout of his settlement?

7

8  A.    Correct.

Q.    Did they discuss medical bills that would have to be paid out
of that settlement?

9

10  A.    Yes. That was the first thing Mike wanted to discuss. I think
Mike had said his medical bills were about half a million, but he had
negotiated with the hospitals, or whatever, and he got it down to a
certain amount. And that's how much he would pay out from the $1
million.

11

12

13  Q.    Do you recall what that amount was?

14  A.    It – 150-. Between 150-and 2-. I'm not really too confident
about that number, actually.

15  Q.    Do you recall Mike ever explaining to Sang Hoon Lee how
much his legal fees were?

16

17  A.    Yes. That was the second thing Mike discussed with Mr.
Lee. And that he told Mr. lee that after the medical bills portion, that
he would take his legal fee of 15 percent. And then after that, he had
discussed, I guess, Arms' portion of the returns, and then
miscellaneous portions. And then the final amount was how much
he would be left with.

18

19

20  Q.    Did Sang – did he – did he explain to him the dollar amount
of that?

21  A.    Yeah, 15 percent. So it was 150,000. It was pretty simple.

22  Q.    Did Sang Hoon Lee agree to Mike Newman receiving that
fee at that meeting?

23

24  A.    He never objected. Mike had told him these were the
payouts, and he didn't say, I approve of giving you money, but, I
mean, he said, Okay.

25

26  Q.    Did – when Mike Newman was explaining that and when
you were translating it over to Sang Hoon Lee, did Mike Newman
explain that that money was going to Mike Newman for legal fees?

27

28  A.    Yes.

16

Q.      And regarding money that was to be paid to Arms, do you recall how much that was?

A.      I believe it was – I want to say 130-. It was something around that.

Q.      Did Sang Hoon Lee agree to pay Arms Trans the amount of money of $130,000?

A.      At that meeting, no. He wanted to discuss with Lindy before he approved Michael paying Arms out.

Q.      Did Sang Hoon Lee say that he actually did owe Arms Trans money at that meeting?

A.      Yes.

Q.      Did he indicate a dollar amount?

A.      He had said he owed roughly about 60,000, which was paid I guess while he was not working. I guess Arms had forwarded – give him some money while he was going to the hospital and stuff. That's, he said, around 60,000, is what he had owed.

Q.      Did he say what they had – what they had given him money for?

A.      No.

Q.      Was there anything else discuss that you can recall at that meeting?

A.      No. It was mostly – well, like I said, as far as I recall, it was the million dollars had come into escrow, and Mike had wanted to talk to Mr. Lee about how the figures would be broken down.

Ex. 66 at 0720:1-0723:10 (Steve Kim Testimony) (emphasis added).

38.    LEE testified similarly about this conversation during the SC Action.

Q.      Now, Mr. Lee, between the time you signed the release [Betula Release Agreement, Exhibit 15] and the time Mr. Newman brought this letter to your house [March 28, 2016 Letter, Exhibit 17], did he contact you at all about his negotiations to pay the medical providers and the bills?

A.      Not that I recall. But I believe he was – he told me he was taking care of the medical bills, when Steve [Kim] was there interpreting.

Q.      And that would be at the time that the settlement agreement was signed?

A.      Not that. It was of March 16th [sic]. But what I'm referring now was after the settlement, the $1 million was received.

Ex. 65 at 0592:20-0593:3 (Lee Testimony).

39.     LEE further testified that, during this meeting with Steve Kim, LEE instructed NEWMAN to not pay ARMS $130,000 from the settlement proceeds because (1) LEE only owed ARMS about $60,000[5], and (2) NEWMAN appeared unfamiliar with LEE's agreement to reimburse $130,000 to ARMS.

Q.      BY MR. MASON: As far as – you're unaware of this document [Exhibit 57], yet you agreed that – would you agree that the $130,000 that was to be paid to Arms Trans was compiled pertaining to services related to payments that they had advanced for your of $1,000 a week; is that correct?

A.      Yes.

Q.      And didn't you think that the $1,000 a week that she had paid you was about 60,000? Didn't you make that statement at one time to Steve Kim?

A.      That's correct.

Q.      … Didn't you tell Michael Newman, with Steve Kim translating in the room for you, to not pay Arms Trans $130,000 because at most you only owed him 60,000?

A.      Yes, I said that. Can I explain the circumstances when I said that?

THE COURT:            I'd like to hear the explanation, yes, please.

THE WITNESS:         So I have questions about the statement which includes the medical expenses and $130,000 with the letter we talked about. So I called Newman on the phone, and I told him I was very confused and asked about this. So I tried to communicate with him, but Steve was sent for interpreting on the speakerphone.

Prior to that, we had agreed that 15 percent would cover everything. So at that time, I had a lot of questions how $130,000 came up. Had Lindy Park been in office, I would have asked her, but she was out of the country. So I told – so I asked Michael, through Steve on the phone, and everything together, I mean, it would be $60,000, but – plus rides and medical expenses. To put it all together, it would be much less than $130,000.

So I asked Michael, "Now, you're asking me to pay $130,000 plus 15 percent?" So I was kind of a little upset when I had this conversation with Michael. So when I confronted him with

_____

[5] During trial in the SC Action, Exhibit 57 was introduced which purported to account for the $130,000 reimbursement payable by LEE to ARMS. However, PARK testified this accounting was incorrect, was created by an attorney after a lawsuit had been initiated, and was not relied upon by PARK or LEE. *See* Ex. 57 (ARMS Reimbursement Accounting) at 0189-0190. *See also* Ex. 65 at 275:16-279:22 (Park Testimony).

1  these questions, Michael, himself, said that he was not really
familiar with the details.

2       So after the conversation, I came to conclusion that I – and
Michael should hold $130,000. And Michael said, "Okay. The funds
3  will not be released unless I approved it anyway." So that was the
circumstance at the time."
4

5  Ex. 65 at 372:3-373:17 (Lee Testimony) (emphasis added).

6       40.    LEE further testified that (1) his agreement to reimburse ARMS $130,000 was

7  between LEE and PARK (not NEWMAN), (2) NEWMAN was <u>unfamiliar</u> with this agreement,

8  and (3) LEE "took it for granted" that PARK had informed NEWMAN that $130,000 payable to

9  ARMS would come from NEWMAN's contingency fee ($150,000) instead.

10      Q.    Okay. When you had that conversation with Mike, did Mike
indicate that the $150,000 was going to the Law Office of Michael
11  P. Newman?

12      A.    I don't recall him saying that. Besides, I never imagined that
it would go to his law office.

13      Q.    So just to confirm, your testimony is that Michael Newman
didn't explain to you that the Law Office of Michael P. Newman
14  would be receiving $150,000 at that time?

15      A.    I didn't even imagine it.

16      Q.    It's not my question. Did Michael – did he explain to you
that $150,000 was being paid to Arms Trans during the meeting
17  with you and Steve Kim? I'm sorry. You, Steve Kim, and Michael
Newman as – concerning the $130,000 and the 150,000?
18
19      A.    Actually, it was a question I had. I asked the Mike, "Now, I
understand 15 percent that goes to Arms would cover everything?
Then why should I pay extra $130,000?" And his response to my
20  question was he didn't know.

21      Q.    So Mike wasn't familiar with $130,000 at that time? That's
what you're saying?
22
      A.    He didn't look or sounded familiar with that.
23
      Q.    So you had an agreement with Lindy about Arms Trans
24  receiving $130,000 out of Michael's fee; is that correct?

25      A.    Yeah. That's the conversation I had with the Lindy Park.

      Q.    Okay. So the agreement that you had was between you and
26  Lindy Park and not you and Michael Newman?

27      A.    That we got them $130,000?

28      Q.    Correct.

19

A.      At the time I took it for granted that the $150,000 would go to the company. And I also took it for granted that Lindy Park and Michael had conversation or agreement between them.

Q.      But you hadn't discussed with Michael Newman about the payments out of his $150,000 that he was to receive from the $1 million settlement; correct?

A.      I recall saying that 15 percent would cover everything.

Q.      But that agreement was between you and Lindy; correct?

A.      That's right. But up until that time, I always thought Michael had been acting as a company counsel at her direction. I never regarded her [sic] as my personal lawyer.

Ex. 65 at 0612:5-0613:18 (emphasis added).

Q.      Mr. Lee, I need to clarify a few things before we finish up. The last time we were in court here, you testified that you told Mr. Newman, with Steve Kim translating for you, that you told Mike Newman to not pay the $130,000 because at most you only owe them 60,000; is that correct?

A.      Yes, I did say that. May I explain what the circumstance was at the time?

. . .

THE COURT:        I would like to hear the explanation just to refresh the Court's memory on this.

…

THE WITNESS:        My understanding –actually, I was told that 15 percent or $150,000 would be owed. And when I looked at the statement, the amount of $130,000. So Lindy Park was the person who explained to me what the $130,000 was about, but she happened to be on vacation, based in Korea.

Because I had medical bills, I wanted to have explanation what the bills were about, so I visited Newman's office at Caravan. So I handed the bills to him and asked him what the $130,000 was all about. In my recollection, I believe Newman was not sure about that either.

I was, at the time, a little upset, so I spoke with Newman through Steve as an interpreter. So I told him that, What am I having this $130,000? I thought 15 percent would include everything. So I was kind of upset at the time.

And then I told him also the money I received from Arms was, at most, $60,000. So why should I pay $150,000 and also $130,000? So hold $130,0000. I'm going to ask her, Lindy Park, when she comes back. So the circumstances – that was the circumstances why I told him to hold $130,000. So that was the circumstances.

20

Q.      BY MR. MASON: Okay. So just to confirm, you said that
Mike Newman seemed to be unfamiliar with the $130,000 at that
meeting too; correct?

A.      Yes.

Ex 65 at 0618:14-0619:24 (Lee Testimony) (emphasis added). It is important to note that LEE

never told NEWMAN to not pay himself the $150,000 pursuant to the Second Retainer

Agreement. Instead, LEE told NEWMAN to not pay ARMS the $130,000 pursuant to the ARMS

Reimbursement Agreement.

41.     LEE further testified that he did not believe that NEWMAN was his personal

lawyer and that NEWMAN would be paid directly from ARMS from the 15% contingency fee.

A.      My understanding at the time [of the meeting between LEE
and NEWMAN, translated by Steve Kim] was 150,000 would cover
everything. And I didn't understand when additional $130,000 was
added to that. So when I spoke with the Mike Newman through
Steve Kim serving as interpreter, I told him to hold $130,000 until
Lindy Park comes back from trip, then I'll tell you.

And when Lindy Park came back from trip, I asked her about
this. And she told me that $130,000 was all included in the 15
percent. And she also told me I have to pay attention to that.

Q.      Okay. So we're going to go to Exhibit 17 in the booklet
[March 28, 2016 Letter]. On Exhibit 17, that meeting that you had
with Steve Kim, that meeting – you testified previously that that
meeting happened because you received this letter from Michael
Newman; is that correct?

A.      That's correct.

Q.      Okay. So on that specific -- indicated as No. 12, it says,
"Law Office of Michael P. Newman, 15 percent"?

A.      Yes.

Q.      And above that is 11, which is "Arms Trans, $130,000"?

A.      Yes.

Q.      And that's the amount that you're questioning in this letter;
correct?

A.      That's correct.

Q.      And this meeting is after you had signed the settlement
agreement for the million on March 16th; correct?

A.      It was a – it was long after I did that.

Q.      So just to confirm, this was after you had signed the
settlement agreement for $1 million on March 16th?

A.    That's correct.

Q.    On that same date when you signed the settlement release, you said you signed an agreement to pay Arms Trans $130,000; is that correct?

A.    Yes. I did sign the settlement, the agreement for final settlement, and also the agreement for $130,000 with me and Mr. Newman and Allen.

Q.    And you understood at the time when you signed it how the $130,000 came about; is that correct?

A.    In my recollection, I signed the agreement and -- thinking that the company had paid me $130,000.

Q.    Okay. So why would you then – in the meeting that you testified previously, why was – with Steve Kim – after that meeting be questioning the full amount of $130,000 if you understood and knew where the $130,000 came from? Shouldn't you be questioning the 15 percent that is going to Mike Newman and not the $130,000 that was being paid to Arms Trans?

A.    You know, I think at the time I never imagined Mr. Newman was my personal lawyer. I still thought at the time Newman was a company counsel. So I thought 100 – 15 percent would cover everything, including $130,000.

Q.    In that letter, it says that the 15 percent goes to Mike Newman, not Arms Trans. Why didn't you question that?

A.    You know, I didn't really pay attention to this because I – I fully believed that he was company counsel, not my personal lawyer.

Q.    Okay. And your understanding was that Arms Trans would be paying him for his services, not you; correct?

A.    Yes. Because he was company payroll, I thought that the company would cover all of the expenses and – although I didn't know what the amount would be.

Ex. 65 at 0621:12-0623:15 (Lee Testimony) (emphasis added).

42.    In a subsequent conversation between LEE and PARK, LEE asked PARK why NEWMAN's March 28, 2016 Letter (Exhibit 17) included an extra $130,000 payable to ARMS. PARK told LEE not to worry about it and that the 15% fee included everything, including reimbursement to ARMS and NEWMAN's legal fees.

Q.    Now, after you had this conversation [with NEWMAN and Steve Kim], did you talk to Lindy Park?

A.    Yes.

Q.    What did Lindy Park say to you?

22

A.    I asked her why he have extra $130,000 here in the – and she told – and also told him that we had an oral agreement that we, the 15 percent would include everything; right? In response, she said, Don't worry about it. Yes, it does include everything.

Q.    Now, did she – was she able to resolve things with Mr. Newman after that?

A.    I don't know if she did or not. But after that, I met Michael Newman for the last time when she came to meet with the balance check after the settlement was received.

Q.    Did anybody – was he able to talk to Michael Newman at that time?

A.    She – he told me everything was settled, and I was not – I was not sure if $130,000 was taken of at that time. But – and he told me that this – the balance check reflects the balance after 15 percent, and $130,000 was not paid out of the settlement.

Q.    What did Mr. Lee say to Mr. Newman?

A.    At the time I understood it as he would talk to the company and the company would take care of everything from 15 percent. And before he left, he hand me his new card saying he just opened a new law office. And he told me I could contact him for legal consultation in the future, so I said, "Congratulations."

Ex. 65 at 0591:20-0592:19

**F.    Newman Makes Interim Distribution of $100,000 to Lee and Newman Pays Himself 15% Contingency Fee Pursuant to the Second Retainer Agreement**

43.    On or about April 7, 2016, NEWMAN delivered a check for $100,000.00 to LEE as an interim distribution from the Settlement Funds. *See* Ex. 19 (Newman Letter) at 0069.

44.    On or about April 8, 2016, a little over a week after the settlement funds cleared NEWMAN's trust account, NEWMAN paid himself $150,000 from the settlement funds which was deposited into his firm's general operating account. JPTS ¶ 14.

**G.    Newman Negotiates Discounted Payoffs with Medical Creditors**

45.    Thereafter, NEWMAN continued to negotiate with medical creditors and lienholders on behalf of LEE. NEWMAN informed LEE that he was doing so.

Q.    Now, Mr. Lee, between the time you signed the release and the time Mr. Newman brought this letter to your house, did he contact you at all about his negotiations to pay the medical providers and the bills?

A.      Not that I recall. But I believe he was – he told me he was taking care of the medical bills, when Steve [Kim] was there interpreting.

Q.      And that would be at the time that the settlement agreement was signed?

A.      Not that. It was of March 16th [soc]. But what I'm referring now was after the settlement, the $1 million was received.

Ex. 65 at 0592:20-0593:3.

46.     In these negotiations, NEWMAN informed the medical creditors that he represented LEE on a discounted contingency fee of 15% and that they should reduce their accordingly.

a.      PROVIDENCE HEALTH & SERVICES: On May 19, 2016, NEWMAN delivered a letter to Providence Health & Services, demanding that Providence reduce its bill from $452,683.90 to $115,000.00. Ex. 28 (Newman Letter to Providence). In said letter, NEWMAN wrote "The standard for attorney fees in California for personal injury causes of action is 33 1/3 percent. This is what I originally took up this matter for in compensation, however, since the settlement I have reduced that to 15 percent. This amounts to a 55 percent reduction in my fees." *Id.* at 0098. On May 31, 2016, Providence delivered a letter to NEWMAN, agreeing to discount their bill to $115,323.16. Ex. 29 (Providence Letter to Newman) at 0100. This reduced LEE's liability to Providence by $337,360.74.

b.      RAWLINGS COMPANY: On April 5, 2016, The Rawlings Company delivered a letter to NEWMAN demanding payment of $29,326.66. Ex. 36 (Rawlings Company Letter to Newman) at 0154. On April 27, 2016, NEWMAN delivered a response letter to The Rawlings Company demanding they discount the balance to $14,000.00. In said letter, NEWMAN wrote "Because Mr. Lee will need this money to pay future medical bills and it is unsure whether he will ever be able to work in his former profession I agreed that I would reduce my fees from 33 1/3 percent to 15 percent." Ex. 37 (Newman Letter to Rawlings Company) at 0155. On April 29, 2016, NEWMAN delivered a second response letter to The Rawlings Company, accepting on behalf of LEE to pay $19,552.08 to The

Rawlings Company. Ex. 38 (Newman Letter to Rawlings Company) at 0157. This reduced LEE's liability to The Rawlings Company by $9,774.58.

        c.    COLLECTION CONSULTANTS: On July 29, 2016, NEWMAN delivered a letter to Collection Consultants, demanding that invoices exceeding $5,000 be reduced to $2,341.67 already paid by NEWMAN on behalf of LEE. Ex. 31 (Newman Letter to Collection Consultants) at 0103-0106.  On August 18, 2016, Collection Consultants delivered a refund check of $871.71 to NEWMAN in response. Ex. 32 (Collection Consultants Refund Check) at 0107. This reduced LEE's liability to Collection Consultants by at least $3,530.04. *See also* Ex. 21 (Newman Letter to Lee explaining Collections Consultants' refund).

47.    Overall, NEWMAN negotiated discounts of LEE's medical expenses totaling at least $350,665.36.

**H.**    **ARMS and Lee First Dispute Payment of $150,000 to Newman Three Months After the Transfer**

48.    On July 11, 2016, HUDRLIK sent an email to NEWMAN first suggesting there was a "communication misunderstanding" about the amounts payable to NEWMAN and this was not "what was explained to him [LEE] in Korean." Ex. 18 (Hudrlik Email).

> Mike. Meeting with Sang Hoon today and I think communication misunderstanding.
>
> Below is what was discussed with Sang Hoon Back in March / April. Per your response below, Lindy discussed the following with Sang Hoon:
>
>     1)    Arms to receive 130K.
>
>     2)    Newman to receive 20K (You did not want to write a new contract, you just to show a discount)
>
>     3)    Sang Hoon to receive Balance of funds after all medical bills paid.
>
> Confusion happened when you showed Sang Hoon something called a "account of statement"
>
> In your "account of statement", you showed Sang Hoon that you (Newman) charged him $150,000.00 (15% of total settlement) plus Arms $130,000.00 plus medical bills.

> This is not what he understood based upon the below e-mail and
> what was explained to him in Korean.
>
> Hoon will be here Wednesday at 1pm to discuss.
>
> Lindy will be here to translate of you need.

Ex. 18 (Hudrlik Email) at 0067.

49.    On August 2, 2016, NEWMAN delivered a closing letter to LEE that fully accounted for all payments made from the settlement funds as well as a second check to LEE for $608,808.45, representing a total payment to LEE of $708,808.45 from the settlement funds (hereinafter, "Newman Closing Letter"). Ex. 19 (Newman Closing Letter); Ex. 42 (Newman Settlement Funds Accounting).

50.    LEE testified that ARMS informed him that NEWMAN kept the 15% contingency fee ($150,000) and did not pay $130,000 to ARMS.

> Q.    Is that – when was it – what date was it that you first found
> out or knew that Mr. Knew was keeping the full $150,000?
>
> A.    First, I didn't know he had kept the $150,000 because I was
> communicating with the company. Later I found he had kept the
> $150,000 when I was visiting the company. I don't know the exact
> date.
>
> Q.    Okay. Was it on August 2nd when he came to your home?
>
> A.    No. I didn't even imagine it at the time. I was not aware of it.
> I thought all the money went to the company first.
>
> Q.    Then why did you write the check on August 10th, 2016?
>
> A.    The company told me so when I was visiting the company
> after I seen my doctor.

Ex. 65 at 0598:8-21.

51.    On August 10, 2016, LEE delivered a check for $130,000 to ARMS. Ex. 65 at 0597:12-0598:1.

52.    On August 23, 2016, LEE sent an email to NEWMAN disputing 15% contingency fee payable to NEWMAN. That same day, NEWMAN sent a response email to LEE informing him of the California State Bar's Fee Arbitration Service. Those emails are quoted below:

> Dear Attorney Newman:
>
> I have some questions that have come up now that my case
> was settled. I would appreciate your giving me the answers.

As part of the settlement, I understood that Arms was to be repaid $130,000 from the settlement proceeds. After I received your breakdown, I noticed that you had deducted 15%, or $150,000, as legal fees. I always understood that from that money Arms would be repaid.

Lately, I have learned otherwise. Arms tells me that they did not receive any money from you from the settlement funds. As I signed an agreement to repay them, I have done so myself from the money I received from your office.

It seems to me, however, that that money should have been paid by you and therefore you need to reimburse me $130,000.

I recall that I signed a letter which was notarized and given to you authorizing you to pay Arms from the settlement proceeds. I therefore do not understand why they were not paid by you and why I was forced to pay them.

Please give me your explanation as quickly and clearly as you can.

Thank you,

Sang Hoon Lee

_____

Dear Mr. Lee,

Sorry that you feel that there is a problem with the fees. I would suggest that you Contact the fee arbitration service that is provided through the California bar. If you request it, it would mandatory for me to participate and they would be able to answer your questions. They can be reached at 415-538-2020.

Michael Newman
Law Office of Michael Newman

Ex. 20 (Lee-Newman Emails) at 0073.

## I.    Lee Files Complaint with California State Bar

53.    Thereafter, LEE filed a California Attorney Complaint Form with the California State Bar. Ex. 41 (Lee State Bar Complaint) at 0177-0180. In a letter dated April 19, 2017, the State Bar concluded LEE's State Bar Complaint warranted no further action, noting that the Second Retainer Agreement provides NEWMAN with a 15% contingency fee and that NEWMAN paid himself a 15% contingency fee. Ex. 41 at 0167-0169. In a letter dated July 14, 2017, LEE delivered a response letter to the California State Bar, disputing the State Bar's initial finding that no further action was warranted. Ex. 41 at 0170-0176.

### J.    Lee Files SC Action against Newman

54.    On August 28, 2017, LEE sued NEWMAN in the Riverside Superior Court for conversion, fraud, and legal malpractice. JPTS ¶ 16. The action was styled *Lee v. Newman*, Case No. RIC 1716036 ("SC Action").

55.    In March and April of 2019, a 5-day trial was held. The claim for legal malpractice was disposed of at trial on NEWMAN's motion for non-suit. At the conclusion of the trial, the court took the matter under submission. JPTS ¶ 17.

56.    In July of 2019, the court entered a statement of decision. JPTS ¶ 18.

57.    On the fraud claim, the court found that LEE did not meet his burden of proof and entered judgment in favor of NEWMAN on this cause of action. JPTS ¶ 19.

58.    On the conversion claim, the court found that NEWMAN agreed to accept $20,000 for his compensation, and by taking $150,000 from the settlement funds, he had committed conversion. The court stated that: 1) LEE had the right to possess the $130,000; 2) NEWMAN converted the $130,000 by a wrongful act; and 3) LEE suffered damages of $130,000. JPTS ¶ 20.

59.    The court held that LEE had exercised his right to void the retainer agreement and determined that the reasonable value of NEWMAN's services was $20,000. The court awarded LEE damages of $130,000. JPTS ¶ 20.

60.    NEWMAN appealed the judgment to the California Court of Appeals on the grounds that the request to void the retainer agreement and the conversion claim were barred by the statute of limitations and that the trial court erred by finding him liable for conversion. JPTS ¶ 21.

61.    LEE cross-appealed on the grounds that the court erred by finding that NEWMAN did not commit and declining to disgorge all of NEWMAN's fees. JPTS ¶ 22.

62.    On March 4, 2021, the appellate court entered an opinion. As to Newman's appeal, the appellate court affirmed the judgment for conversion. They further held that the request to void the retainer agreement was beyond the statute of limitations, but found that the error was harmless since it did not have any effect on the judgment for conversion. JPTS ¶ 23.

63.     On LEE's appeal, the appellate court found that sufficient evidence was presented to support the trial court's finding in favor of NEWMAN on the fraud claim. They further held that LEE forfeited the disgorgement request since it was not raised in the trial court. JPTS ¶ 24.

64.     The appellate court awarded LEE his costs of appeal. JPTS ¶ 25.

**K.     Newman Files for Bankruptcy and Lee Files This Adversary Proceeding**

65.     After the appellate court entered its opinion on March 4, 2021, NEWMAN filed the instant bankruptcy proceeding on March 15, 2021. JPTS ¶ 26.

66.     On June 9, 2021, LEE filed a nondischargeability complaint against NEWMAN ("AP Complaint"), initiating this adversary proceeding. AP Doc. 1. The AP Complaint asserts four Claims for Relief. The First, Second, and Third Claims are pled under 11 U.S.C. § 523(a)(4). The Fourth Claim is pled under 11 U.S.C. § 523(a)(6).

67.     On August 14, 2021, LEE passed away. And on August 16, 2021, LEE's adult daughter, Chloe Taekyeong Lee ("C. LEE") substituted in as the plaintiff in this adversary proceeding. *See* AP Doc. 12 (Suggestion of Death).

68.     On April 13, 2023, C. LEE filed the JPTS. AP Doc. 78.

69.     On May 5, 2023, C. LEE filed the Joint Exhibit List. AP Doc. 81.

## II.     ADMISSIONS AND STIPULATIONS

NEWMAN currently intends to stipulate to the admission of all exhibits listed in the Joint Exhibit List.

## III.     CLAIMS FOR RELIEF

Generally, exceptions to discharge are construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000). The statutory exceptions to discharge should be "narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chicago v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001); *see also Lamar, Archer & Cofrin, LLP v. Appling*, __ U.S. __, 138 S. Ct. 1752 (2018). A creditor seeking to except a debt from discharge bears the burden of proving each element of its cause of action by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

**A.      First Claim – Defalcation While Acting in a Fiduciary Capacity**

**[11 U.S.C. § 523(a)(4)]**

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The AP Complaint asserts three claims under § 523(a)(4). The First Claim asserts a defalcation theory. The Second Claim asserts an embezzlement theory. And the Third Claim asserts a larceny theory.

A creditor seeking relief under § 523(a)(4) for defalcation while acting in a fiduciary capacity must establish three elements: (1) an express trust existed; (2) the debt was caused by defalcation; and (3) that the debtor was a fiduciary to the creditor at the time the debt was created. *Moussighi v. Talasazan (In re Talasazan)*, 2018 Bankr. LEXIS 1896, *20-21 (Bankr. C.D. Cal., June 22, 2018) (citing *Nahman v. Jacks*, 266 B.R. 728, 735 (B.A.P. 9th Cir. 2001)).

"Defalcation is the misappropriation of trust funds or money held in any fiduciary capacity, or the failure properly to account for such funds." *Id.* (citing *Jacks*, 266 B.R. at 737). Alternatively, it has been defined as "a failure to produce funds entrusted to a fiduciary." *Id.* (citing 4 Collier on Bankruptcy ¶ 523.10[1][b] (16th ed.)). Most importantly, at least for the present case, defalcation requires a "culpable state of mind ... involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013).

In *Bullock*, the Supreme Court applied the familiar noscitur a sociis canon to hold that the term "defalcation" possessed a mens rea requirement akin to those of "fraud," "embezzlement," and "larceny." 569 U. S., at 269, 274-275.

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code §2.02(2)(c), p. 226 (1985). See id., §2.02, Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge"

30

1
2
3
4
5

was designed to include "'wilful blindness'"). That risk "must be of
such a nature and degree that, considering the nature and purpose of
the actor's conduct and the circumstances known to him, its
disregard involves a gross deviation from the standard of conduct
that a law-abiding person would observe in the actor's situation."
Id., §2.02(2)(c), at 226 (emphasis added). Cf. Ernst & Ernst v.
Hochfelder, 425 U.S. 185, 194, n. 12, 96 S. Ct. 1375, 47 L. Ed. 2d
668 (1976) (defining scienter for securities law purposes as "a
mental state embracing intent to deceive, manipulate, or defraud").

6  *Bullock*, 569 U.S. at 273-274.

7      Here, the evidence will show that NEWMAN did not commit an intentional wrong and did

8  not consciously disregard a substantial and unjustified risk to LEE.

9      • There was a language barrier between LEE and NEWMAN.

10      • PARK communicated with LEE in Korean about all aspects of the case.

11      • PARK initially attempted to represent LEE against Betula Transportation. NEWMAN

12      did not want to represent LEE initially. NEWMAN only agreed to represent LEE after

13      agreeing to a 15% contingency fee, which NEWMAN trusted that PARK explained to

14      LEE.

15      • The Second Retainer Agreement states that NEWMAN will receive a 15% contingency

16      fee of the total recovery pursuant to PARK's instructions. ARMS inserted a 15%

17      contingency fee in the Second Retainer Agreement.

18      • PARK and LEE entered into a separate oral agreement that ARMS would advance

19      salary payable to LEE and provide related transportation services. LEE would release

20      any claims against ARMS, including misclassification claims. And LEE would

21      reimburse any expenses advanced by the ARMS to LEE from any recovery received

22      from Betula Transportation.

23      • NEWMAN was not a party to the oral agreement and was unfamiliar with its terms.

24      • Only after NEWMAN negotiated a $1,000,000 settlement with Betula Transportation,

25      LEE and ARMS executed the ARMS Reimbursement Agreement, whereby LEE

26      agreed to reimburse $130,000 to ARMS.

27      • PARK told LEE that the $130,000 would be funded by the $150,000 payable to

28      NEWMAN under the Second Retainer Agreement.

1    • LEE did not believe that he actually owed $130,000 to ARMS. LEE believed that he

2        owed approximately $60,000 as reimbursement to ARMS. Nonetheless, LEE did not

3        object to reimbursing $130,000 to ARMS so long as it came out of NEWMAN's

4        $150,000 contingency fee.

5    • NEWMAN was unfamiliar with the terms of the ARMS Reimbursement Agreement,

6        especially that LEE believed that the $130,000 payment to ARMS was to come from

7        his $150,000 contingency fee, leaving NEWMAN with only $20,000.

8    • NEWMAN was ethically prohibited from sharing the contingency fee in the Second

9        Retainer Agreement with ARMS because that would be fee-splitting with a nonlawyer.

10        *See* Fmr. Cal. R. Prof. Conduct 1-320(A) ("Neither a member nor a law firm shall

11        directly or indirectly share legal fees with a person who is not a lawyer….").

12    • The fair value of the legal provided by NEWMAN is closer to $150,000 than $20,000.

13        NEWMAN represented LEE for over a year, negotiated a $1,000,000 (policy limit)

14        settlement, negotiated the discount of at least $350,665.36 of LEE's medical bills (70%

15        discount), which resulted in a total disbursement of $708,808.45 to LEE. While most

16        attorneys would have charged a 33 1/3 % contingency fee ($333,333.33). NEWMAN

17        only charged a 15% contingency fee ($150,000).

18    • NEWMAN delivered the March 28, 2016 Letter to LEE, explaining that he intended to

19        disburse (1) $130,000 to ARMS pursuant to the ARMS Reimbursement Agreement,

20        and (2) $150,000 to NEWMAN pursuant to the Second Retainer Agreement.

21    • NEWMAN and LEE met regarding the proposed distributions set forth in the March

22        28, 2016 Letter. Steve Kim translated the meeting.

23    • LEE instructed NEWMAN to not disburse $130,000 to ARMS pursuant to the ARMS

24        Reimbursement Agreement because he did not owe ARMS $130,000. LEE contended

25        that he only owed ARMS around $60,000.

26    • LEE did <u>not</u> object to NEWMAN disbursing $150,000 to himself pursuant to the

27        Second Retainer Agreement.

28

- NEWMAN fully complied with LEE's instructions. NEWMAN paid $150,000 to himself pursuant to the Second Retainer Agreement. He did <u>not</u> pay $130,000 to ARMS pursuant to the ARMS Reimbursement Agreement.

- LEE first objected to the $150,000 disbursement to NEWMAN three months <u>after</u> NEWMAN transferred the funds to his operating account.

- In a later email, HUDRLIK acknowledged there was a "communication misunderstanding" between LEE and NEWMAN, which arose from LEE's understanding because on PARK's oral statements to him which differed materially from the written terms of the Second Retainer Agreement.

- NEWMAN advised LEE to file a complaint with the California State Bar Fee Arbitration Service, which initially denied LEE's complaint.

- In the SC Action, the trial court found that NEWMAN was not liable for fraud.

This evidence proves that NEWMAN did not commit an intentional wrong and he did not consciously disregard a substantial and unjustified risk to LEE.

Accordingly, the Court should find that NEWMAN did not have the requisite subjective intent for defalcation under 11 U.S.C. § 523(a)(4).

## B. Second and Third Claims – Embezzlement and Larceny (11 U.S.C. § 523(a)(4))

A creditor seeking relief under § 523(a)(4) for embezzlement must establish three elements: "(1) property rightfully in the possession of a nonowner; (2) a nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991).

Embezzlement differs from larceny only in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking. 4 Collier on Bankruptcy ¶ 523.10[2]. "For purposes of section 523(a)(4), a bankruptcy court is not bound by the state law definition of larceny but, rather, may follow federal common law, which defines larceny as a 'felonious taking of another's personal

1   property with intent to convert it or deprive the owner of the same.'" *Ormsby v. First Am. Title*

2   *Co. (In re Ormsby)*, 591 F.3d 1199, 1205 (9th Cir. 2010). "Felonious is defined as 'proceeding

3   from an evil heart or purpose; malicious; villainous . . . Wrongful; (of an act) done without excuse

4   of color of right.'" *Id.* at n.4 (citing *Elliott v. Kiesewetter (In re Kiesewetter)*, 391 B.R. 740, 748

5   (Bankr. W.D. Pa. 2008) (quoting Black's Law Dictionary (8th ed. 2004))).

6       Here, NEWMAN is not liable for embezzlement for two reasons.

7       First, NEWMAN did not appropriate the Settlement Funds to a use other than which they

8   were entrusted. NEWMAN abided by the terms of the Second Retainer Agreement and followed

9   LEE's instructions after the meeting about the March 28, 2016 letter. From the Settlement Funds

10  ($1,000,000.00), NEWMAN paid LEE's medical bills ($141,191.55), NEWMAN's contingency

11  fee ($150,000.00), and the remainder to LEE ($708,808.45). NEWMAN did not pay himself

12  anything more than what LEE had previously agreed to in writing.

13      Second, there are no circumstances indicating fraud for the reasons stated above.

14  NEWMAN did not know of the separate oral agreement between LEE and PARK. NEWMAN

15  never represented to LEE (or anyone else) that he would only accept $20,000 for the legal services

16  provided. NEWMAN never agreed to share his contingency fee with ARMS. And NEWMAN

17  charged a reasonable fee for the results obtained.

18      NEWMAN is also not liable for larceny for the same reasons. In addition, NEWMAN did

19  not have a felonious intent when he accepted the Settlement Funds from Betula Transportation and

20  deposited them into his attorney trust account.

21      **C.    Fourth Claim – Willful and Malicious Injury (11 U.S.C. § 523(a)(6))**

22      Section 523(a)(6) excepts from discharge debts arising from willful and malicious injuries

23  to an entity or its property.  *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199,

24  1206 (9th Cir. 2010); *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir.

25  2008). The willfulness and malice elements are legally distinct and require separate consideration.

26  *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146-47 (9th Cir. 2002).  Under § 523(a)(6), a debt arises

27  from a "willful" injury when the debtor subjectively intended to cause injury to the creditor or

28  subjectively believed that injury was substantially certain to occur.  *Ormsby*, 591 F.3d at 1206; *Su*,

34

1   290 F.3d at 1144-46.  A debt arises from a "malicious" injury when it is based on: "(1) a wrongful

2   act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause

3   or excuse." *Ormsby*, 591 F.3d at 1207 (quoting *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202,

4   1209 (9th Cir. 2001)).

5           Here, NEWMAN do not commit a willful or malicious injury. For the reasons above,

6   NEWMAN did not commit a willful injury because he did not subjectively intend to cause injury

7   to LEE. Likewise, NEWMAN did not commit a malicious injury because he acted with just cause.

8   NEWMAN withdrew the $150,000 from the Settlement Funds pursuant to the Second Retainer

9   Agreement and consistent with LEE's instructions during the meeting following the March 28,

10  2016 Letter.

11  **IV.    BRIEF DISCUSSION OF EVIDENTIARY ISSUES**

12          NEWMAN intends to introduce the former testimony of LEE and Steve Kim given during

13  the SC Action as they are both unavailable. *See* Fed. R. Evid. 804(b)(1). LEE is deceased and

14  NEWMAN is unable to locate Steve Kim.

15          Also NEWMAN has subpoenaed C. LEE to appear at trial to testify as to, among other

16  things, any statements that LEE made to her regarding NEWMAN, the Second Retainer

17  Agreement, and the ARMS Reimbursement Agreement.

18  **V.     CONCLUSION**

19          Accordingly, NEWMAN respectfully requests the Court enter judgment in his favor on all

20  Claims in the AP Complaint.

21  Dated: October 16, 2023                     LAW OFFICE OF DONALD W. REID

22

23                                              By: Donald W. Reid
                                                    Counsel for Defendant, Michael Newman
24

25

26

27

28

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  PO Box 2227, Fallbrook, CA 92088

A true and correct copy of the foregoing document entitled (*specify*): **DEFENDANT'S TRIAL BRIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 16, 2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Suzanne C Grandt     suzanne.grandt@calbar.ca.gov, joan.randolph@calbar.ca.gov
- Howard B Grobstein (TR)     hbgtrustee@gtllp.com, C135@ecfcbis.com
- Benjamin Heston     bhestonecf@gmail.com, benheston@recap.email,NexusBankruptcy@jubileebk.net
- Donald W Reid     don@donreidlaw.com, 5969661420@filings.docketbird.com
- United States Trustee (RS)     ustpregion16.rs.ecf@usdoj.gov

☐     Service information continued on attached page

**2.   SERVED BY UNITED STATES MAIL**:
On (*date*) October 16, 2023, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows: Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐     Service information continued on attached page

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:
(state the method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 16, 2023, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows:  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- Hon. Scott Clarkson, 411 West Fourth Street, Suite 5130, Santa Ana, CA 92701-4593

☐     Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 16, 2023 | Donald W. Reid | /s/Donald W. Reid |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

36