NEXUS BANKRUPTCY
BENJAMIN R. HESTON (SBN 297798)
3090 Bristol Street, #400
Costa Mesa, CA 92626
Tel: (949) 312-1377
Fax: (949) 288-20546
*ben@nexusbk.com*

LAW OFFICES OF RICHARD A. LUCAL
RICHARD A. LUCAL (SBN 143372)
333 S. Juniper Street, #100
Escondido, CA 92025
Tel: (760) 741-8141
Fax: (760) 741-8145
*ral@looral.com*

Attorneys for Plaintiff

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## RIVERSIDE DIVISION

| | |
|---|---|
| In re:<br><br>MICHAEL PAUL NEWMAN,<br><br>Debtor. | Case No.: 6:21-bk-11329-SC<br><br>Chapter 7<br><br>Adv. No.: 6:21-ap-01071-SC |
| CHLOE TAEKYEONG LEE,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL PAUL NEWMAN,<br><br>Defendant. | **PLAINTIFF'S CLOSING BRIEF AND REQUEST FOR ORDER AMENDING THE COMPLAINT TO CONFORM TO PROOF AT TRIAL UNDER FRCP 15(b)**<br><br>Trial<br>Date:        October 30, 2023<br>Location:    411 W. Fourth Street<br>                  Courtroom 5C<br>                  Santa Ana, CA 92701 |

1

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................. 8

   A.    Evidence Presented at Trial and Before the Court ......................... 8

   B.    State Bar Court Decision. .................................................. 17

II.     LAW AND ARGUMENT ......................................................... 25

   A.    The Complaint Should Be Amended To Conform To Proof At Trial With Regard To The Essential Factual And Legal Findings In The State Bar Court Decision ......................... 25

   B.    The Doctrine Of Collateral Estoppel Applies To Both The State Court Judgment And The State Bar Court Decision And Precludes Relitigation Of Issues. .................... 28

   C.    The Debt Owed To Plaintiff Was Caused By Defendant's Defalcation While Acting In A Fiduciary Capacity. .................................................. 31

   D.    The Debt Owed To Plaintiff Was Caused By Defendant's Embezzlement .................... 34

   E.    The Debt Owed To Plaintiff Was Caused By Defendant's Willful And Malicious Injury To Plaintiff's Property .................................................. 36

III.    CONCLUSION .................................................................. 38

1

## TABLE OF AUTHORITIES

**Cases**

Banks v. Gill Distrib. Ctrs., Inc., 263 F.3d 862 (9th Cir. 2001) ...................................................... 31

Brosterhous v. State Bar, 12 Cal.4th 315 (Cal. 1995)............................................................. 29, 30

Bullock v. BankChampaign, N.A., 569 U.S. 267 (2013) ......................................................... 32

Burdette v. Carrier Corp., 158 Cal.App.4th 1668 (Cal. Ct. App. 2008)...................................... 29

Carillo v. Su (In re Su), 290 F.3d 1140 (9th Cir. 2002)........................................................ 36

Comcast of L.A., Inc. v. Sandoval (In re Sandoval), 341 B.R. 282 (Bankr. C.D. 2006).............. 36

Davis v. Aetna Acceptance Co., 293 U.S. 328 (1934)........................................................ 36

Freeman v. Chicago Park Dist, 189 F.3d 613 (7th Cir. 1999) .................................................. 26

Gayden v. Nourbakhsh (In re Nourbakhsh), 67 F.3d 798 (9th Cir. 1995).................................. 28

Geernaert v. Mitchell, 31 Cal.App.4th 601 (Cal. Ct. App. 1995)............................................. 35

Grogan v. Garner, 498 U.S. 279 (1991).............................................................................. 28

Hasso v. Hapke, 227 Cal.App.4th 107 (Cal. Ct. App. 2014)................................................ 35

In re Coupon Clearing Service, Inc., 113 F.3d 1091 (9th Cir. 1997) ........................................ 23

In re Harmon, 250 F.3d 1240 (9th Cir. 2001) ..................................................................... 28

In re Jercich, 238 F.3d 1202 (9th Cir. 2001)................................................................... 36, 37

In re Peklar, 260 F.3d 1035 (9th Cir. 2001)....................................................................... 37

Kawaauhau v. Geiger, 523 U.S. 57 (1998) ...................................................................... 36

Kim v. Nash Finch Company, 123 F.3d 1046 (8th Cir. 1997) ............................................... 26

Larsen v. Beekmann, 276 Cal.App.2d 185 (Cal. Ct. App. 1969) ........................................... 37

Lucido v. Superior Court (People), 51 Cal.3d 335 (Cal. 1990)....................................... 28, 29, 30

Maltaman v. State Bar, 43 Cal.3d 924 (Cal. 1987)........................................................... 29

Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373 (1985) ...................................... 28

Murphy v. Murphy, 164 Cal. App. 4th 376 (Cal. Ct. App. 2008) ........................................ 28, 29

Nutrasweet Company v. X-L Engineering Co., 227 F.3d 776 (7th Cir. 2000)........................... 26

Oney v. Weinbert (In re Weinberg), 410 B.R. 19 (B.A.P. 9th Cir. 2009) .................................. 29

Ormsby v. First Am. Title Co. of Nev., 591 F.3d 1199 (9th Cir. 2010) ...................................... 36

Otto v. Niles (In re Niles), 106 F.3d 1456 (9th Cir. 1997) .......................................................... 31

People v. Taylor, 12 Cal.3d 686 (Cal. 1974) .............................................................................. 29

Phillips v. Estate of Arnold (In re Phillips), BAP No. WW-15-1178-TaKuJu (B.A.P. 9th Cir.

    Dec. 16, 2016).......................................................................................................................... 34

Shapiro v. Sutherland, 64 Cal.App.4th 1534 (Cal. Ct. App. 1998) ............................................ 35

Shen v. Leo A. Daly Co., 222 F.3d 472 (8th Cir. 2000).............................................................. 26

Stephens v. Bigelow (In re Bigelow), 271 B.R. 178 (B.A.P. 9th Cir. 2001).............................. 31

Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551 (9th Cir. 1991)

    ............................................................................................................................................ 34, 37

Warner Construction Corp. v. L.A., 2 Cal.3d 285 (Cal. 1970)...................................................... 35

**Statutes**

28 U.S.C. § 1738 ......................................................................................................................... 28

Bankruptcy Code §523(a)(4) ............................................................................................... passim

Bankruptcy Code §523(a)(6) .............................................................................................. 7, 28, 36, 38

California Rule of Professional Conduct 3-310(C)(1)................................................................. 21

California Rule of Professional Conduct 4-100(A) ..................................................................... 22

California Rule of Professional Conduct 4-100(B)(4)................................................................. 22

Federal Rule of Civil Procedure 15(b)........................................................................ 5, 25, 26, 38

Plaintiff Chloe Taekyeong Lee ("Plaintiff"), Trustee of the Sang Hoon Lee Living Trust, respectfully submits this post-trial brief and request to amend the complaint to conform to proof at trial under Federal Rule of Civil Procedure 15(b).

Plaintiff is the successor to her father, Sang Hoon Lee ("Lee"), who passed away last year.  Defendant Michael Newman ("Defendant") represented Lee concerning a personal injury claim and misappropriated $130,000 of Lee's money from Defendant's client trust account while in a fiduciary position.  Defendant filed the instant Chapter 7 bankruptcy case wherein he sought to obtain a discharge of this debt.

This trial is the Defendant's third bite at the apple on all key factual issues relevant to non-dischargeability.  Defendant has forced Plaintiff through one civil trial, one civil appeal, a bankruptcy appeal, State Bar Court proceedings, and now a bankruptcy trial.  As discussed in more detail below, the prior proceedings and the evidence adduced at the trial in this action demonstrate the following:

1) Defendant's representation of both Sang Hoon Lee and his former employer, ARMS, was rife with conflicts of interest, and Defendant never gave a meaningful explanation of the conflicts to either client;

2) Defendant was only in a position to represent Sang Hoon Lee because of the conflicts of interest (Lee would lose substantial economic benefits from ARMS if he hired an independent attorney, and ARMS would be exposed to substantial liability for misclassifying Lee as an independent contractor if Lee sought representation elsewhere), and his willingness to violate his ethical obligations to his clients, especially Lee;

3) Defendant took all of his direction from ARMS and never from Lee – including the negotiation of any fee that he would be paid;

(4) Defendant drafted agreements between ARMS and Lee which only benefitted ARMS and never explained the terms to Lee;

5) Defendant had Lee sign a contingency fee retainer without explaining the terms or other options;

6) Defendant fraudulently concealed or actively misrepresented material facts to ARMS with full knowledge that the information would be provided to Lee and relied on by him (including, but not limited to, concealing the proximity of a $1 million settlement offer at the time he demanded a contingency fee retainer, misrepresenting the purpose of getting a contingent fee retainer, misrepresenting the need for a 15% retainer, concealing that he had filled in a 5% retainer which he sent to the insurance adjustor to begin a dialog, misrepresenting that he would not take the 15% anyways, misrepresenting that he would agree to a flat fee of $20,000 with ARMS getting $130,000 in reimbursement for payments and services provided to Lee, concealing that he intended to keep $150,000 from the settlement – at the time Lee was signing an agreement to reimburse ARMS; misrepresenting the amount of medical liens by $500,000 in a March 28, 2016 letter to Lee intended to get Lee to agree to pay Defendant $150,000 from the settlement proceeds);

7) refusing to return $130,000 to his trust account when Lee disputed the amount that Defendant paid himself from settlement proceeds; and

8) raising a frivolous claim of fee-splitting in order to effectively turn one of his clients against the other. Both Lee and ARMS believed that Defendant was representing Lee in his capacity as general counsel for ARMS and under his substantial salary. The net result of Defendant's actions was to intentionally and maliciously harm Lee, to deprive him of funds

while he was in a vulnerable condition and to commit various acts supporting the non-discharge of this debt.

The State Bar Court decision, confirmed by the evidence adduced at trial, effectively closes the loop on the elements to preclude discharge of either the State Court judgment or State Bar Court restitution order by demonstrating that the debt owed to Plaintiff was the result of Defendant's acts of defalcation [Bankruptcy Code §523(a)(4)], embezzlement [Bankruptcy Code §523(a)(4)] and willful and malicious injury [Bankruptcy Code §523(a)(6)]. The collateral estoppel with regard to the State Bar Court decision is also entirely consistent with the live testimony given at trial, the 8 days of transcripts of prior testimony made in the two previous cases (which the parties stipulated that the Court could consider), and the documentary exhibits in evidence.

In this brief, Plaintiff will cite to the exhibits submitted to this Court (including 8 days of trial testimony[1] in two courts and the resulting judgment/decisions made), and the testimony adduced at trial ("RT" – trial transcript).

---

[1]    As to citations to prior trial testimony, the specific page numbers will be preceded by an "N" for Defendant Newman's testimony, "L" for Sang Hoon Lee's testimony, "LP" for Lindy Park's testimony, a "DH" for Dave Hudrlik's testimony, an "AK" for Allen Kim's testimony, an "SK" for Steven Kim's testimony, and an "RK" for Raj Kharki's testimony.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.
## INTRODUCTION

A.    **Evidence Presented at Trial and Before the Court**

The factual background below is a blend of stipulated facts ("Stip.Facts"), findings of the State Court in support of its conversion judgment, proceedings before the State Bar Court (plus findings), documentary evidence submitted to this Court (including documentary evidence, 6 volumes of trial testimony from the State Court and State Bar Court), and the trial testimony on October 30, 2023 ("RT").  Of note, since Sang Hoon Lee passed away, he was not able to testify at trial, and the Court/parties agreed that the testimony would be addressed in post-trial briefing (not read into the record).  Defendant will also be seeking to submit the testimony of Allen Kim and Steve Kim (former managers of ARMS/Caravan who testified in the State Court trial), and this brief will provide some of their testimony on key issues.

Lee was formerly a contractor with Arms Logistics, Inc. ("ARMS"), a local trucking and transport company.  Defendant was in-house counsel for ARMS and held himself out as general counsel to third parties. (Stip.Fact 2; Ex. 2, 5, 24 and 26).  In 2015, Lee was severely injured in a work-related accident involving a driver from Belena Transportation ("Belena"), and both the police report and Belena's insurance carrier identified the Belena driver as being at fault. (Stip. Fact 1 and 2).  At the time of the accident, there were issues concerning Lee's classification as an independent contractor, and Defendant advised ARMS that he believed Lee was misclassified. (Stip.Fact. 3).  Prior to Lee's accident, Newman had advised ARMS on the classification of their drivers and had drafted an independent contractor agreement used by the Company.  (RT, p.N7:16-19; State Bar Court Decision, ex. 79, p. 7, #1473)

In early 2015, ARMS, through one of its owners Lindy Park, agreed to pay Lee a weekly salary and to provide transportation and Korean/English translation services. (Stip.Fact 4).  ARMS also agreed to have Defendant, as its in-house counsel, assist Lee with processing his insurance claim.  (State Bar Court Decision, Ex. 79, pp. 7-8, #1473-74; RT, pp.LP173:12-174:22; Ex. 65, pp. L341:4-342:19, #0579-80, 408:22-27, #646, DH308:23-28, #546).  As Park

discussed with Lee and explained to Defendant, if Lee consulted an attorney other than
Defendant, it was unlikely that ARMS would be able to pay Lee and provide the benefits under
this agreement.  (RT, p. LP176:1-18).  Having Defendant represent Lee on his claim protected
ARMS from potential litigation with Lee for misclassification. NEWMAN was well aware that
neither ARMS nor LEE had a meaningful choice to use another attorney – as they both had a lot
to lose.  NEWMAN never disclosed to LEE that he had failed the bar exam seven times, that he
had only been admitted to practice law for a little over a year, that he had no litigation
experience, and that he had no experience in personal injury claims. (RT, pp. N57:11-58:3).
LEE simply did not have the option of finding an attorney of his choosing, and NEWMAN only
obtained the representation of LEE as a result of the conflicts of interest and his willingness to
disregard his ethical obligations to his clients.

As part of his job as in-house counsel for ARMS, Defendant would regularly represent
the owners, employees, and contractors of ARMS, at the direction of the owners of ARMS,
David Hudrlik ("Hudrlik"), and Lindy Park ("Park").  (RT, p. N37:7-24).  When representing the
owners, employees, and contractors, it would fall under his ARMS/Caravan salary, and
Defendant did not collect fees from these individuals separately from his ARMS salary. (Ex. 26,
RT, pp. DH260:9-261:16, Ex. 64, N22:10-17, #0260, LP193:9-24, #0431).  In fact, Lee is the
only person Defendant ever sought compensation from separately during his entire time working
at ARMS.  (Ex. 64, pp. N23:8-18, #0261, LP193:25-194:1, #0431-32).

In 2015, Defendant took on Lee's representation for his claim against Belena
Transportation and, as such, a fiduciary attorney-client relationship was formed. (Stip. Fact 5).
As the State Bar Court found, Defendant's joint representation of Lee and ARMS was done
without any disclosures of potential conflicts and without the parties giving knowing waivers of
any conflicts.  (Ex. 2, 5, 11 and 12; Ex. 79, p. 8, #1474, RT, pp.N39:16-18, 50:14-21, 51:20-
52:1, LP195:21-25).  At the time, Defendant had been an attorney for around one year, had no
litigation experience, and had never handled a personal injury claim.  (Stip. Fact 6).  Lee's native
language was Korean and he spoke very little English.  Translation services were provided by

Korean-speaking employees of ARMS. (Stip. Fact 7). Any information about the litigation provided to Lee was given by Defendant to ARMS, with the expectation that ARMS would relay the information to Lee. (RT, pp. N29:11-18, 32:6-10, 39:19-40:1, 41:4-16, 61:25-62:7). Throughout 2015, Defendant was representing Lee as part of his duties as in-house counsel for ARMS and while being paid a salary at ARMS. (Ex. 79, p. 8, #1474). Lee and ARMS always understood and believed that Defendant was representing Lee only in Defendant's capacity as the attorney for ARMS, and Lee did not have the ability to control or direct Defendant. (RT, pp. LP180:10-181:10, DH293:10-13, Ex.65, pp. L357:4-13, #0595, 386:1-387:7, #0624, 392:16-393:16, #0630, 425:8-15, #0663).

Throughout 2015, Defendant was not able to negotiate a settlement with Belena's carrier. (Stip.Fact 8). However, in June of 2015, Defendant sent a demand for approximately $2.5 million in damages (with approximately $500,000 in medical expenses identified), and while Belena's carrier did try to attribute 50% fault to Lee, it did not contest the amount of the demand. (Ex. 2, 3, 4, 24, RT, pp. N63:5-25, 64:9-12). As such and knowing that the Belena policy limit was $1 million, Defendant knew in 2015 that a policy limit offer was likely. (Id.). This was never disclosed to either ARMS or Lee prior to Defendant requesting that Lee sign a contingency fee agreement. (RT, pp. LP177:20-178:23, DH 265:6-11, Ex.65, pp. L343:14-344:10, #0581-82)

On January 20, 2016, Defendant sent an email to the owners of ARMS, Park, and Hudrlik, stating that the adjustor for the Belena carrier required Lee to sign a contingency fee agreement in order for Defendant to talk to him about the claim. (Stip. Fact 9 and Ex. 5 and 7) The adjustor did not require a contingency fee agreement but only a representation letter. (Ex. 24). The retainer agreement provided by Defendant to ARMS did not include contingency percentages, and Defendant requested that ARMS decided the percentages. (Ex. 5) On January 20 or 21, 2016, Lee signed a retainer agreement that Defendant had previously provided to ARMS ("First Retainer Agreement"). (Stip.Fact 10 and Ex. 5, 7 and 11; Ex. 64, N52:2-54:6, #0290-92, 58:22-59:24, #0296). At the time that Lee signed the agreement, he left the contingency fee percentages blank. After Lee signed and without his knowledge, Defendant

1  inserted percentages of 5% if resolved before trial and 10% for trial and post-trial and sent the

2  retainer to the Belena carrier. (Id.; Ex. 5, 7 and 11, RT, pp. N52:9-53:24).  **The retainer**

3  **provided that Defendant would get nothing if terminated prior to a settlement.**  (Ex. 11 and

4  RT, pp. N126:17-128:6).  The First Retainer Agreement: 1) was not dated; 2) did not specify the

5  contingency fee; 3) did not contain disclosures regarding the joint representation of ARMS; 4)

6  falsely stated that Defendant did not represent any other party in connection with the claim; and

7  5) was written in English. (Ex. 11)

8      Defendant concealed the fact that he had already sent the First Retainer Agreement to the

9  Belena carrier and began settlement discussions.  Instead, he told ARMS that the Belena carrier

10  would only take him seriously if the retainer agreement said 15%.  (RT, DH267:2-9).  Plaintiff

11  only found out that the first retainer had been sent to the adjustor after it served a subpoena on

12  the insurance company in the underlying civil litigation. (RT, pp. N55:19-23, 70:3-5).

13      Shortly after the First Retainer Agreement was signed and submitted by Defendant to the

14  Belena carrier, ARMS inserted 15% into another copy of the retainer agreement ("Second

15  Retainer Agreement"), and Lee signed the agreement.[2]  (Stip. Fact 11 and Ex. 6 and 12; Ex. 65:

16  pp. DH304:26-307:23, L390:7-15, 412:10-24).  Defendant never discussed the terms of either

17  retainer agreement with Lee, and all of his fee discussions were with the owners of ARMS. (RT,

18  pp. N32:6-10, 32:19-23, 34:17-22, 68:3-19, 147:6-148:19, 149:6-25, 167:4-19, and Ex. 65,

19  L414:4-8, #0652).  Defendant claims that Allen Kim, manager of ARMS, translated the

20  retainer for Lee, but Allen Kim had no legal background and could not explain anything about

21  the agreement.[3]

22

23  [2]      ARMS understood that the 15% was to be divided between Caravan Canopy (which was paying Newman's
   salary) and ARMS (which was paying Lee his weekly salary and providing other services).  ARMS, through Lindy

24  Park, did explain to and agree with Lee that only 15% from the settlement proceeds would be required to pay ARMS

25  for all services provided, including Newman.

26  [3]      During the State Court trial, Kim testified with a translator, and stated that he speaks English "to a certain
   degree." (Ex. 65, pp. 430:8-431:19, #0668)  Allen Kim did not translate the retainer "word for word". (Ex. 65, pp.

27  432:26-433:23, #0670-71).  "When it comes to legal language and words, legal words are still confusing to me."

28

1    With both the First Retainer Agreement and the Second Retainer Agreement and based

2    on oral and written statements by Defendant (Ex. 5), both ARMS and Lee believed that

3    Defendant was continuing to represent Lee as ARMS in-house counsel and under his ARMS

4    salary. (RT, pp. LP182:1-6, 184:16-185:2, 224:22-228:18, 257:14, Ex.64, pp. N59:15-24, #0297,

5    LP221:26-222:15, #0459, Ex. 65, pp. LP291:18-292:1, #0529-30, L344:21-345:8, #0582,

6    DH304:26-306:12, #0542-44).  Defendant never explained to Lee or ARMS that he expected to

7    be paid under the retainer agreement, and never once discussed anything about the retainer

8    agreement directly with Lee.  (RT, pp. N147:6-148:19, 148:24-149:25, 167:4-19).  Defendant

9    never explained to ARMS or Lee that he was close to settling the claim and falsely stated that the

10    retainer agreement had to be on a contingency fee basis and could not be hourly, flat fee, or any

11    other sort of fee arrangement.  (Ex. 65, pp. DH307:18-25, #0545, LP209:15-17, #0447, L413:6-

12    10, #0651)

13    As Newman expected and after Lee signed a contingency fee retainer, it took only a few

14    phone calls to the Belena carrier to get a policy limits offer of $1 million.  (Ex. 7, 9, 10, 24 and

15    RT, pp. N312:4-10, 77:10-19).  At the same time that Defendant was representing Lee for his

16    dispute with Belena, he was actively representing ARMS with any potential claims that Lee

17    might have against ARMS.  (Ex. 79, pp. 22-25, #1488-91, RT, pp. N79:21-81:19, LP242:8-

18    243:3, 257:5-7, Ex.65. p. DH309:10-24, #0547).  Defendant drafted various versions of

19    agreements between Lee and ARMS which identified Lee as an independent contractor, agreed

20    to have Lee repay ARMS, and agreed to have Lee waive any claims against ARMS. (Ex. 10, 13,

21    14, 16;  RT, pp. N9:17-10:19, 158:7-159:1).  As NEWMAN testified at the bankruptcy trial,

22    none of the provisions in any of these agreements were for the benefit of LEE and all were

23

24    (Ex. 65, pp. 440:2-21, #0678).  Newman was company counsel for ARMS, and if legal documents needed to be

25    prepared, Newman was the one to do that.  (Ex. 65, pp. 441:21-442:11, #0679-80).  Newman did not talk to Kim

26    prior to the translation of the retainer, and Kim does not recall what, if any, directions were given by Lindy Park.

27    (Ex. 65, pp. 442:12-25, #0680, 443:27-444:12, #0681-82).  At time that Kim read retainer to Lee, he understood that

28    Newman was representing ARMS with regard to issues relating to Lee.  (Ex. 65, pp. 444:13-21, #0682).

strongly in favor of ARMS.  (RT, pp. N79:21-81:19).  The State Bar Court found this to be a troubling conflict of interest that precluded Defendant from providing Lee with competent advice about his claims.

As found in the State Court judgment and findings and the State Bar Court decision, Defendant, *after* the anticipated $1 million offer from Belena's carrier was received, responded to a question from Lindy Park as to whether the Second Retainer Agreement should be modified. (Ex. 10).  Defendant said: "I wouldn't have taken the 15% anyways, better to leave to show discount." (Ex. 10).  At the time that Defendant sent this email, he knew that the Second Retainer Agreement could be terminated by Lee with him getting no fee.  (Ex. 12; RT, pp. N126:17-128:6).

Between this February 26, 2016 email exchange between Defendant and Park, and Lee's execution of documents on March 16, 2016, ARMS entered into an agreement with Lee that 15% of the settlement proceeds would be used to reimburse ARMS, and ARMS would pay Defendant from those proceeds. (Ex. 64, pp. LP224:24-226:13, #0462-64, Ex.65, pp.L425:25-426:6, #0663-64).  Defendant met with Hudrlik and agreed that he would get a flat fee/bonus of $20,000 from the settlement (with $130,000 going to ARMS).  (RT, p.DH271:10-25).  This was confirmed as a necessary finding of fact in both the State Court judgment and the State Bar Court decision.  Defendant then amended the agreement between Lee and ARMS to have Lee repay ARMS $130,000. (Ex. 16; RT, pp. N158:7-159:1).  In this agreement that Defendant drafted, Lee waived any potential claims against ARMS, confirmed that he was an independent contractor, and agreed that ARMS would be reimbursed $130,000 from the settlement for compensation and services provided.  By executing this agreement, Lee gave up his rights to pursue any claims against ARMS.

Both the amended Lee/ARMS agreement and the Belena settlement release were signed by Lee on March 16, 2016 with Defendant, Lee, an ARMS translator (Allen Kim), and a notary (Raj Kharki) present.  (Ex. 64, pp. N89:5-90:8, #0327-28).  During this meeting, Defendant, with a translator present, made no effort to discuss either agreement or any other issues with Lee. (RT, pp. N82:22-83:19, 90:15-91:23).  Defendant concealed the fact that he intended to take $150,000 from the settlement proceeds.  (RT, pp. N96:18-97:12).  If Lee had been made aware that Defendant would be retaining $150,000, he would not have entered into the agreement which provided for an additional payment of $130,000 to ARMS.  (Ex. 65, p. L349:4-23, #0587). As both the State Court and State Bar Court found, Lee had agreed with ARMS to allow ARMS to keep 15% of the settlement, and ARMS would compensate Defendant from this amount.  (Ex. 65, pp. L349:24-350:1, #0587-88).

In late March of 2016, Defendant received the settlement funds, and, on March 28, 2016, sent a letter to LEE which stated that 15% of the settlement would be paid to Defendant and $130,000 to ARMS.  (Stip. Fact 13).  Although Defendant was aware that Lee would not be able to read the letter without a translator, he sent it only to Lee and did not provide a copy to ARMS. (Ex. 17; Ex. 65, pp. L357:27-358:13, #0595-96).  The letter was intentionally misleading in that NEWMAN, knowing that the medical liens were over $500,000, identified only about $20,000 in liens in the letter.  Defendant admitted that his purpose for sending the letter was to focus on his $150,000 fee and LEE's agreement to pay $130,000 to ARMS. (RT, pp. N98:11-99:6, 100:6-11, 105:20-24).  With his understanding that $150,000 from the settlement funds was to pay both any obligation to ARMS and Defendant, Lee met with NEWMAN to discuss this letter and objected to Defendant's letter providing for $280,000 to be paid.[4] (RT, pp. N102:22-25, Ex. 65,

---

[4]    During this meeting, NEWMAN and LEE met in person, with Steve Kim, a manager of Caravan Canopy at the time, participating on a speaker phone.  NEWMAN claims that LEE did not object to NEWMAN's 15% fee, but LEE testified that he understood any payment to NEWMAN was a payment to ARMS, that the $150,000 was all he

pp. L350:9-352:6, #0588-90).  He then talked with Lindy Park who confirmed that Defendant was to only receive $20,000 with ARMS receiving $130,000 and the total ARMS/Newman payment to be $150,000 from the settlement.  (Ex. 65, pp. L386:1-387:7, #0624).  Lee always understood that any payment to NEWMAN was a payment to ARMS, and never believed that NEWMAN was representing LEE separate from his position as general counsel for ARMS.  (Ex. 65, pp. L 356:21-357:13, #0594-95).

As the State Bar Court found, once Lee raised an objection to the payment of the $150,000, Defendant was obligated to return the disputed amount to the trust account until the dispute was finally resolved. (Ex. 79, pp. 26-28, #1492-94).  Instead, on or about April 8, 2016, and a little over a week after the settlement funds cleared his account, Defendant paid himself $150,000 which was deposited in his general business account. (Stip.Fact 14).  Defendant immediately applied those funds to obtaining a lease for and building tenant improvements on his new law office. (Ex. 62).  In July of 2016, Hudrlik sent Defendant an email to discuss the fee issue and get Defendant involved in a meeting with Lee, with Park available to translate and with Hudrlik present. (Ex. 18).  Defendant refused and immediately resigned. (RT, pp. DH293:14-294:12, Ex. 64, pp. N155:28-157:17, #0393-95).  For the first time, Defendant claimed that if he accepted $20,000 and ARMS getting $130,000 from the settlement it would be unethical fee-

---

agreed to pay ARMS, and that there should not be two separate charges.  NEWMAN relies on the testimony of his friend Steve Kim to support his position.  Steve Kim's testimony is not competent.  Much of his testimony was hearsay from NEWMAN, and he testified that he understood that NEWMAN had represented Lee in a lawsuit for over a year and that NEWMAN had discounted and resolved all of LEE's medical bills – both of which were false. (Ex. 66, pp. 477:21-25, #0715, 479:1-17, #0717, 482:6-15, #0720).  Steve Kim confirmed that all of the work NEWMAN performed for Lee was done in his capacity as counsel for ARMS, that NEWMAN never stated that he was representing Lee separate from his ARMS employment.  Kim also testified that the fee dispute was between NEWMAN and ARMS – not Lee. (Ex. 66, pp. 479:22-480:6, #0717-18, 489:7-24, #0727).  Steve Kim also testified that he was not aware of the March 28, 2016 letter at the time of the meeting and no documents were discussed. (Ex. 66, pp. 481:26-482:2, #0719-20).

splitting and, as such, that he intended to keep the full $150,000 – despite his earlier agreement. (RT, pp. N122:8-123:6, DH279:2-280:9).  During the State Court trial, Defendant admitted that he could always discount his fees to $20,000 and Lee could agree to pay $130,000 to ARMS without implicating any fee-splitting issues.  (Ex. 66, pp. N571:22-572:3, #0809-10).  This is exactly what the State Court, Court of Appeal, State Bar Court, and BAP found had occurred.

Newman and his counsel claim that he was entitled to be paid for representing Lee – ignoring that he was doing the work under his Arms/Caravan salary of $2708.33 twice monthly prior to March, 2016 (annual salary of $65,000) and $3208.33 after March 1, 2016 (annual salary of $77,000).  Every prior court has found that NEWMAN never entered into a binding agreement with Lee for a contingency fee and never even discussed a contingency fee with ARMS or Lee in 2015.  Newman testified at the bankruptcy trial that his entire work produced from 2015 consisted of a two-page demand letter and a three-page draft complaint and that, in 2016, he made two phone calls to get a policy limits offer of $1 million. (RT, pp. N65:22-66:7, 311:16-312:10)    After Newman, without notice to ARMS or Lee, paid himself $150,000 from the Lee settlement on April 8, 2016, he stopped coming into the office, stopped doing any work for ARMS and was paid his full salary of $6416,66 per month until July 15, 2016 (18 days before giving Lee a termination of representation letter) – while the only work he was doing was negotiating Lee's medical bills.  (RT, pp. N109:2-5, H293:14-294:12)    Two prior courts found that Newman put in very little work negotiating the bills (demand letter, response and acceptance).    While Newman claims that he was entitled to a fees of $150,000, his representation of Lee was limited to processing an insurance claim and negotiating medical liens -- administrative work that is often performed by non-attorneys (e.g. paralegals), and the filing of litigation was not contemplated by either Lee or Arms.

On August 2, 2016, Defendant personally delivered a letter to Lee, in English, with a summary of the allocations of the settlement proceeds which showed $150,000 paid to Defendant – with nothing to ARMS.  (Ex. 20).  For the first time, Defendant gave Lee a business card indicating that he was not working for ARMS. (Ex. 65, pp. L354:8-19, #0592).  When Lee found out that Defendant had not paid ARMS from the $150,000, he personally paid $130,000 to ARMS.  (Ex. 20; RT, pp. DH280:10-12 and Ex. 65, pp. L355:22-356:14, #0593).  In an August 2016 email, Lee demanded that Defendant reimburse the $130,000 to Lee.  (Ex. 19).  Defendant refused and told Lee that he could initiate a fee arbitration.  (Id.).

On August 28, 2017, Lee sued Defendant in the Riverside Superior Court for conversion, malpractice, and fraud.  After a 5-day bench trial in March and April of 2019, the Court entered judgment on the conversion claim for $130,000 plus interest accruing from April 8, 2016.  The Court dismissed the malpractice claim as untimely and found that Lee had not met his evidentiary burden on the fraud claim.  In July of 2019, the Court entered a statement of decision.  (Stip.Facts, 15-20).  As to the conversion claim, the Court found that Defendant had agreed to accept $20,000 from the settlement funds for representing Lee, and, by taking $150,000, had converted $130,000.  (Stip.Fact 19).  After the parties appealed, the Court of Appeals affirmed the judgment.  (Stip.Fact 23).  Defendant thereafter sought to discharge the judgment through a Chapter 7 bankruptcy.  Plaintiff then timely filed the instant adversary proceeding.

**B.     State Bar Court Decision.**

In October 2021, the State Bar initiated disciplinary proceedings against Defendant, and a three-day trial was held in April 2022.  In its Decision, the Court stated, "In this discipline case, the court has applied the clear and convincing evidence standard of proof to independently assess the records admitted from the relevant civil proceedings, resolving all reasonable doubts in

[Newman's] favor… In addition, [Newman] was given fair opportunity to present evidence to contradict, temper, or explain all admitted civil records." (Ex. 79, pp. 4-5, #1470-1471). After three days of live testimony, the State Bar Court found Newman culpable on all five counts including two violations of rules governing conflicts of interest ("failures to properly disclose a relationship with an interested party and to obtain informed written consent to a representation involving potential conflicts of interest") and "three violations of trust accounting duties (failures to maintain client funds in trust, to restore disputed client funds to a trust account, and to promptly pay client funds on request)." (Ex. 79, p. 1, #1467).

The Court found that all of the culpability witnesses were highly credible (Lindy Park, David Hudrlik, Rajendra Karki, and Richard Lucal) – with the notable exception of Defendant. (Ex. 79, p. 5, #1471). The Court found: **"In contrast, much of [Defendant's] testimony lacked credibility. Many of [Defendant's] factual accounts were unreasonable in the context of the relevant events and/or were contrary to the overwhelming weight of the evidence— including the documentary evidence and the consistent testimony of more reliable witnesses. The court also takes into account [Defendant's] evasive demeanor at trial and frequent responses that he did not recall information a reasonable attorney would remember. For these reasons, the court finds [Defendant] was an unreliable witness."** (Ex. 79, p. 6, #1472).

The State Bar Court confirmed the factual analysis above as to Defendant's work for ARMS and on behalf of its owners, employees, and contractors for a set salary, that Defendant advised ARMS regarding classification of truck drivers and drafted an independent contractor agreement that applied to Lee, that Defendant informed ARMS that he believed Lee was misclassified at the time of the accident, that ARMS entered into an agreement with Lee to

provide weekly compensation, translation and transportation services and Defendant's legal

assistance with the Belena insurance claim, that Defendant, at ARMS' request, began assisting

Lee in January 2015, that Defendant had minimal contact with Lee throughout the

representation, and that Defendant was representing Lee under his regular ARMS salary.  (Ex.

79, p. 6-9, #1472-75).  The Court specifically confirmed the above analysis as to issues regarding

the First Retainer Agreement, the lack of any informed waiver of conflicts, the false statement

that Defendant only represented Lee in the dispute and that Defendant never discussed conflicts

of interest with Lee.  (Ex. 79, pp. 8-10, #1474-76)   Park, Hudrlik, and Lee all understood that

the sole purpose of both the First and Second Retainer Agreements to allow Defendant to

negotiate with Belena's adjustor on Lee's behalf and did not change the fact that his work for

Lee was being done under his ARMS salary.  (Ex. 79, p. 10-11, #1476-77).  The Court further

confirmed that Defendant had directed Lee to initially sign a retainer without percentages, later

inserted the percentages of 5 and 10%, and then sent the retainer to the Belena insurance

adjuster. (Ex. 79, p. 11, #1477).  Defendant never discussed either retainer with Lee.   Lee and

ARMS agreed that ARMS would get 15% from any settlement and would compensate Defendant

from that amount – with the agreement that $130,000 would go to ARMS as reimbursement for

salary and other benefits provided, and $20,000 to Defendant as a bonus for his work on Lee's

case.  (Ex. 79, p. 12, #1478).  The Court discussed, at length, the February 26, 2016 email

exchange between Defendant and Park in which Defendant stated:  "I wouldn't have taken the

15% anyways, better to leave to show discount" and which attached a draft agreement between

ARMS and Lee which was prepared by Defendant (as well as prior drafts).  (Ex. 79, pp. 12-14,

#1478-80 and Ex. 10, 13, 14, 16).  The Court found this statement to be consistent with the

testimony that the Second Retainer Agreement was not agreed to by Lee, was understood by Lee

to be required only to have Defendant negotiate with the Belena carrier, and did not represent an

agreement by Lee to pay Defendant 15% of the settlement.

As to Defendant's March 28, 2016 summary of expenses sent to Lee (after Defendant had

received the $1 million settlement), the Court found that Lee had objected to paying $150,000 to

Defendant *and* $130,000 to ARMS – as he had only agreed to a total of $150,000 to cover both.

This was confirmed by ARMS. (Ex. 79, p. 15, #1481).  As to the work performed by Defendant

after the retainer was signed, it included minimal contact with the Belena carrier to get the $1

million settlement and little effort to negotiate discounts on Lee's medical bills.  (Ex. 79, p. 17,

#1483).

The Court noted that Defendant never raised any claims that paying ARMS from the

settlement would be illegal fee-splitting until the July 12, 2016 meeting – more than three

months after Defendant had paid himself from the settlement funds.  (Ex. 79, p. 16, #1482).  The

Court discussed Defendant's final settlement accounting, Lee's payment of $130,000 to ARMS

in August 2016, and Lee's August 2016 demand that Defendant reimburse the $130,000 – as

well as Defendant's response. (Ex. 79, p. 17-18, #1483-84).  All of the State Bar Court's findings

are consistent with and corroborate the factual discussion above, and evidence submitted to the

Bankruptcy Court in the form of live testimony and documentary evidence.

After making factual findings applying the clear and convincing standard, the Court

found that Defendant violated California Rule of Professional Conduct 3.310(B)(3) by failing to

disclose to Lee his relationship with ARMS, that Defendant knew that ARMS had a substantial

interest in the outcome of Lee's case, that a settlement with Belena would reduce the likelihood

of a claim against ARMS by Lee, and that a settlement would end ARMS' requirement to make

payments and provide other services to Lee.  "Arms' interests were a motivating factor in its

request that [Defendant] work on Lee's claim to begin with, infecting the representation with conflicts from the outset." (Ex. 79, p. 21, #1487).  The conflicts lasted throughout the entire attorney-client relationship between Lee and Defendant – from January 2015 through August 2016.  Defendant never provided Lee with written disclosures nor obtained an informed waiver of conflicts.  The Lee/ARMS agreements drafted by Defendant clearly demonstrated the nature of the egregiousness of the conflicts as it had Lee admitting to being an independent contractor, waiving his rights against ARMS, and agreeing to pay a substantial amount of money to ARMS. (Ex. 79, pp. 21-22, #1487-88).

Defendant was also found culpable of violating California Rule of Professional Conduct 3-310(C)(1) by representing two clients in the same matter when the interests of the two clients potentially conflicted without obtaining the informed consent of each.  (Ex. 79, pp. 22-23, #1488-89).  "Nevertheless, [Defendant's] conduct and communications leave no doubt that he was acting as Arms' counsel, as well as Lee's, with regard to overlapping issues."  (Ex. 79, p. 23, #1489).  The Court gave a detailed description of the numerous potential conflicts raised by Defendant's joint representation of ARMS and Lee with regard to Lee's claim against Belena and noted that the conflicts were clear from the outset of Defendant's representation of Lee. (Ex. 79, p. 24, #1490).  Defendant failed to "notify each client of the relevant circumstances and the actual and reasonably foreseeable adverse consequences that the joint nature of the representation would have on his abilities to represent each." (Id.).  While having a duty to Lee to maximize his recovery, Defendant had a duty to ARMS to protect it from liability to Lee.  Defendant's "duty of loyalty to Lee *should* have prevented [Defendant] from advising Arms about legal exposure to, and avoidance of, Lee's potential claims."  (Ex. 79, p. 25, #1491).

The Court found Defendant culpable for violating California Rule of Professional Conduct 4-100(A) by failing to maintain client funds in a client trust account when the attorney's fee is disputed by the client.  (Ex. 79, p. 26, #1492).  Defendant was found culpable for depositing the $150,000 in his firm's general account when he knew there was a fee dispute and failing to return $130,000 to the account once Lee further informed Defendant of the dispute in August 2016. (Ex. 79, pp. 26-28, #1492-94).  The Court found that Lee did not agree to pay a 15% contingency fee to Defendant.  Lee agreed to pay $150,000 in total to ARMS and Defendant, and the agreement was that Defendant would get $20,000 and ARMS $130,000.  (Ex. 79, p. 27, #1493).  The Court found Defendant culpable for violating California Rule of Professional Conduct 4-100(B)(4) by failing to pay Lee $130,000 on demand. (Ex. 79, p. 28, #1494)

The Court was required to evaluate issues of aggravation and mitigation.  As to aggravating circumstances, the Court found that Defendant committed "five distinct ethical violations…"  (Ex. 79, p. 29, #1495).  This warranted moderate aggravation under applicable rules.  A critical finding with regard to the issues pending in this bankruptcy proceeding, the Court found that Defendant "caused significant harm" to Lee.  (Ex. 79, p. 31, #1497)  "By engaging in a hopelessly conflicted dual representation, without proper disclosures of the circumstances, [Defendant] deprived Lee of the opportunity to make an informed decision about whether to seek independent, unconflicted counsel to fully advise him on the scope of his potential claims – including those against Arms.  [Defendant] then conducted the representation at Arms' direction, relegating Lee's interests to the backseat, seemingly unaware of his concurrent duties as Lee's fiduciary."  (Ex. 79, p. 31, #1497).  Defendant, by wrongfully taking $130,000 and refusing to promptly return it at Lee's request, deprived Lee of substantial funds

when he was "particularly vulnerable, due to his injuries, related expenses, and inability to work." (Ex. 79, p. 31, #1497)   This significant harm to the client was a basis for substantial aggravation under applicable standards.  (Id.)

The Court further found that Defendant's "misconduct also is substantially aggravated by his utter failure to accept responsibility for his actions." (Ex. 79, p. 32, #1498).  "Rather than accepting responsibility, [Defendant] has attempted to shift the blame to others, including the principals of Arms." Defendant displayed a defiant attitude toward the civil judgment and "insists that he will never return Lee's money – money he only received because of his position of trust as Lee's fiduciary." (Id.)   Defendant's "unwillingness to consider the impropriety of his actions goes 'beyond tenacity to truculence' and poses a risk of further professional misconduct (Id.).  The Court further found additional aggravation because of Defendant's continuing failure to make restitution and the high level of victim vulnerability.   (Ex. 79, p. 33, #1499).

**If Newman had either kept the disputed $130,000 in his trust account or returned the money to the trust account in August 2016, the money would have been the property of plaintiff and not subject to these bankruptcy proceedings since property held in trust does not become property of the Estate.  In re Coupon Clearing Service, Inc., 113 F.3d 1091, 1099 (9th Cir. 1997).  Plaintiff would not be in her current position of having to collect a judgment from an attorney who will do anything to avoid payment and would not have incurred very substantial expenses trying to collect.**

Based on its analysis of the factual and legal issues, aggravating factors, and mitigating factors, the Court imposed six months of actual suspension and an additional 18 months of probation.  The Court ordered that Defendant make restitution of $130,000 plus interest from April 8, 2016 (at 10%), and required the restitution to be made 30 days prior to the end of the

probation period. (Ex. 79, p. 41, #1507).  The Court further issued monetary sanctions against

Defendant.  In April 2023, the California Supreme Court confirmed the discipline and entered a

final order.  (Ex. 70).

Each of the factual issues decided by the State Bar Court, by a clear and convincing

evidence standard, were essential to its determination of Defendant's culpability for "willfully"

violating five rules of professional conduct involving conflicts of interest and client funds and

serious aggravating factors.  Defendant has repeatedly contradicted the findings of the State

Court and the State Bar Court and has claimed that:

(1) he did not represent Lee until June 2015 and that there was no conflict because

ARMS had orally agreed to pay Lee weekly and to provide services (Ex. 79, p. 8, #1474, fn 2

and p. 21, #1487);

(2) Defendant had an oral 15% contingency agreement with ARMS in 2015 (Ex. 79, p. 9,

#1475, fn 3);

(3) Defendant did not talk with Hudrlik about changing the fee from the 5% in the First

Retainer Agreement to 15% in the Second Retainer Agreement (Ex. 79, p. 11, #1477, fn. 4);

(4) the Second Retainer Agreement was not for the purposes of his talking with Belena's

carrier but was to memorialize a prior oral fee agreement (Ex. 79, p. 12, #1478, fn. 5);

(5) he never entered into an agreement with ARMS for $20,000 paid from the settlement

for representing Lee (Ex. 79, p. 12, #1478, fn. 6);

(6) the February 26, 2016 email from Defendant to Park was not intended to state that

Defendant would take no fee from the Second Retainer Agreement but that he would not take the

full 15% unless he negotiated Lee's medical bills to less than $500,000 (Ex. 79, p. 13, #1479, fn.

7);

(7) While Defendant admits to having drafted the first two versions of the ARMS/Lee

agreements, he claimed that he did not draft the final agreement in which Lee agreed to pay

ARMS $130,000 in reimbursement (Ex. 79, p. 14, #1480, fn. 8; Ex. 8, 13, 14, 16);

(8) Lee, after receiving Defendant's March 28, 2016 letter regarding distribution of

settlement proceeds, only disputed the payment of $130,000 to ARMS (Ex. 79, p. 15, #1481, fn.

11);

(9) the generic waiver paragraph in his Second Retainer Agreement validly obtained

informed consent from Lee (Ex. 79, p. 21-24, #1487-90);

(10) he did not represent both Lee and ARMS with respect to Lee's accident and injuries

(Ex. 79, p. 23, #1489); and

(11) To avoid any responsibility for his actions, others were to blame (Ex. 79, p. 31,

#1497).

During the bankruptcy trial, Defendant repeatedly testified that he does not contest any of

the findings in the State Bar Court decision. (RT, pp. **N133:7-8**, 22:12-19, 23:14-25, 32:11-18,

117:3-119:11)   Plaintiff is herein requesting that the Court amend the complaint to conform to

proof at trial with regard to the collateral estoppel effect of the State Bar Court decision and its

essential findings on both culpability and aggravation.

## **II**

## **LAW AND ARGUMENT**

**A.    THE COMPLAINT SHOULD BE AMENDED TO CONFORM TO PROOF AT
TRIAL WITH REGARD TO THE ESSENTIAL FACTUAL AND LEGAL
FINDINGS IN THE STATE BAR COURT DECISION.**

Under the authority of FRCP 15(b), Plaintiff respectfully requests that this Court order

the amendment of the complaint in this action to conform to proof at trial including all aspects,

findings, and restitution ordered by the California State Bar Court.  During the October 30, 2023

trial in this action, the State Bar Court's August 2022 decision regarding discipline of Newman

and ordering restitution as a result of his misappropriation of $130,000 from Lee's trust account,

conflict of interest and other issues was tried with the express consent of Defendant.   Indeed,

Defendant stipulated, during the trial, that this Court could consider all testimony given in that

matter, in addition to consideration of the decision itself.  Under FRCP 15(b), "[w]hen an issue

not raised by the pleadings is tried by the parties' express or implied consent, it must be treated

in all respects as if raised in the pleadings.' Freeman v. Chicago Park Dist, 189 F.3d 613, 618

(7th Cir. 1999).  Consent may be found where a party opposing the motion to amend failed to

object when the evidence was presented at trial. Shen v. Leo A. Daly Co., 222 F.3d 472, 479 (8th

Cir. 2000).   A party may move at any time, even after judgment, to amend the pleadings to

conform to the evidence.  Where the requirements are met, motions to amend the pleadings are

liberally allowed. Nutrasweet Company v. X-L Engineering Co., 227 F.3d 776, 787 (7th Cir.

2000).  No formal amendment to the pleadings is required where there was no objection to the

evidence at trial.

The only requirements are that the opposing party has had "actual notice" of an

unpleaded issue and adequate opportunity to cure any surprise resulting from the change in the

pleadings.  Kim v. Nash Finch Company, 123 F.3d 1046, 1063 (8th Cir. 1997).  With regard to

the State Bar decision, it was issued in August 2022 and was adopted as a final order by the

California Supreme Court in April 2023.  Defendant was suspended from practicing law

commencing on May 17, 2023.  Newman was well aware of the issues relating to the State Bar

Court decision, stipulated to the admissibility of the transcripts, decision, and Supreme Court

Order and litigated the issues during the October 30, 2023 trial.  As to the issue of collateral

estoppel discussed below, this issue was fully addressed in Plaintiff's October 15, 2023 trial brief.

Newman was charged with five counts of professional misconduct by the California State Bar in connection with Newman's representation of two clients, Arms Trans Inc. ("ARMS") and Lee in the same matter.  The State Bar Court found Newman culpable on all five counts including two violations of rules governing conflicts of interest ("failures to properly disclose a relationship with an interested party and to obtain informed written consent to a representation involving potential conflicts of interest") and "three violations of trust accounting duties (failures to maintain client funds in trust, to restore disputed client funds to a trust account, and to promptly pay client funds on request)."  (Ex. 79, p. 1, #1467).  As the State Bar Court found: "This misconduct involved a troubling disregard for the duties [Newman] owed his clients over an extended course of dealing.   [Newman] engaged in a problematically conflicted representation, during which he unilaterally withdrew $130,000 more in legal fees from a vulnerable client's settlement funds than the client had agreed to pay." (Ex. 79, pp. 1-2, #1467-68).  "Due to the serious nature of his misconduct, the substantial aggravating factors – including, most notably, [Newman's] profound lack of insight into the wrongfulness of his acts – and the limited mitigation, the court recommends that [Newman] be suspended from the practice of law for two years, with execution stayed, and that he be placed on probation for two years with conditions including a six-month actual suspension." (Ex. 79, pp. 1 and 2).  The State Bar Court decision was implemented by the California Supreme Court in April 2023.  (Ex. 70).  The State Bar Court decision, adopted by the California Supreme Court ordered Newman to pay restitution of $130,000 plus interest from April 8, 2016.

With regard to the State Bar Court decision, Newman repeatedly testified that he did not dispute the findings made by the State Bar Court judge in the decision.   The State Bar Court

decision, consistent with all of the evidence submitted to this Court, effectively closes the loop

on the elements to preclude discharge of either the State Court judgment or State Bar Court

restitution by demonstrating that Defendant committed acts of defalcation (Bankruptcy Code

section 523(a)(4)), embezzlement (Bankruptcy Code section 523(a)(4)) and willful and malicious

injury (Bankruptcy Code section 523(a)(6)).

**B.      THE DOCTRINE OF COLLATERAL ESTOPPEL APPLIES TO BOTH THE
        STATE COURT JUDGMENT AND THE STATE BAR COURT DECISION AND
        PRECLUDES RELITIGATION OF ISSUES.**

Both the State Court judgment and State Bar Court decision (implemented by California

Supreme Court order) represent final rulings and the doctrine of collateral estoppel applies to the

necessary factual findings made by the respective Courts.

The Ninth Circuit has held:

> Principles of collateral estoppel can be used in the context of bankruptcy adversary
> proceedings. Grogan v. Garner, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d
> 755 (1991). Under the Full Faith and Credit Act, 28 U.S.C. § 1738, the preclusive
> effect of a state court judgment in a subsequent bankruptcy proceeding is
> determined by the preclusion law of the state in which the judgment was issued.
> Gayden v. Nourbakhsh (In re Nourbakhsh), 67 F.3d 798, 800 (9th Cir. 1995) (citing
> Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380, 105 S.Ct. 1327,
> 84 L.Ed.2d 274 (1985)).

In re Harmon, 250 F.3d 1240, 1245 (9th Cir. 2001).

In California, whether collateral estoppel will prevent a party from litigating a fact or

issue requires five threshold requirements be met:

> **First**, the issue sought to be precluded from relitigation must be identical to that
> decided in a former proceeding. **Second**, this issue must have been actually litigated
> in the former proceeding. **Third**, it must have been necessarily decided in the
> former proceeding. **Fourth**, the decision in the former proceeding must be final and
> on the merits. **Finally**, the party against whom preclusion is sought must be the
> same as, or in privity with, the party to the former proceeding.

Lucido v. Superior Court (People), 51 Cal.3d 335, 341 (Cal. 1990); See also In re Harmon at

1245; Murphy v. Murphy, 164 Cal. App. 4th 376, 78 Cal. Rptr. 3d 784 (2008).

The scope of issues and facts that a party can be collaterally estopped from relitigating

require that the court weigh the equities in applying the doctrine:

1
2
3
4

> Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings?

5    Burdette v. Carrier Corp., 158 Cal.App.4th 1668, 1689, 71 Cal.Rptr.3d 185, 201 (2008).

6    If these requirements are met, the court must then consider whether application of

7    collateral estoppel will further the public policies underlying the doctrine: "(1) to promote

8    judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments

9    which undermine the integrity of the judicial system; and (3) to provide repose by preventing a

10   person from being harassed by vexatious litigation." People v. Taylor, 12 Cal.3d 686, 695 (Cal.

11   1974); Lucido at 343. While the State Court proceeding did not involve the narrow issue of

12   dischargeability,

13
14
15

> [t]he fact that different forms of relief are sought in the two lawsuits is irrelevant, for if the rule were otherwise, litigation finally would end only when a party ran out of counsel whose knowledge and imagination could conceive of different theories of relief based upon the same factual background.

16   Murphy v. Murphy at 400-01; see also Lucido at 342 ("the identical issue requirement addresses

17   whether 'identical factual allegations' are at stake in the two proceedings, not whether the

18   ultimate issues or dispositions are the same").

19   With regard to the State Bar Court decision, incorporated by California Supreme Court

20   Order (Ex. 69 and 79), California law does allow claims preclusion for State Bar Court decisions

21   because the Court was acting in a judicial capacity and resolved disputed issues of fact which the

22   parties had adequate opportunity to litigate. Maltaman v. State Bar, 43 Cal.3d 924, 947 (Cal.

23   1987); Brosterhous v. State Bar, 12 Cal.4th 315, 324 (Cal. 1995). Further, the findings of the

24   California State Bar Court are made on the higher evidentiary standard of clear and convincing

25   evidence. Oney v. Weinbert (In re Weinberg), 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009). Collateral

26   estoppel only applies if the present issue is identical to an issue decided in a prior proceeding, but

27   this requires only that "identical factual issues" are at stake in two proceedings – not whether the

28

ultimate issues or disposition are the same.  <u>Brosterhaus v. State Bar</u> at 324; <u>Lucido</u> at 341-2.

Here, the factual basis for the State Court's determinations of conversion involves determination of certain necessary issues which are identical to those presented in this adversary proceeding.   This included Defendant's agreement to accept a flat fee of $20,000 for his representation of Lee, Defendant's collection and retention of $150,000, and Defendant's refusal to return $130,000 at Lee's demand.[5]  As discussed above, the State Bar Court findings, on a clear and convincing standard, are more extensive on factual issues identical to that presented in this case including, at a minimum:  (1) that Defendant had potential conflicts arising from his joint representation of Lee and ARMS on the same matter; (2) that Defendant failed to disclose these conflicts to Lee or to obtain his knowing consent; (3) that the conflicts of interest prevented Defendant from properly representing Lee, that Defendant promoted the interests of his other client ARMS over Lee, and when Lee was in a highly vulnerable condition; (4) that Defendant operated with a complete disregard for the actual and potential harm to Lee; and (5) that Defendant willfully violated three ethics provisions regarding trust accounting by taking Lee's money and by failing to return it to trust despite a client dispute.   Each of these overarching findings were supported by a number of specific factual issues discussed above (e.g. that Newman prepared the final Arms/Lee agreement for reimbursement of $130,000, that Newman was present when the agreement was signed, that Newman never explained the agreement to Lee and that Newman never disclosed to Lee his intent to keep $150,000 from the settlement at the time Lee signed the Arms/Lee agreement and that Lee would never have signed the agreement if

---

[5]    While the BAP, in reversing, in part, this Court's grant of partial summary judgment, found that the State Court conversion judgment was based on strict liability, the BAP simply noted that some additional evidence would be required to support the state court's finding that the conversion was "wrongful and intentional."   It stated:  "The state court's finding may refer merely to the fact that Newman intended the act of retaining the funds, which was wrongful dominion, and may have no relevance to whether Newman knew the conduct was wrong or whether he consciously disregarded a substantial and unjustifiable risk." (p. 13)  The documentary evidence and testimony at trial demonstrated that the State Court finding of "wrongful and intentional" was fully supported by the evidence. The BAP did confirm these three necessary findings for the State Court judgment.

he knew Newman's intent).   All of these acts were done while Defendant was in a fiduciary

position to Lee.    Many of the findings provide evidence of indications of fraud by Newman.

The State Court trial took five days and included a number of witnesses, including

Defendant.  The State Bar Court trial took three days, included the Court's access to transcripts

from the State Court proceeding and had testimony from over 10 witnesses, including Defendant.

Defendant was a party to both proceedings and represented by counsel.    The findings of the

State Court and State Bar Court effectively establish that Newman misappropriated $130,000

while acting in a fiduciary capacity, that the misappropriation was committed with indications of

fraud, that Newman displayed a reckless disregard for the potential damage to a very vulnerable

client, and that his actions were intentional and wrongful.   Given preclusive effect to those

findings, the Court must find defalcation, embezzlement and willful and malicious act –

precluding discharge.


**C.     THE DEBT OWED TO PLAINTIFF WAS CAUSED BY DEFENDANT'S
         DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY.**

Section 523(a)(4) provides that debts that arise from a debtor's defalcation while acting

in a fiduciary capacity are not dischargeable. A debt is nondischargeable under §523(a)(4)

defalcation, where "1) an express trust existed, 2) the debt was caused by fraud or defalcation,

and 3) the debtor acted as a fiduciary to the creditor at the time the debt was created." Otto v.

Niles (In re Niles), 106 F.3d 1456, 1459 (9th Cir. 1997).

In the Ninth Circuit, an attorney-client relationship may rise to the level of a fiduciary

relationship for purposes of §523(a)(4) if there are client trust funds involved. Stephens v.

Bigelow (In re Bigelow), 271 B.R. 178, 187 (B.A.P. 9th Cir. 2001).  Here, Defendant was Lee's

attorney, and therefore an attorney-client relationship existed.  The State Court found that

Defendant converted Plaintiff's funds from a client trust account, and this Court, in granting

partial summary judgment, and the BAP, on appeal, confirmed that the first and third elements

above are satisfied.  (citing to Banks v. Gill Distrib. Ctrs., Inc., 263 F.3d 862 (9th Cir. 2001)).

As to the second element above, for a debt to be caused by defalcation, the fiduciary must engage in: (1) bad faith, moral turpitude, or other immoral conduct, (2) **intentional improper conduct** or criminally reckless conduct, or (3) conduct in which he, although without actual knowledge of his wrongdoing, was **willfully blind to or consciously disregarded a substantial and unjustifiable risk** that a breach of his duties would result. Bullock v. BankChampaign, N.A., 569 U.S. 267, 274, 133 S. Ct. 1754, 1760 (2013).

While the State Court judgment was found only to have been a strict liability conversion claim, the State Bar Court did include conclusive findings that Defendant acted in bad faith, moral turpitude, or other immoral conduct (justifying the imposition of discipline with aggravating factors), intentional improper conduct, and conduct to which created an unjustifiable risk of harm to his client.  Essentially, the State Bar Court, applying a clear and convincing evidence standard, found every issue necessary for defalcation.  Each of those issues were necessarily decided both with regard to culpability and with regard to the determination of aggravation.

The evidence adduced at trial confirmed the findings of the State Bar Court decision and demonstrated that Defendant met each of the three alternate requirements for defalcation including:  (1) Defendant's representation of both Sang Hoon Lee and his former employer, ARMS, was rife with conflicts of interest, and Defendant never gave a meaningful explanation of the conflicts to either client; (2) Defendant was only in a position to represent Sang Hoon Lee because of the conflicts of interest (Lee would lose substantial economic benefits from ARMS if he hired an independent attorney, and ARMS would be exposed to substantial liability for misclassifying Lee as an independent contractor if its own counsel did not represent Sang Hoon Lee), and his willingness to violate his ethical obligations to his clients, especially Lee; (3) Defendant took all of his direction from ARMS; and none from Lee – including the negotiation of any fee that he would be paid; (4) Defendant drafted agreements between ARMS and Lee

which only benefitted ARMS and never explained the terms to Lee; (5) Defendant had Lee sign a

contingency fee retainer without explaining the terms or other options; (6) Defendant fraudulent

concealed or actively misrepresented material facts to ARMS with full knowledge that the

information would be provided to Lee and relied on by him (including, but not limited to,

concealing the proximity of a $1 million settlement offer at the time he demanded a contingency

fee retainer, misrepresenting the purpose of getting a contingent fee retainer, misrepresenting the

need for a 15% retainer, concealing that he had filled in a 5% retainer which he sent to the

insurance adjustor to begin a dialog, misrepresenting that he would not take the 15% anyways,

misrepresenting that he would agree to a flat fee of $20,000 with ARMS getting $130,000 in

reimbursement for payments and services provided to Lee, concealing that he intended to keep

$150,000 from the settlement – at the time Lee was signing an agreement to reimburse ARMS;

misrepresenting the amount of medical liens by $500,000 in a March 28, 2016 letter to Lee

intended to get Lee to agree to pay Defendant $150,000 from the settlement proceeds); (7)

refusing to return $130,000 to his trust account when Lee disputed amount that Defendant paid

himself from settlement proceeds; and (8) raising a frivolous claim of fee-splitting in order to

effective turn one of his clients against the other.  Both Lee and ARMS believed that Defendant

was representing Lee in his capacity as general counsel for ARMS and under his substantial

salary.  The net result of Defendant's actions was to intentionally and maliciously harm Lee, to

deprive him of funds while he was in a vulnerable condition and to commit various acts

supporting the non-discharge of this debt.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.     THE DEBT OWED TO PLAINTIFF WAS CAUSED BY DEFENDANT'S EMBEZZLEMENT.**

The Ninth Circuit has held that embezzlement under §523(a)(4) requires three elements: (1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991) (internal quotation marks and citation omitted); Phillips v. Estate of Arnold (In re Phillips), BAP No. WW-15-1178-TaKuJu (B.A.P. 9th Cir. Dec. 16, 2016) (emphasis added).  On Lee's motion for partial summary judgment, this Court, affirmed by the BAP, held that the first and second elements were proven in the State Court proceedings for the purposes of collateral estoppel.  The sole issue to be decided in further proceedings whether there were "circumstances indicating fraud."

While this definition requires that one show "circumstances indicating fraud", it is not necessary that all of the elements of fraud be proven in order to prevail under this theory.   Both this Court in granting partial summary judgment and the BAP determined that the State Court's finding that Lee did not prove his fraud claim in not preclusive as to the issue of "circumstances indicating fraud."  As the Ninth Circuit BAP has held: 'the third element of §523(a)(4) embezzlement [fraudulent intent] 'required on indicia of fraud as opposed to proof of all elements of fraud.'"

> The state court's findings and conclusions demonstrate[d] numerous indicators of fraud including "intentional conversion of Banana's funds", self-dealing, the complete lack of disclosure to Arnold of the improper payments, the lack of a business purpose for the improper payments, the lack of records and invoices, clear and convincing evidence of bad faith, and mislabeling the payment of a substantial finder's fee in order to avoid disclosure to Arnold.

> In re Phillips, at *7 (citing to the transcript of the state court proceeding).

Here, the circumstances indicating fraud are substantial and pervasive.  Defendant, as a fiduciary, committed constructive fraud by withholding material information about his substantial conflicts of interest in jointly representing Lee and ARMS on the same matter, his inability to properly assert Lee's claims and rights as a result of the conflict, the likelihood and

imminence of obtaining a $1 million settlement at the time that he demanded a contingency fee retainer agreement, and his intent to keep 15% from the settlement proceeds which exposed Lee to a $130,000 debt to ARMS. See Warner Construction Corp. v. L.A., 2 Cal.3d 285, 294 (1970). Defendants active misrepresentations included stating that the purpose of the contingency fee agreement was to allow him to talk with the Belena adjustor, that he did not intend to take the 15% contingency fee (at a time when he knew the contingency fee agreement could be canceled with Defendant receiving nothing), and that Lee's medical liens were approximately $20,000 (in his March 28, 2016 letter intended to get Lee to confirm that Defendant was entitled to $150,000). Lee had no way of discovering the information withheld or the active misrepresentations. To the extent that Defendant made false statements to ARMS, he knew the information would be relayed to and relied on by Lee. Under California law, Defendant's false representations or fraudulent concealment directed at ARMS, with knowledge that it will be provided to Lee, is fraud perpetrated on Lee.[6] (CACI 1906 and authority cited therein).

---

[6]    It is true that in order for a defendant to be liable for fraud, he or she must intend that a particular representation (or concealment) be relied upon by a specific person or persons. However, it is also established that a defendant cannot escape liability if he or she makes a representation to one person while intending or having reason to expect that it will be repeated to and acted upon by the plaintiff (or someone in the class of persons of which plaintiff is a member). (Shapiro v. Sutherland, 64 Cal.App.4th 1534, 1548 (Cal. Ct. App. 1998); see also Geernaert v. Mitchell, 31 Cal.App.4th 601, 605-06 (Cal. Ct. App. 1995)) • "[L]iability for a fraud worked on an agent is imposed where it is the agent who not only places reliance on the misrepresentations, but also makes the decision and takes action based upon the misrepresentations." (Hasso v. Hapke, 227 Cal.App.4th 107, 129 (Cal. Ct. App. 2014)) • "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transactions involved." (Hasso, supra, at p. 130.)

Throughout these events, Defendant engaged in fraudulent behavior to accomplish his ends of taking Lee's money. These facts strongly support a finding that the debt at issue is the result of Defendant's embezzlement.

**E.    THE DEBT OWED TO PLAINTIFF WAS CAUSED BY DEFENDANT'S WILLFUL AND MALICIOUS INJURY TO PLAINTIFF'S PROPERTY.**

Bankruptcy Code section 523(a)(6) excepts from discharge "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6).  A creditor must prove both willfulness and malice. Ormsby v. First Am. Title Co. of Nev., 591 F.3d 1199, 1206 (9th Cir. 2010). The "willful injury requirement is met only when the debtor has a subjective motive to inflict injury *or* when the debtors believes that injury is substantially certain to result from their own conduct." Carillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002).

To prevail on a section 523(a)(6) claim arising from a California conversion judgment, a creditor must "first establish that a conversion has occurred under California law, and second that the conversion was willful and malicious." Comcast of L.A., Inc. v. Sandoval (In re Sandoval)*, 341 B.R. 282, 295 (Bankr. C.D. 2006).

However, the Court held that this was no longer the law since the United States Supreme Court in Kawaauhau v. Geiger, 523 U.S. 57 (1998) clearly stated that "not every tort judgment for conversion is exempt from discharge. Negligent or reckless acts... do not suffice to establish that a resulting injury is 'willful and malicious'". Kawaauhau at 63-64 (citing Davis v. Aetna Acceptance Co., 293 U.S. 328 (1934)).  This Court may determine that Defendant, who naturally had awareness of the economic value of the money he "intentionally" converted, carried a belief that injury was "substantially certain" to result from his conversion. In re Jercich, 238 F.3d 1202, 1208 (9th Cir. 2001).

As to the malice prong, a plaintiff must show that a defendant committed (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause

or excuse. Id.  "When a wrongful act such as conversion, done intentionally, necessarily

produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof

of a specific intent to injure." In re Littleton at 554.  Accordingly, the Court rejected that such a

per se rule exists and held that "[a] judgment for conversion under California law therefore does

not, without more, establish that a debt arising out of that judgment is non-dischargeable under §

523(a)(6)." In re Peklar, 260 F.3d 1035, 1039 (9th Cir. 2001); see also Larsen v. Beekmann, 276

Cal.App.2d 185, 189 (Cal. Ct. App. 1969) ("a conversion is not per se always a willful and

malicious injury to the property of another.").

　　　　The "without more" that was missing from Peklar is present here.  In addition to the State

Court judgment and its findings, the State Bar Court filled in the other requisite findings when it

imposed discipline against Defendant for willful ethical violations with substantial aggravating

factors and ordered restitution of $130,000 plus interest to Lee.  The evidence is overwhelming

on the issue of conflicts of interest, the negative impact on Lee's rights, damage to Lee (a

vulnerable client), Defendant's refusal to take responsibility, and his blatant disregard for his

fiduciary responsibilities and duty of loyalty to Lee.  The State Bar Court further found all of the

necessary elements to demonstrate that this conduct was intentional and done with reckless

disregard to the certainty that Lee would be harmed.

1

### III

2

### CONCLUSION

3      Wherefore, for the reasons set forth above, and in the interests of justice, Plaintiff

4   respectfully requests that this Court order the amendment of Plaintiff's complaint pursuant to

5   FRCP 15(b) to conform to proof at trial as to the State Bar Court decision, supporting findings,

6   and restitution award.

7      Plaintiff further respectfully requests that this Court find, based on the legal principle of

8   collateral estoppel as it applies to the State Court Judgment and State Bar Court decision, the

9   testimony at trial, and all the evidence submitted, that the debt owed to Plaintiff is non-

10  dischargeable under Bankruptcy Code sections 523(a)(4) and 523(a)(6).

11

12                                          NEXUS BANKRUPTCY

13

14  Date: December 20, 2023

                                            BENJAMIN HESTON,
15                                          Attorney for Plaintiff

16

17                                          LAW OFFICES OF RICHARD A. LUCAL

18

19  Date:  December 20, 2023

                                            RICHARD A. LUCAL,
20                                          Attorney for Plaintiff

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**3090 Bristol Street #400
Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **PLAINTIFF'S CLOSING BRIEF AND REQUEST FOR ORDER AMENDING THE COMPLAINT TO CONFORM TO PROOF AT TRIAL UNDER FRCP 15(B)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:
Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 12/20/2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Suzanne C Grandt    suzanne.grandt@calbar.ca.gov, joan.randolph@calbar.ca.gov
Howard B Grobstein (TR)    hbgtrustee@gtllp.com, C135@ecfcbis.com
Donald W Reid    don@donreidlaw.com, 5969661420@filings.docketbird.com
United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov

☐  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 12/20/2023 I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed (state method for each person or entity served):

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/20/2023 | Benjamin Heston | /s/Benjamin Heston |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**