**FILED & ENTERED**

**MAR 11 2024**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY craig    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>Michael Paul Newman,<br><br>                              Debtor.<br><br>Chloe Taekyeong Lee, Trustee of the Sang Hoon Lee Living Trust,<br><br>                              Plaintiff,<br><br>v.<br><br>Michael Paul Newman,<br><br>                              Defendant. | Case No. 6:21-bk-11329-SC<br><br>Chapter 7<br><br>Adversary No. 6:21-ap-01071-SC<br><br>**MEMORANDUM DECISION AFTER TRIAL**<br><br>**Trial:**<br>Date: October 30, 2023<br>Time: 9:30 a.m.<br>Courtroom 5C<br>411 W. Fourth Street<br>Santa Ana, CA 92701 |

On October 30, 2023, a trial was held in the above-captioned adversary proceeding.[1] Benjamin R. Heston, Esq. and Richard A. Lucal, Esq. appeared for Chloe

---

[1] A trial transcript was entered on the docket December 1, 2023, as Dk. 96. All references to the transcript will be referenced by page number as shown in the docket header at the top center of each page, line number, and the witness testifying ("Δ" for Defendant, "DH" for David Hudrlik, and "LP" for Lindy Park), as follows: "Trial Tr. at __:__ (Witness)."

1

Taekyeong Lee, Trustee of the Sang Hoon Lee Living Trust,[2] and Donald W. Reid, Esq. appeared for Michael Paul Newman ("Defendant"). Plaintiff's witnesses, Lindy Park and David Hudrlik, as well as Defendant, all appeared, testified, and were cross-examined by the opposing party.

A credible witness is a witness who comes across as competent and worthy of belief. This Court determines witness credibility on many factors. The substance of the testimony is tantamount, as well as the amount of detail and the accuracy of recall of past events. Witness contradiction plays a part in the credibility determination. How the testimony is delivered also has an impact. The Court considers factors including body language, eye contact, and whether the responses are direct or appear to be evasive, unresponsive, or incomplete. In addition, when deciding cases, the Court is permitted to take into consideration its knowledge and impressions founded upon experiences in everyday walks of life.

As detailed below, the Court finds the testimony of Defendant not credible, and the testimony of witnesses Lindy Park and David Hudrlik credible.[3] In reaching these credibility determinations, the Court considered each witness's demeanor as they testified, including the way they held themselves, whether they made or did not make inconsistent statements, and their directness or evasiveness.

At the conclusion of trial, all exhibits were admitted and the Court directed the parties to file closing briefs. After considering the arguments of counsels, the related

---

[2] During the course of this proceeding, Plaintiff Sang Hoon Lee passed away and Plaintiff Chloe Taekyeong Lee was substituted in as the proper plaintiff pursuant to an order entered September 9, 2021, as Dk. 18. The use of the term "Plaintiff" throughout this opinion refers to Sang Hoon Lee.

[3] This Court made its credibility determinations independently, but notes that the State Bar Court reached the same conclusion, finding "… the testimony of all of the witnesses, other than [Defendant], to be highly credible, honest, forthright, direct, and specific…. In contrast, much of [Defendant]'s testimony lacked credibility." Trial Exhibit 79 (State Bar Court Decision) at 5-6. During trial, in response to vague testimony, the Court cautioned Defendant twice: "…I'm also judging credibility of this witness…" [Trial Tr. at 59:16-17] and "You understand I'm judging your credibility – " [Trial Tr. at 63:23-24]. Overall, the Court found Defendant's testimony evasive and unbelievable.

pleadings including post-trial briefs, all evidence admitted during the trial,[4] and based upon the discussion on the record, and for the reasons more fully explained below, the Court finds against Defendant and in favor of Plaintiff on all counts. A separate judgment will be entered concurrently herewith.

## I. Prefatory Statement

This case involves an attorney who had been admitted to the State Bar of California ("State Bar") for approximately one year (Defendant), who engaged in conduct which created a direct conflict of interest with his highly vulnerable client and was subsequently disciplined by the State Bar as a result.

Plaintiff, who spoke limited English, was a truck driver who suffered a serious injury during the course of his employment. Plaintiff's employer arranged for its in-house counsel, Defendant, to represent Plaintiff in connection with his injury, while simultaneously paying Defendant his salary, and later promised an additional $20,000 payment. Plaintiff's employer also provided additional support for Plaintiff, such as $1,000 weekly payments, translation services, the delivery of groceries, and transportation to and from medical appointments. In return, Plaintiff promised to repay his employer $130,000 upon resolution of his claims and waive any claims against his employer.

The evidence at trial indicates that, from any settlement received, Plaintiff understood and agreed that he would pay his employer a total of $150,000 only: $20,000 would be allocated to Defendant and $130,000 would be allocated for reimbursement of expenses.

Defendant, however, took advantage of a contingency fee retainer agreement Plaintiff signed providing for a payment of 15% to Defendant (as opposed to the

---

[4] The parties stipulated to admission of the exhibits on the Amended Joint Exhibit List, filed as Docket 92 on October 26, 2023. Exhibits will be referenced by their number in the Amended Joint Exhibit List as follows: "Ex. ___" The Court relies on all admitted exhibits even if not specifically referenced.

employer) to take and retain funds to which he was not entitled, capitalizing on Plaintiff's vulnerability to do so.

At the beginning of 2016, Defendant had Plaintiff sign a blank contingency fee agreement, representing that it had to be signed for the sole purpose of authorizing the insurance company to negotiate with Defendant. Plaintiff's employer inserted the 15% contingency fee into the agreement and Defendant later confirmed that he would not take that amount.

Thirty-three days later Plaintiff reached an agreement with the insurer for a policy limit settlement of $1,000,000. Relying upon documents he knew were not controlling, Defendant subsequently asserted that he was entitled to, and took, $150,000 (and not just $20,000), which left Plaintiff owing an additional $130,000 to his employer, which was contrary to Plaintiff's agreement. When Plaintiff objected, Defendant refused to return the $130,000, and abruptly terminated his in-house counsel position with his employer.

Plaintiff sued Defendant in the California Superior Court on August 10, 2017, for conversion, fraud, and legal malpractice [JPTS at 3:27-4:1; Ex. 63],[5] and on July 25, 2019, obtained a judgment for conversion in the amount of $130,000, plus interest at 10% from April 8, 2016, which was affirmed on appeal [JPTS at 4:5-5:10; Ex. 67; Ex. 68]. Shortly after the filing of Defendant's bankruptcy on March 15, 2021, Plaintiff initiated this adversary seeking nondischargeability of this debt under 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 523(a)(6) [JPTS at 5:9-10].

Defendant argued, as he did unsuccessfully in both state court and before the State Bar, that he had an oral agreement with Plaintiff for the 15% contingency, above and beyond the funds to which Plaintiff had promised to repay to his employer. The Court finds Defendant's testimony uncredible and unbelievable and finds that

---

[5] Joint Pre-Trial Stipulation, filed April 13, 2023 as Dk. 78. Approved by an order entered October 18, 2023, as Dk. 88. All references to the approved Joint Pre-Trial Stipulation shall be referred by the appropriate page and line number as follows: "JPTS at __:__." The Court relies on all facts admitted in the JPTS even if not specifically referenced.

Defendant engaged in intentionally deceptive and misleading, bad faith conduct. As set forth herein, the Court finds Chloe Taekyeong Lee, Trustee of the Sang Hoon Lee Living Trust has met her burden and judgment should be awarded in her favor and against Defendant.

## II.    Factual Background

### A. Before Settlement

Plaintiff worked for Arms Trans Inc. (d/b/a Arms Logistics, hereinafter "Arms") as a driver [JPTS at 2:6-11]. Arms was owned and operated by Lindy Park and David Hudrlik, who also co-owned Caravan Canopy [JPTS at 2:12-16]. Plaintiff spoke very limited English as his native language was Korean, so Lindy Park and other employees of Arms would, at times, provide translation services [JPTS at 3:3-4; Trial Tr. at 182:9-12 (LP); Trial Tr. at 33:18-34:18 (Δ)]. Defendant worked as in-house counsel for Arms and Caravan Canopy and received a salary from Caravan Canopy [JPTS at 2:12-15; Ex. 26][6].

In December of 2014, Plaintiff was seriously injured in a work-related accident involving two semi tractor-trailers [JPTS at 2:7-11]. The other driver, employed by a different transportation company, Belena Transportation ("Belena"), was found at-fault [JPTS at 2:7-11; Ex. 1 (Police Report)]. After Plaintiff's injury, Defendant alerted Arms that Plaintiff may have been improperly classified as an independent contractor and Arms may be exposed to liability [JPTS at 2:17-20]. Arms agreed to provide various services to Plaintiff, including a weekly payment of $1,000, translation services,

---

[6] Throughout Defendant's representation of Plaintiff, Defendant received his normal compensation as in-house counsel to Arms and Caravan Canopy [Trial Tr. at 276:16-22 (DH); Ex. 26 (Summary of Payments to Defendant from Caravan Canopy)]. Once Defendant began making progress towards settlement of Plaintiff's claim, David Hudrlik offered, on behalf of Arms, to pay Defendant a $20,000 bonus once Plaintiff's matter settled [Trial Tr. at 276:16-20 (DH); Trial Tr. at 292:24-293:16 (DH); Trial Tr. at 197:6-23 (LP)]. Prior to this offer, Defendant was only going to be compensated with his normal salary from Arms [Trial Tr. at 295:15-296:1 (DH)]. Defendant testified that this offer was never made [Trial Tr. at 90:4-7 (Δ)], which testimony the Court finds unbelievable.

5

transportation, and Defendant's representation of Plaintiff on his insurance claim,[7] while simultaneously preparing an agreement for Arms which did not favor Plaintiff.[8] [JPTS at 2:21-26].

Throughout his representation of Plaintiff, Defendant took direction from Lindy Park and David Hudrlik.[9]

On January 20, 2016, Defendant sent an email to David Hudrlik and Lindy Park stating Belena's insurance carrier required a contingency-based retainer agreement in order to speak with Defendant and proceed in processing Plaintiff's claim [JPTS at 3:8-11]. Defendant prepared and provided them with a contingency-based retainer agreement but left the contingency percentage blank, explaining that "[i]t is a contingency based letter although I left blank but standard for personal injury cases. They will not talk to me unless I have this letter." [Ex. 5]. The next day, on January 21, 2016, Lindy Park directed an Arms employee to insert 15% on the agreement (which Plaintiff later signed). [JPTS at 3:12-17].

**B. The Settlement**

On February 25, 2016, Lindy Park sent an email to Defendant, with David Hudrlik copied, advising that Plaintiff would be willing to settle with Belena for a policy-limit offer of $1 million [Ex. 10]. The email also asked a series of questions for Defendant to answer, including "Do we need to change the agreement between you [Defendant] and SANG [Plaintiff] as It currently says 15% on that agreement." [*Id.*] Defendant responded, "**I wouldn't have taken the 15% anyways**, better to leave to show discount." (emphasis added) [*Id.*] However, at trial, Defendant testified that when

---

[7] Unknown to Plaintiff, Defendant took eight tries to pass the Bar, had been admitted to the Bar for approximately one year prior to his representation of Plaintiff, had no litigation experience, and had never handled a personal injury case before [JPTS at 2:27-3:2; Trial Tr. at 62:14-25 (Δ)].
[8] Defendant testified at trial that he believed this agreement alleviated any conflict of interest between his representation of Plaintiff and Arms. The State Bar Court found this to be an unwaived conflict of interest. *See* Ex. 79 (State Bar's Decision) at 20-26.
[9] *See* Trial Tr. at 273:19-274:10 (DH) (testifying that Defendant was working on the insurance claim at the direction of Lindy Park); Trial Tr. at 249:9-17 (LP) (testifying that she "never felt that, at any moment, [Defendant] was representing [Plaintiff], nor was he representing [Plaintiff] and Arms. [She] always felt he was representing Arms.")

6

he sent this email saying he would not take a fifteen percent contingency, it *was* his intent to take fifteen percent.[10]

Had there been an agreement for a fifteen percent contingency fee, (a) there is no reason Defendant would have omitted that information from Lindy Park or David Hudrlik as the evidence at trial indicated Defendant regularly discussed his representation of Plaintiff with them, including discussions regarding Defendant's fees,[11] (b) Lindy Park would have no reason to have sent this email since the contingency fee agreement would have accurately reflected their agreement, (c) Defendant would have no reason to deny his intent to take a contingency fee in his response, and (d) Lindy Park would have known about the agreement.

The testimony at trial was that on February 23, 2016, Defendant reached an agreement with Tom Lyans, the insurance adjustor for Belena, for a settlement. [Trial Tr. at 80:4-82:2 (Δ)]. Belena settled Plaintiff's claim for the policy limit of $1,000,000 [JPTS at 3:18-23].

On March 16, 2016, Plaintiff signed a contract to repay Arms for the services provided, including the $1,000 weekly payments [Ex. 16], which also contained a release of liability preventing Plaintiff from suing Arms ("March 16 Agreement") [*Id.*] This agreement did not favor Plaintiff. At Arms' request, Defendant prepared the initial drafts of the March 16 Agreement but did not draft the final version that Plaintiff signed, obligating him to repay $130,000.[12] [Trial Tr. at 82:25-84:8 (Δ)].

---

[10] "[Richard Lucal, attorney for Plaintiff]: [A]t the time you sent that e-mail to Lindy Park saying, 'I would [sic] have taken the 15 percent anyway,' it was your intent to always take the 15 percent, correct? [Defendant]: Correct." Trial Tr. at 89:19-22 (Δ).

[11] Defendant testified that, except for one meeting in April where only he and Plaintiff were present, all fee discussions went through Lindy Park and/or David Hudrlik. *See* Trial Tr. at 37:6-10 (Δ). Had Plaintiff and Defendant reached an agreement regarding a fifteen percent contingency fee, it would have been decided long before the April meeting as settlement funds had already disbursed by April. *See also* Trial Tr. at 34:11-18 (Δ) (testifying he primarily communicated with Plaintiff only through Lindy Park).

[12] Defendant's drafts and the final signed version are very similar. The original draft required only repayment of the weekly $1,000 payments. Ex. 13. The second draft added a hold-harmless provision. Ex. 14. The final signed version that Defendant avers he did not draft is extremely similar to the second draft, but changed the description of services Arms provided and changed the repayment requirement to a specific dollar amount, $130,000. Ex. 16. David Hudrlik testified that he believes Arms actually provided Plaintiff over $130,000 in total services. Trial Tr. at 296:7-8 (DH).

7

On March 28, 2016, Defendant sent Plaintiff a letter summarizing Plaintiff's outstanding bills and liens which listed, among other things, a fifteen percent retainer owed to Defendant's law office and a $130,000 payment to Arms [Ex. 17; JPTS at 3:18-23]. Every item listed is shown with a dollar value except the contingency to Defendant's law office, which was expressed as a percentage (i.e., "15%").[13] [Ex. 17] The letter also significantly misrepresented Plaintiff's medical bills at less than $20,000, whereas Defendant knew they were at least $462,540.34 [*See*, Defendant's June 15, 2015, demand letter sent to Belena's insurer depicting total medical bills of $462,540.34 at Ex. 3; Ex. 17]. No negotiation of medical bills had taken place between sending these letters, so Plaintiff still owed the full amount identified in the demand letter [Trial Tr. at 103:11-22 (Δ)]. At trial, when asked about the discrepancy, Defendant did not respond, and stated that the purpose of his March 28, 2016 letter was to determine what the $130,000 owed to Arms was for, and to confirm his contingency fee.[14] [Trial Tr. 103:11-105:21 (Δ)], which testimony the Court finds not credible.

### C. After the Settlement

On March 30, 2016, the $1,000,000 settlement (the "Settlement Funds") was deposited into Defendant's client trust account [Ex. 22; Trial Tr. at 32:6-9 (Δ)]. On April 8, 2016, Defendant transferred $150,000 into his law office's general operating account and sent a $100,000 check to Plaintiff [PTJS at 3:24-26; Ex. 22]. Around the same time, Defendant began negotiating Plaintiff's medical bills.[15] On April 12, 2016, Defendant

---

[13] Of the twelve accounts listed that Plaintiff allegedly owed money to, eight included a value expressed in dollars including "11. Arms Trans, $130,000," three expressed that the amount owed was unknown, and only the last item was expressed in a percentage: "12. The Law Office of Michael P Newman, 15%." Ex. 17.

[14] Defendant's testimony is not believable. First, Defendant drafted the original versions of the contract which included repayment to Arms, it just did not include a final repayment amount of $130,000. *See* Ex. 14. Defendant was physically present in the room when Plaintiff signed the release agreement obligating him to repay Arms $130,000 and even took the original document, leaving Arms with a copy. *See* Trial Tr. at 87:8-88:19; Ex. 16. Second, his testimony seeking confirmation of a 15% contingency fee agreement is not credible, for the reasons previously articulated.

[15] Defendant was unable to identify when he began negotiating medical bills, but stated none had been negotiated when Defendant transferred the $150,000 to his general fund on April 8, 2016. Trial Tr. at 174:3-6 (Δ). The earliest evidence of Defendant negotiating medical bills is Ex. 33, a fax he sent on April 7, 2016, requesting an itemized bill from a medical provider.

completed a lease application for a new law office, listing $120,000 cash on hand and $150,000 in annual income.[16]

Sometime between then and July 11, 2016 (the record is not clear as to when), Plaintiff expressed to Lindy Park his dissatisfaction about owing both $150,000 to Defendant and $130,000 to Arms [Trial Tr. at 203:1-204:1 (LP); Trial Tr. 284:2-10 (DH)]. Lindy Park relayed Plaintiff's concerns to David Hudrlik, who sent Defendant an email on July 11, 2016, with Lindy Park copied, to reiterate the understood agreement: Plaintiff would pay Arms $150,000, which would be used to refund Arms $130,000 and pay Defendant $20,000 [Ex. 18; Trial Tr. at 205:2-13 (LP); Trial Tr. at 294:25-295:21 (DH)]. David Hudrlik specifically brought attention to the fifteen percent fee Defendant included in Defendant's statement of outstanding bills and said "That is not what he [Plaintiff] understood based upon the below email and what was explained to him in Korean. Hoon [Plaintiff] will be here Wednesday at 1pm to discuss. Lindy [Park] will be here to translate of [sic] you need." [Ex. 18]. Defendant testified that he doesn't believe he responded to this email.[17] [Trial Tr. at 119:14-25].

The day before the scheduled meeting with Plaintiff, Defendant arrived at Arms' office, met with David Hudrlik, and abruptly resigned from Arms and Caravan Canopy [Trial Tr. at 284:13-285:6 (DH)]. After Defendant announced his resignation, David Hudrlik told Defendant that he needed to return the $150,000 to Plaintiff, either through David Hudrlik or directly [*Id.*] Defendant responded that this constituted fee

---

[16] Defendant's testimony confirmed the $120,000 "cash on hand" came from the Settlement Funds but could not recall what he had done with the remaining $30,000 during the four days between taking the $150,000 and completing the lease application. Trial Tr. at 113:2-15 (Δ). The Court does not find credible the testimony that Defendant, who received an annual salary of approximately $65,000 to $77,000 according to Ex. 26, cannot recall what he did with $30,000 in four days. *See* Ex. 62 (lease application).

[17] The Court presumes Defendant did not, as if this information was incorrect, this is the type of email to which Defendant, as an attorney, would have responded. Here, under these circumstances, the Court infers that silence is consent. *See, e.g.*, Circuit City Stores, Inc. v. Najd, 294 F.3d 1104, 1109 (9th Cir. 2002).

splitting and was prohibited for attorneys.[18] [*Id.*] Defendant left, leaving all files and belongings behind [*Id.*]

On August 2, 2016, Defendant sent Plaintiff a letter terminating representation accompanied with a final check for $608,808.45 and an accounting [Ex. 19]. The accounting showed $141,234.76 total paid towards medical bills, $100,000 distributed earlier to Plaintiff, $150,000 in legal services, and $42.21 earned in interest, bringing Plaintiff's total net payout to $708,808.45 [*Id.*]

On August 23, 2016, Plaintiff sent an email to Defendant seeking information about his settlement [Ex. 20]. Plaintiff stated he understood Arms was to be repaid $130,000 and Defendant was to be paid by Arms [*Id.*] Plaintiff did not understand why Defendant had deducted fifteen percent and not paid Arms [Ex. 20; Trial Tr. at 206:19-24 (LP)]. Plaintiff told Defendant he needed to be reimbursed the $130,000 [Ex. 20], demonstrating Plaintiff's knowledge and understanding that Arms was to be paid $130,000 and Defendant was to be paid $20,000, not a separate fee of $150,000. Defendant replied, "Sorry that you feel that there is a problem with the fees. I would suggest that you Contact the fee arbitration service that is provided through the California bar. If you request It, It would be mandatory for me to participate and they would be able to answer your questions." [Ex. 20].

**D. State Court, Appeal, and Bankruptcy**

Plaintiff sued Defendant in the California Superior Court on August 10, 2017, for conversion, fraud, and legal malpractice [JPTS at 3:27-4:1; Ex. 63]. The legal malpractice claim was disposed of during trial on a motion from Defendant for non-suit [JPTS at 4:2-3]. On July 25, 2019, following a five-day trial that occurred in March and

---

[18] The Court questions Defendant's characterization of returning the $150,000 as constituting fee splitting when Defendant was apparently unable to identify the direct adversity conflict caused by his simultaneous representation of Plaintiff and Arms despite twice taking and passing the professional ethics examination. Trial Tr. at 317:16-318:12. It is equally illogical that Defendant was knowledgeable of rules pertaining to fee splitting yet was unaware that disputed client funds must be returned to a client trust account. The Court infers that Defendant's alleged fee splitting concern was merely an excuse as to why he could not return the money to Plaintiff.

April of 2019, the Superior Court entered judgment for Defendant on the fraud claim and for Plaintiff on the conversion claim, finding Defendant agreed to accept $20,000 for his compensation and the remaining $130,000 was converted [JPTS at 4:2-17; Ex. 67]. It found Defendant "acted intentionally and wrongfully in acquiring and retaining [Plaintiff's] money." [Ex. 67]. Plaintiff was awarded damages of $130,000. [*Id.*]

Defendant appealed to the California Court of Appeals and Plaintiff cross-appealed [JPTS at 4:18-24]. The appellate court's opinion, entered March 4, 2021, affirmed the Superior Court's judgment and awarded costs of appeal to Plaintiff [JPTS at 4:25-5:8; Ex. 68].

On March 15, 2021, eleven days after the Appellate Court issued its decision, Defendant filed this bankruptcy proceeding [JPTS at 5:9-10]. On June 9, 2021, Plaintiff filed this adversary proceeding seeking a determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(4) (on embezzlement and defalcation grounds) and § 523(a)(6).[19]

Plaintiff filed a motion for summary judgment, which the Court granted on the First (§ 523(a)(4) – defalcation) and Fourth (§ 523(a)(6)) claims by an order entered October 13, 2021 [Dk. 25]. That order was reversed by the Ninth Circuit Bankruptcy Appellate Panel ("BAP") by a decision docketed July 19, 2022 [Dk. 63]. The BAP held that this Court improperly applied issue preclusion as the California State Court did not need to find a culpable state of mind in Plaintiff's conversion claim against Defendant, thus making the State Court decision ineligible for preclusive effect over § 523(a)(4) or (a)(6).[20] The case was remanded for further proceedings. As noted above, trial occurred on October 30, 2023. As set forth herein, this Court finds in favor of Plaintiff and against Defendant on all counts.

---

[19] The complaint also sought a determination of nondischargeability on larceny grounds under § 523(a)(4), but this claim was voluntarily dismissed by Plaintiff in a stipulation filed as Dk. 41 on November 9, 2021, and approved by an order entered as Dk. 42 on November 9, 2021.

[20] "[B]ecause a conversion claim under California law does not require a culpable state of mind, any finding of culpability was entirely unnecessary to the Conversion Judgment and, thus, not entitled to preclusive effect. Without undisputed facts sufficient to establish [Defendant]'s culpable state of mind, summary judgment was inappropriate. Dk. 63 at 2-3.

### III. The First Claim for Relief – Defalcation While Acting as a Fiduciary - 11 U.S.C. Section 523(a)(4)

A debt is nondischargeable under § 523(a)(4) defalcation where "1) an express trust existed, 2) the debt was caused by fraud or defalcation, and 3) the debtor acted as a fiduciary to the creditor at the time the debt was created." *Otto v. Niles (In re Niles),* 106 F.3d 1456, 1459 (9th Cir. 1997).

In the Ninth Circuit, an attorney-client relationship may rise to the level of a fiduciary relationship for purposes of § 523(a)(4) if there are client trust funds involved. *Stephens v. Bigelow (In re Bigelow)*, 271 B.R. 178, 187 (B.A.P. 9th Cir. 2001). When an attorney representing a client holds client funds in a trust account, an express trust is created and the attorney becomes the client's fiduciary.[21] Here, Defendant was Plaintiff's attorney, and an attorney-client relationship existed.[22] The State Court found that Defendant converted Plaintiff's funds from a client trust account,[23] and Defendant testified at trial the settlement funds were deposited into a client trust account.[24] Accordingly, the first and third elements above are satisfied[25].

As to the second element, for a debt to be caused by defalcation the fiduciary must engage in: (1) bad faith, moral turpitude, or other immoral conduct, (2) intentional improper conduct or criminally reckless conduct, or (3) conduct in which he, although without actual knowledge of his wrongdoing, was willfully blind to or consciously disregarded a substantial and unjustifiable risk that a breach of his duties would result. *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274, 133 S. Ct. 1754, 1760 (2013).

---

[21] The BAP decision, Dk. 63, found elements (1) and (3) satisfied, stating "[t]he attorney-client relationship between the parties is sufficient to establish the first and third elements of the claim because the state court found that Newman converted Lee's funds from a client trust account. Dk. 63 at 12. *See Banks v. Gill Distrib. Ctrs., Inc.*, 263 F.3d 862 (9th Cir. 2001) (holding that an express trust and fiduciary relationship are satisfied when an attorney deposits a client's trust funds into his trust account)."
[22] *See* JPTS at 2:25-26 ("When [Defendant] took on [Plaintiff]'s representation, a fiduciary attorney-client relationship was created.")
[23] *See* Ex. 67 at 7 (finding Defendant created a trust account to hold settlement funds); Ex. 67 at 13 (finding Defendant converted funds from that trust account).
[24] *See* Trial Tr. at 102:13-19 (Δ).
[25] *See also* footnote 21.

Defalcation requires a "culpable state of mind." *Id*. at 269. A fiduciary's conduct is intentional if he knows the conduct is improper or he "consciously disregards (or is willfully blind to) a substantial and unjustifiable risk." *Id*. at 274 (cleaned up).

This element is met. Defendant's version of events is not believable. The Court finds that the evidence establishes Defendant knew his conduct consisted of (1) bad faith, moral turpitude, or other immoral conduct, (2) intentional improper conduct or criminally reckless conduct, or (3) conduct in which he, although without actual knowledge of his wrongdoing, was willfully blind to or consciously disregarded a substantial and unjustifiable risk that a breach of his duties would result.

The evidence establishes that Defendant took advantage of a vulnerable person for the purpose of obtaining $130,000 to which he was not entitled. As part of Defendant's employment, he was tasked with representing Plaintiff in connection with Plaintiff's personal injury action. Consistent with this representation, the undisputed evidence is:

- Defendant was paid a salary.
- The contingency fee retainer agreement was originally executed on January 20, 2016, with the contingency portion blank for the purposes of permitting Defendant to negotiate with the insurer.
- Lindy Park coordinated translation services for Plaintiff.
- Defendant did not engage in substantive communications with Plaintiff in the absence of Lindy Park or another translator.
- Lindy Park determined the 15% contingency fee amount and had it inserted into the retainer agreement.
- Defendant sent an email in which he said he would not have taken the 15% contingency amount – and better to leave it in, showing a discount (i.e., the Court interprets that statement as the $20,000 to which he had agreed was a discount from the 15%).

13

- A settlement was reached with the insurer 33 days after issuance of the retainer agreement.

The evidence indicating that Defendant knowingly and willfully took advantage of Plaintiff:

- Both Lindy Park and David Hudrlick testified that Defendant, in addition to his regular salary, would only receive $20,000 for the representation.
- Defendant took direction from Lindy Park and/or Mr. Hudrlik.
- Defendant testified that the 15% contingency fee agreement with Plaintiff was valid and constituted the memorialization of an oral agreement with Plaintiff. This testimony is simply not credible. Lindy Park instructed that the 15% be inserted.  Defendant's own emails indicate that he never intended on accepting 15%. And, Plaintiff required a translator for legal matters, thus rendering the existence of any oral agreement with Defendant, who could provide no particulars of such oral agreement, unbelievable.
- With respect to the final accounting, Defendant was aware that Plaintiff required translator services, yet did not have the March 28, 2016 letter translated when he presented the "accounting" indicating a 15% contingency disbursement to Plaintiff. In that same letter, Defendant represented that the outstanding medical bills were only $20,000, as opposed to $462,540, which was previously represented by Defendant himself, in a letter from June of 2015. When asked about the discrepancy, Defendant testified that he wanted an explanation as to the $130,000 payment to Arms, which is unbelievable, since Defendant was present when that agreement was signed, kept the original agreement, and had drafted the original versions.

- Defendant refused to meet with Plaintiff at a scheduled meeting to discuss the "accounting" when Plaintiff raised a concern to Lindy Park and/or David Hudrlik, instead abruptly resigning from his employment, without even clearing out his office.
- When Plaintiff reached out directly to Defendant to discuss the "accounting," Defendant told Plaintiff, an injured, non-English speaker, to go to State Bar arbitration.

The Court finds, based upon the evidence before it, that Plaintiff never agreed to pay a 15% contingency fee agreement to Defendant. When asked why he left the January 20, 2016, version blank, Defendant testified he wanted someone at Arms to "put the numbers in there,"[26] though both Lindy Park and David Hudrlik were unaware of any valid contingency agreement,[27] and Defendant's own email to Lindy Park and David Hudrlik stated he "wouldn't have taken the 15% anyways." [Ex. 10]. Defendant essentially argues he wanted someone at Arms to confirm the terms of an alleged oral agreement of which they had no knowledge.

Lindy Park and David Hudrlik both credibly testified that, despite the retainer letter, the agreement was that Defendant would negotiate and repay Plaintiff's medical bills, repay $150,000 to Arms, then disburse the remainder to Plaintiff. $130,000 would remain with Arms to refund their payments and services rendered to Plaintiff, and Defendant would get the remaining $20,000. Both Lindy Park and David Hudrlik denied that there had been any discussion or agreement that Defendant would get an additional fee or contingency beyond his salary and the additional $20,000. Lindy Park and David Hudrlik both testified that Plaintiff shared this understanding and never intended for any other payment to be made to Defendant [Trial Tr. at 180:19-25 (LP);

---

[26] Trial Tr. at 41:7-9 (Δ).
[27] *See* Trial Tr. at 180:19-25 (LP) (testifying Defendant never claimed additional compensation for Plaintiff's claim); Trial Tr. at 279:13-17 (DH) (testifying that Defendant never expressed intent to take fifteen percent).

Trial Tr. at 279:13-17 (DH)]. Plaintiff's email objecting to the retention of $150,000 and request for the return of $130,000 corroborates this understanding.

The evidence and testimony demonstrate that Defendant did not intend the January 20-21, 2016, retainer agreement to be a valid agreement as between Defendant and Plaintiff.  While Defendant included a reference to the 15% contingency in his March 28, 2016 "accounting" letter to Plaintiff, the purpose of which he states was confirmation of his 15% retainer agreement, if true, would have been unnecessary if the January 2016 agreement were valid. When the March 28, 2016, letter was sent, Defendant had already reached a $1,000,000 settlement, and there was no reason not to include the dollar amount, $150,000, on the letter. The inclusion of a percentage (15%) was undoubtedly confusing to a non-English speaker, who could not understand legal concepts. Further, this was not translated into Korean.[28]  This letter appears to have been created for the purposes of corroborating Defendant's unbelievable testimony that Plaintiff agreed to a 15% agreement.

From the evidence presented at trial, including the contradictions in testimony, the lack of credibility, and Defendant's decision to resign from Arms one day ahead of the scheduled meeting with Plaintiff to discuss his disputed fee, the Court can infer that Defendant wrongfully and intentionally intended to take funds that rightfully belonged to Plaintiff.  Arms reliably paid Defendant's salary, and Defendant had worked with David Hudrlik for years at various other ventures and companies before Arms [Trial Tr. 265:18-266:2 (DH)]. There is no clear reason for Defendant to resign besides avoiding a meeting with Plaintiff, David Hudrlik, and Lindy Park to discuss his taking of funds from a vulnerable client to which he knew he was not entitled.

The Court finds that the conduct described above demonstrates by a preponderance of the evidence bad faith, moral turpitude, immoral conduct, and

---

[28] Defendant's testimony that he was relying upon Plaintiff's (teenage) daughter to translate is simply not believable. If true (which the Court does not believe), as an attorney, Defendant should have known the substantial risk Defendant was undertaking given the importance of the topic.

intentional improper conduct. Because Defendant's conduct demonstrates bad faith, moral turpitude, immoral conduct, and intentional improper conduct, the final element of defalcation while acting as a fiduciary under 11 U.S.C. § 523(a)(4) is met. The Court finds for Plaintiff Chloe Taekyeong Lee, Trustee of the Sang Hoon Lee Living Trust and against Defendant on this first claim for relief.

### IV.    The Second Claim for Relief – Embezzlement - 11 U.S.C. Section 523(a)(4)

Embezzlement under § 523(a)(4) requires a showing of three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *Transamerica Com. Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991). In bankruptcy proceedings, embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Moore v. U.S.*, 160 U.S. 268, 269 (1895).

Client funds held by an agent of the client are property rightfully in the possession of a nonowner. *First Del. Life Ins. Co. v. Wada (In re Wada)*, 210 B.R. 572 (B.A.P. 9th Cir. 1997) (finding client funds held by a travel agent were property rightfully in the possession of a nonowner). Similarly, Defendant held Plaintiff's settlement funds in a client trust account. Defendant obtained the funds lawfully and was in rightful possession, having been entrusted by Plaintiff to negotiate medical bills then disburse the funds. Accordingly, the first element is satisfied.

The funds were entrusted to Defendant for purposes of (a) negotiating and paying medical bills, (b) paying Arms pursuant to the signed contract, and (3) remitting the remainder to Plaintiff. As established above, the Court finds that Plaintiff did not agree to a fifteen percent contingency to Defendant, in addition to the amounts being paid to Arms. Upon being made aware of a dispute, rather than returning the disputed funds to a client trust account and addressing the matter, Defendant resigned from Arms one day before a meeting with Plaintiff.

In light of these facts, this Court finds that Defendant knowingly and intentionally retained $130,000, for himself (which was a purpose contrary to which they were entrusted) – which was to be used to repay Arms pursuant to Plaintiff's contract with Arms. The second element, appropriation of property to a use other than that for which it was entrusted, is satisfied.

Circumstances indicating fraud or fraudulent intent are present where a party knowingly and wrongly takes something of value from another. *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1205 (9th Cir. 2010). The circumstances set forth above, under the First Claim for Relief, indicate fraudulent intent. Defendant saw a vulnerable client with a large settlement and formed a plan to take advantage of a contingency fee agreement providing for 15% to himself. Defendant's behavior is ripe with circumstances indicating fraud, and this element is satisfied.

The facts reveal Plaintiff's settlement funds were rightfully in the possession of Defendant, were appropriated by Defendant for a use other than that in which they were entrusted, and Defendant's conduct shows evidence of fraud and knowledge of the wrongness of his actions. The Court finds for Plaintiff and against Defendant on the second claim for relief, embezzlement under 11 U.S.C. § 523(a)(4).

### V.    The Fourth Claim for Relief – 11 U.S.C. Section 523(a)(6)

To prevail under § 523(a)(6), a plaintiff must prove three elements: (1) willful conduct, (2) malice, and (3) causation. *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1146-47 (9th Cir. 2002). Section 523(a)(6)'s "willful injury requirement is met only when the debtor has a subjective motive to inflict the injury or when the debtor believes that injury is substantially certain to result from his own conduct." *Ormsby*, 591 F.3d at 1206. In *Ormsby*, the Court determined that the debtor's knowledge of an asset's economic value was sufficient to demonstrate his belief that unauthorized use would be substantially certain to cause injury. *Id.* Therefore, a debtor is charged with the knowledge of the natural consequences of his actions. *Id. See also Patralia v. Jercich (In*

*re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001) (finding withholding of employee wages while the defendant had the ability to pay his employees satisfied the willful requirement).

Defendant knew that taking $130,000 from Plaintiff was substantially certain to result in injury to Plaintiff. As in *Ormsby*, Defendant is charged with knowledge that his unauthorized taking of funds, $130,000, would be substantially certain to cause injury, especially to Plaintiff, a vulnerable client. Defendant is charged with the knowledge of the natural consequences of his actions. *Id*. Defendant's actions meet the willful standard set forth in *Ormsby* as harm to Plaintiff was certain.

As for maliciousness, a plaintiff must show that a defendant committed "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Jercich*, 238 F.3d at 1209. "When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure." *Littleton*, 942 F.2d at 554.

Defendant's act of transferring $130,000 from his client trust account into his firm's general operating fund was a wrongful act. As established above, Defendant did not have Plaintiff's consent and converted the funds to which he was entrusted. For the reasons set forth above, Defendant intentionally engaged in these actions, which necessarily caused injury, without just excuse. Defendant's argument in defense is his alleged oral contract with Plaintiff, which testimony the Court found uncredible and the existence of which is countered by the overwhelming weight of the evidence as discussed above. Defendant has satisfied the elements of willfulness and maliciousness.

Finally, there is no question as to causation. Defendant's conduct was the sole cause of Plaintiff's harm.

Plaintiff's conduct satisfies each element of 11 U.S.C. § 523(a)(6). The Court finds in favor of Plaintiff Chloe Taekyeong Lee, Trustee of the Sang Hoon Lee Living Trust and against Defendant on the fourth and final cause of action.

## VI. Conclusion

In light of the foregoing, the Court finds that Plaintiff Chloe Taekyeong Lee, Trustee of the Sang Hoon Lee Living Trust sustained her burden and proved, by a preponderance of the evidence, that Plaintiff Chloe Taekyeong Lee, Trustee of the Sang Hoon Lee Living Trust is entitled to a judgment, as set forth herein.

A separate Judgment reflecting the foregoing will be issued concurrently herewith.

**IT IS SO ORDERED.**

###

Date: March 11, 2024

Scott C. Clarkson
United States Bankruptcy Judge